THOMAS R. BURKE (State Bar No. 141930)
   thomasburke@dwt.com
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone:  (415) 276-6500
Facsimile:    (415) 276-6599

RAVI V. SITWALA (pro hac vice)
   rsitwala@hearst.com
SARAH S. PARK (pro hac vice)
   Sarah.Park@hearst.com
**THE HEARST CORPORATION**
300 West 57th Street
New York, New York 10019-3792
Telephone: (212) 841-7000
Facsimile: (212) 554-7000

Attorneys for Defendant
FIRST DATABANK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| ALFASIGMA USA, INC.,<br><br>           Plaintiff,<br><br>vs.<br><br>FIRST DATABANK, INC.,<br><br>           Defendant. | Case No. 4:18-cv-06924-HSG<br><br>**DEFENDANTS' SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE**<br><br>DATE:      March 28, 2019<br>TIME:      2:00pm<br>PLACE:   Courtroom 2, 4th Floor |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on March 28, 2019, at 2:00 p.m., or as soon thereafter as this matter may be heard in Courtroom 2 of the United States District Court for the Northern District of California, Oakland Division, located in the United States Courthouse at 1301 Clay Street, Oakland, California 94612, the Honorable Haywood S. Gilliam presiding, Defendant First Databank, Inc. ("First Databank"), by and through its attorneys, will hereby respectfully move the Court for an Order striking Plaintiff Alfasigma USA, Inc.'s ("Alfasigma") Complaint pursuant to the California anti-SLAPP statute, California Civil Procedure Code section 425.16, on the grounds that Alfasigma cannot establish through admissible evidence a probability of prevailing on its claims against First Databank, dismissing the Complaint on the grounds that Alfasigma fails to state a claim under Federal Rule of Civil Procedure 12(b)(6), and striking the request for injunctive relief as patently unconstitutional.

This motion is made upon this notice, the attached memorandum of points and authorities, the declarations of Ravi V. Sitwala and Patrick Lupinetti, all records, papers, and pleadings on file in this action, and all further evidence as may be presented prior to or at the hearing of the motion.

DATED: December 21, 2018

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE

THE HEARST CORPORATION
RAVI V. SITWALA
SARAH S. PARK
    By:      s/ Ravi V. Sitwala
                        Ravi V. Sitwala

Attorneys for Defendant
FIRST DATABANK, INC.

## **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

    I.      FIRST DATABANK'S ROLE AS AN INDEPENDENT PUBLISHER .............. 3

    II.     THE FDA'S GUIDANCE CONCERNING MEDICAL FOODS ........................ 4

    III.    ALFASIGMA'S PRODUCTS AND UNDERSTANDING OF THE LAW ......... 5

    IV.    FIRST DATABANK'S REFINEMENT OF ITS CLASS FIELD
           AND ADDITION OF A PRESCRIPTION PRE-NATAL VITAMIN
           DESCRIPTOR ......................................................................................... 5

    V.     ALFASIGMA'S CLAIMS ........................................................................... 7

ARGUMENT ................................................................................................................... 8

    I.      ALFASIGMA'S STATE LAW CLAIMS SHOULD BE STRICKEN
           UNDER THE ANTI-SLAPP STATUTE ....................................................... 9

         A.    Alfasigma's Claims Are Subject to an Anti-SLAPP Motion ..................... 9

         B.    Alfasigma Cannot Establish a Probability of Prevailing
              on Its Claims .......................................................................... 10

              1.    First Databank's Speech Is Not Subject to Alfasigma's
                    State Law Claims ............................................................ 11

              2.    Alfasigma Cannot Show Any Falsity to Support Its
                    Claims ........................................................................... 15

    II.     ALFASIGMA'S CLAIMS SHOULD BE DISMISSED UNDER
           RULE 12(b)(6) ........................................................................................ 18

         A.    The Lanham Act Does Not Apply to First Databank's
              Non-Commercial Speech ......................................................... 19

         B.    Alfasigma Fails to Plausibly Allege Falsity ................................. 20

CONCLUSION ................................................................................................................ 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariix, LLC v. NutriSearch Corp.*,
No. 17CV320-LAB (BGS), 2018 WL 1456928 (S.D. Cal. Mar. 23, 2018) .............. 12, 13, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 18

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ......................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 18

*Bernardo v. Planned Parenthood Fed'n of Am.*,
115 Cal. App. 4th 322 (2004) ......................................................................................... 11

*Braun v. Chronicle Publ'g Co.*,
52 Cal. App. 4th 1036 (1997) .......................................................................................... 9

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) .......................................................................................... 11

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) .................................................................................... 17, 19

*Dex Media West, Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) .................................................................................... 12, 13

*DuPont Merck Pharm. Co. v. Superior Court*,
78 Cal. App. 4th 562 (2000) ........................................................................................... 10

*Exeltis USA Inc. v. First Databank, Inc.*,
No. 17-CV-04810-HSG, 2017 WL 6539909 (N.D. Cal. Dec. 21, 2017) .............. 6, 10, 12, 18

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ........................................................................................ 19

*Gallagher v. Chipotle Mexican Grill, Inc.*,
No. 15-CV-03952-HSG, 2016 WL 454083 (N.D. Cal. Feb. 5, 2016) ................................... 20

*Gershman v. Bayer HealthCare LLC*,
No. 14-CV-05332-HSG, 2015 WL 2170214 (N.D. Cal. May 8, 2015) ................................ 18

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994) ................................................................................. 19

ii

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) ........................................................................................... 9

*Hunt v. City of L.A.*,
  638 F.3d 703 (9th Cir. 2011) ......................................................................................... 11

*Kelly-Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013)........................................................................................... 19

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014).................................................................................................. 19, 20

*Metabolife Int'l, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001) ......................................................................................... 10

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) .................................................................................................. 13

*Navellier v. Sletten*,
  106 Cal. App. 4th 763 (2003) ........................................................................................ 10

*New.Net, Inc. v. Lavasoft*,
  356 F. Supp. 2d 1090 (C.D. Cal. 2004) ..................................................................... 10, 11

*Rezec v. Sony Pictures Entm't, Inc.*,
  116 Cal. App. 4th 135 (2004) ........................................................................................ 11

*Rimini Street, Inc. v. Oracle Int'l Corp.*,
  No. 2:14-CV-1699-LRH-CWH, 2017 WL 4227939 (D. Nev. Sept. 22, 2017)..................... 20

*Rivera v. First Databank, Inc.*,
  187 Cal. App. 4th 709 (2010) ................................................................................... 10, 11

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)....................................................................................................... 13

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ....................................................................................... 20

*Stutzman v. Armstrong*,
  No. 2:13-CV-00116-MCE, 2013 WL 4853333 (E.D. Cal. Sept. 10, 2013)......................... 11

*Taubman Co. v. Webfeats*,
  319 F.3d 770 (6th Cir. 2003) ......................................................................................... 19

*Taus v. Loftus*,
  40 Cal. 4th 683 (2007) .................................................................................................. 10

*Theodosakis v. Clegg*,
  No. CV-14-2445-TUC-JAS, 2017 WL 1294529 (D. Ariz. Jan. 30, 2017) .......................... 11

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ................................................................................ 11

*Varian Med. Sys., Inc. v. Delfino*,
    35 Cal. 4th 180 (2005) ......................................................................... 9, 10

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................. 9, 10

*Viggiano v. Hansen Nat. Corp.*,
    944 F. Supp. 2d 877 (C.D. Cal. 2013) ...................................................... 18

**Statutes**

Cal. Civ. Proc. Code § 425.16 ....................................................... 3, 9, 10

**Other Authorities**

CMS, Release No. 178 (Oct. 5, 2016), https://www.medicaid.gov/medicaid-chip-program-
    information/by-topics/prescription-drugs/downloads/rx-releases/state-releases/state-rel-
    178.pdf; ............................................................................................... 16

*Frequently Asked Questions About Medical Foods; Second Edition*, FDA (May 2016),
    https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocuments
    RegulatoryInformation/UCM500094.pdf ................................................... 4

IRS, *Affordable Care Act: Questions and Answers on Over-the-Counter Medicines and Drugs*
    (Aug. 2, 2018), https://www.irs.gov/newsroom/affordable-care-act-questions-and-answers-
    on-over-the-counter-medicines-and-drugs ............................................... 16

DEFENDANT'S SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS
CASE NO. 4:18-cv-06924-HSG

## MEMORANDUM OF POINTS AND AUTHORITIES

This case is a direct assault on the First Amendment rights of Defendant First Databank, Inc. ("First Databank"), brought in service of Plaintiff Alfasigma USA, Inc.'s ("Alfasigma") commercial interests.  Alfasigma's Complaint contains numerous misleading allegations which are contradicted by its own allegations made against one of its competitors, Nivagen Pharmaceuticals, Inc., in another litigation it filed in the Eastern District of California.  California's anti-SLAPP statute was designed to weed out exactly this sort of abusive litigation, which directly and intentionally burdens First Databank's constitutional rights.  Alfasigma's federal claims also cannot survive a motion to dismiss under Rule 12(b)(6) given their legal defects and facial implausibility.

The central premise of Alfasigma's Complaint in this case is that its medical food products are "'prescription' pharmaceutical products" and that it is false advertising for First Databank to refuse to describe the products as requiring a prescription in its pharmaceutical reference database.  But, as Alfasigma itself recognizes in its complaint in the *Nivagen* case,[1] it is "literally false" to describe a medical food as "prescription" because the FDA has stated that medical foods cannot legally be labeled as "prescription."  Indeed, Alfasigma claims that its competitor Nivagen is engaged in false advertising by describing its products as "prescription."  In other words, Alfasigma is suing First Databank for false advertising for refusing to state what Alfasigma claims in another case would itself be false advertising.  These shenanigans should not be countenanced by this Court.

First Databank publishes a database of information about pharmaceutical products, including clinical, pricing, and other information about the products.  It has no economic interest in the products, but rather sells subscriptions to the database much like any other publisher.  Its subscribers, in turn, use the information for their own purposes which may (or may not) include payors deciding whether to cover particular pharmaceutical products.

---

[1] *Alfasigma USA, Inc. v. Nivagen Pharm., Inc.*, C.A. No. 2:17-cv-01974-MCE-GGH (E.D. Cal.).

Alfasigma manufactures and sells medical foods.  Medical foods are not drugs and are not governed by FDA regulations concerning drugs.  The FDA has unequivocally stated that only drug products may be labeled as "prescription" under the FDCA, explaining that the federal prescription requirements only pertain to those products and specifically noting that non-drug medical foods cannot legally bear "prescription" labeling.  Notwithstanding this, Alfasigma continues to describe its medical food products as "prescription," even though it recognizes that no prescription is actually required under the law for the products (and that it is illegal to describe them as such).

One of the fields in First Databank's database is called the Class value field.  This field historically distinguished between products labeled as prescription from those that were not.  But after the FDA made clear that non-drug products cannot be labeled as "prescription" in Spring 2016, First Databank revised its editorial policy concerning the field so that it now distinguishes those products that require a prescription under federal law from those that do not (including over-the-counter drugs, medical foods, dietary supplements, and other products to which the federal prescription requirements do not apply).  More recently, First Databank announced that it will be further revising the field next Fall to add an entirely new value that will identify non-drug products such as medical foods and dietary supplements, as distinguished from prescription and over-the-counter drug or device products.

While Alfasigma recognizes in its *Nivagen* complaint that "because medical foods and dietary supplements are not drugs requiring a prescription, they are not eligible for reimbursement by Medicaid or Medicare, nor are they eligible for reimbursement by many private insurers," and has explicitly declared its medical foods to be "non-reimbursable" in that case, in this case it suggests that its medical food products are "often reimbursed by either public or private insurance."  The gravamen of its Complaint in this case is that First Databank's accurate publication that medical foods do not require prescriptions under federal law may lead insurers to choose not to pay for them.  But even if this were true, that would not give rise to any cause of action against First Databank for numerous reasons.

DEFENDANT'S SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS
CASE NO. 4:18-cv-06924-HSG

First, all of Alfasigma's claims only apply to commercial speech—that is, speech that merely proposes a commercial transaction. But First Databank's drug information publication is not commercial speech under any definition—as it is not advertising and does not propose any kind of commercial transaction. (While this Court last year declined to dismiss a similar complaint filed by another manufacturer on this ground, several subsequent decisions from other courts including one concerning the very information at issue here warrant a different result here, as discussed below.) Second, Alfasigma cannot show any falsity either in what First Databank currently publishes or what it has announced it plans to publish late next year. Alfasigma's products do not require a prescription under federal law and this is all that First Databank is stating. Moreover, Alfasigma itself recognizes that the statement it is demanding that this Court compel First Databank to make is literally false and if made in advertising would constitute false advertising. Ultimately, what Alfasigma is challenging is not a statement of fact at all but rather third-party payors' judgments about what should be reimbursed under their own plans. Those judgments cannot create a claim against First Databank. This case should be dismissed.

## FACTUAL BACKGROUND[2]

### I.    FIRST DATABANK'S ROLE AS AN INDEPENDENT PUBLISHER

Defendant First Databank is a publisher of a medication database that provides clinical, descriptive, and pricing data about pharmaceutical products. (Lupinetti Decl. ¶¶ 2-4) First Databank's subscribers include a wide range of entities, from hospitals to pharmacies, drug wholesalers to insurance companies, health plans to pharmacies and more. (*Id.*) The database is created by editors who review, select and include the listed products, with clinical information about the products in addition to pricing and other information. (*Id.*) First Databank is not alleged to (and does not) engage in the development, marketing, or sale of medications, nor does

---

[2] The facts contained therein are drawn from the Complaint and, where expressly cited, the Declaration of Patrick Lupinetti ("Lupinetti Decl.") and the documents attached thereto. The facts from the Lupinetti Declaration are properly before the Court both because they concern matters incorporated by reference into the Complaint or otherwise central to the allegations (*see infra* at 18), and because motions to strike under the anti-SLAPP statute allow evidence to be introduced and require plaintiffs to produce admissible evidence showing that they are likely to prevail on their claims. *See* Cal. Civ. Proc. Code § 425.16(b)(2) (requiring consideration of both supporting and opposing evidence). For ease of reference, some judicial and other public records are attached the Declaration of Ravi V. Sitwala ("Sitwala Decl.").

3

it profit from the sale of any medications—it is simply a publisher of information about them. (*Id.* ¶ 5; *see also* Compl. ¶ 33)  Critically, First Databank does not decide what products are (or should be) covered by payors (whether governmental or private).  (*Id.* ¶ 32)  Instead, it simply publishes descriptive information that payors could use in making their determinations just as its other subscribers may use First Databank's information in making other judgments or determinations.  (*Id.*)

## II.    THE FDA'S GUIDANCE CONCERNING MEDICAL FOODS

In May 2016, the FDA issued guidance about medical foods.  *See Frequently Asked Questions About Medical Foods; Second Edition*, FDA (May 2016), https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocuments RegulatoryInformation/UCM500094.pdf (also provided at Lupinetti Decl., Ex. A).  Medical foods are foods "formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."  *Id.* at 3-4 (citation omitted).  In response to the question "Does FDA require that medical foods be made available by written or oral prescription?," the FDA explained:  "***No.  The requirement for a written or oral prescription*** in section 503(b) of the FD&C Act and its implementing regulations at 21 CFR 201.100 ***only applies to the dispensing of prescription drug products***."  *Id.* at 7 (emphasis added).  The FDA further explained:

> The labeling of medical foods may **not** bear the symbol "Rx only." Section 503(b)(4)(A) of the FD&C Act (21 U.S.C. 353(b)(4)(A)) provides that a prescription drug is misbranded if the label of the drug fails to bear, at a minimum, the symbol "Rx only" to indicate that the product may not lawfully be dispensed without a prescription.  Unlike prescription drugs, medical foods are not required by federal law to be dispensed by prescription.  Therefore, ***the use of the symbol "Rx only" in the labeling of a medical food would misbrand a medical food under section 403(a)(1) of the FD&C Act because it would be a false and misleading statement about that product***.

*Id.* at 8 (emphasis in the last sentence added).

DEFENDANT'S SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS
CASE NO. 4:18-cv-06924-HSG

### III.   ALFASIGMA'S PRODUCTS AND UNDERSTANDING OF THE LAW

Alfasigma sells various medical foods.  According to the Complaint, "Alfasigma's medical foods are marketed to and prescribed by doctors, filled by pharmacists, and reimbursed by insurers . . . ."  (Compl. ¶ 2)  The labeling for the products available on Alfasigma's product websites describes each of the products identified in the Complaint as "a prescription medical food."  (Lupinetti Decl., Exs. K-M; *see also* Compl. ¶ 39 (alleging that its products are "correctly described as prescription products"))

However, in *Alfasigma USA, Inc. v. Nivagen Pharmaceuticals, Inc.*, C.A. No. 2:17-cv-01974-MCE-GGH (E.D. Cal. filed Sept. 22, 2017), Alfasigma has sued one of its competitors for fraud and false advertising, among other things, based in part on Nivagen's "improper[] label[ing of] its product as a 'prescription' product."  (First Am. Compl. [ECF No. 44] ("Nivagen Compl.") ¶ 69 (attached as Sitwala Decl., Ex. O))  The central thrust of Alfasigma's claims in that case is that Nivagen is unfairly competing with Alfasigma's medical food products by marketing an identical product as "prescription" when it is illegal to do so.  (*See generally id.*; *see also id.* ¶ 11 ("Although medical foods are not drugs, and the Federal Food, Drug and Cosmetic Act [] does not require medical foods to be dispensed by prescription, they are intended to be used under the supervision of a physician; thus, medical foods are often dispensed via a prescription, but a prescription is not required."))

### IV.   FIRST DATABANK'S REFINEMENT OF ITS CLASS FIELD AND ADDITION OF A PRESCRIPTION PRE-NATAL VITAMIN DESCRIPTOR

First Databank's database includes numerous fields describing different clinical, descriptive, and pricing information about pharmaceutical products.  One such field is the "Class" value field.  Historically, this field "identifie[d] whether products (including drugs, vitamins, medical foods, bulk drug ingredients and devices) have been designated by manufacturers as 'Rx Only', 'Rx', 'Dispensed by prescription', 'To be used under the supervision of a physician' or other comparable labeling."  (Lupinetti Decl., Ex. C at 2368)  The field used a code of "F" when "[p]roduct labeling indicate[d] prescription or physician

supervision required for use" and a code of "O" when a "[p]roduct ha[d] no labeling indicating dispensing limitations." (*Id.*)[3]

Based on FDA's guidance concerning medical foods and its review of other authorities, First Databank made an editorial decision to revise the definition of its Class value field. Because the FDA made clear that non-drug products could not be labeled as requiring a prescription (and would be misbranded if they were), First Databank determined that such products should not be designated with the "F" Class value, even if labeled as "RX only" or otherwise labeled by the manufacturer as "prescription."[4] Accordingly, in 2016, First Databank revised its definitions of its Class values to limit the "F" value to "[d]rugs that are prohibited by federal law from being dispensed without a prescription; bulk drug ingredients for compounding; prenatal vitamins labeled as prescription; or prescription medical devices," while defining the "O" value to include "[p]roducts with no federal legal prescription requirement, including medical foods, nutritional supplements, non-prescription medical devices and over-the-counter drugs." (Lupinetti Decl., Ex. D at 2504) Based on these definitions, First Databank announced that Alfasigma's products at issue in this case (then sold by its predecessor company) would be given a Class value of "O." (*Id.* ¶ 13 & Exs. F-G)

Later, based on further review concerning prenatal vitamin dietary supplements not at issue here (but subject to several other litigations including one before this Court), First Databank further revised the values so that the "F" value applies to: "Drugs that are prohibited by federal law from being dispensed without a prescription including bulk drug ingredients for

---

[3] Alfasigma misleadingly alleges that the "O" value "signifies that a product is 'Over-the-counter. A prescription is not required per the product labeling.'" (Compl. ¶ 36) But counsel for Alfasigma is well aware that this is not the current definition of the "O" value and has not been for many years. (*See* Lupinetti Decl. ¶ 10) Alfasigma also includes an image from what it describes as First Databank's portal for manufacturers. (Compl. ¶ 41) But the portal is only available to manufacturers who submit products for inclusion in the database, and manufacturers are only able to view information about their own submissions. (*See* Lupinetti Decl. ¶ 17)

[4] Alfasigma cites a letter it alleges to be from the FDA to First Databank concerning medical foods. (Compl. ¶ 45) However, the letter does not take issue with First Databank's conclusion that medical foods are not subject to federal prescription requirements (and in fact confirms it). *See Exeltis USA Inc. v. First Databank, Inc.*, No. 17-CV-04810-HSG, 2017 WL 6539909, at *8 (N.D. Cal. Dec. 21, 2017)

compounding or prescription medical devices," while the "O" value corresponds to: "Products with no federal legal prescription requirement, including medical foods, dietary supplements, non-prescription medical devices and over-the-counter drugs." (Lupinetti Decl., Ex. H at 2529) First Databank also includes a field that identifies whether a given product is designated by its manufacturer as a medical food. (*Id.* at 2504)

In order to further delineate products in the Class value field, First Databank announced earlier this year that it plans to add an entirely new Class value of "Q" late next year. The "Q" value will be given to all non-drug or device products and makes no representation about the prescription status of the products. (Lupinetti Decl., Exs. I-J) The "F" and "O" values will be limited to drug or device products to distinguish prescription drugs or devices from non-prescription ones. (*Id.*)

## V.      ALFASIGMA'S CLAIMS

Alfasigma claims that some insurers have stopped covering its medical foods because of First Databank's change in its Class value field. (Compl. ¶¶ 46-53) In particular, it alleges that one insurer, recognizing that "[f]ederal regulations require medical 'food' be identified as not requiring a prescription" announced that First Databank was classifying all medical foods as over the counter items. (*Id.* ¶ 48) It further claims that "insurers offering insurance plans that previously provided coverage for the Alfasigma Products now mistakenly believe that either the FDA or Alfasigma has determined that the Alfasigma Products are available OTC and not by prescription, and that the Alfasigma Products are no longer subject to prescription insurance coverage and reimbursement." (*Id.* ¶ 49) However, in the Nivagen case, Alfasigma recognizes that "because medical foods and dietary supplements are not drugs requiring a prescription, they are not eligible for reimbursement by Medicaid or Medicare, nor are they eligible for reimbursement by many private insurers." (Nivagen Compl. ¶ 14; *see also* Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction [ECF No. 11] ("Nivagen PI Motion") at 7-8 (attached as Sitwala Dec., Ex. P) ("Nivagen's representations concerning Niva-Fol – that it is a 'prescription dietary supplement' bearing an 'Rx' symbol that 'requires licensed medical supervision,' . . . – are literally false individually

7

and in their overall context, and are false by necessary implication as they falsely represent to payors and customers that Niva-Fol is eligible for government reimbursement.  Nivagen's representations concerning Niva-Fol enable it to unfairly compete against the similar, <u>non-reimbursable</u> products offered by Alfasigma and/or Breckenridge.") (emphasis added); *id.* at 2, 10 (again describing products as "non-reimbursable"))

Alfasigma also takes issue with First Databank's recently announced plan to assign a new "Q" value to medical foods and all other non-drug or device products.  (Compl. ¶¶ 54-58)  But it fails to articulate any claimed inaccuracy, instead simply complaining that medical foods are not "similar to" the other products in the category, such as dietary supplements.  (*Id.*)  While this is irrelevant as it does not make the value false in any way, it is also again inconsistent with Alfasigma's own allegation in another case.  Complaint [ECF No. 1], *Alfasigma USA, Inc. v. EBM Medical, LLC*, C.A. No. 2:17-cv-7753 (Aug. 11, 2017) ¶ 19 (attached as Sitwala Dec., Ex. R) ("As a therapeutic category, medical foods are similar to, but distinct from, both drugs and dietary supplements.").

Alfasigma brings claims under the Lanham Act for false advertising, contributory false advertising, and unfair competition, and claims under state law for false advertising and unfair competition.  Among other relief, Alfasigma asks this Court to compel First Databank to describe its products with the "F" Class value.

## **<u>ARGUMENT</u>**

This case strikes at the heart of First Databank's right to publish accurate information about pharmaceutical products.  Alfasigma does not challenge the fact that federal law does not require its products to be dispensed by prescription.  Yet it seeks to punish First Databank for saying precisely that and asks the Court to compel First Databank to identify its products as prescription products even though the FDA has stated that the products cannot legally be prescription-only products.  This case should be dismissed.

8

## I.   ALFASIGMA'S STATE LAW CLAIMS SHOULD BE STRICKEN UNDER THE ANTI-SLAPP STATUTE

Under the California anti-SLAPP statute, section 425.16 of the California Civil Procedure Code, "a cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." Cal. Civ. Proc. Code § 425.16(b)(1).  The California anti-SLAPP statute broadly protects the discussion of issues of concern to the public by "nip[ping] SLAPP litigation in the bud by striking offending causes of action . . . ." *Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997); *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 192 (2005) (the purpose of the law is "to prevent SLAPPs by ending them early and without great cost to the SLAPP target") (citation omitted).

The Ninth Circuit statute has "long held that the anti-SLAPP statute applies to state law claims that federal courts hear pursuant to their diversity jurisdiction." *Hilton v. Hallmark Cards*, 599 F.3d 894, 900 n.2 (9th Cir. 2010).  California's anti-SLAPP statute provides substantive legal protections for speakers exercising their First Amendment rights. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) ("California law recognizes the protection of the anti-SLAPP statute as a substantive immunity from suit . . . .").

The anti-SLAPP statute "establishes 'a two-step process for determining' whether an action should be stricken . . . ." *See Varian Med. Sys.*, 35 Cal. 4th at 192 (citation omitted). First, "a defendant 'must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech.'" *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003) (citation omitted).  Once that showing is made, the burden shifts to the plaintiff to demonstrate "a probability of prevailing on the claim." *Varian Med. Sys.*, 35 Cal. 4th at 192 (citation omitted).  Each step is discussed below.

### A.   Alfasigma's Claims Are Subject to an Anti-SLAPP Motion

In order to meet its burden of showing that a suit arises from its act of free speech, a defendant must show that plaintiff's claims arise from "any written . . . statement or writing" on

9

a public issue, or "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest."  Cal. Civ. Proc. Code § 425.16(b)(1), (e)(2), (e)(4).

This Court has already held that the anti-SLAPP statute applies to state-law claims challenging the accuracy of First Databank's Class value field.  *Exeltis USA Inc.*, 2017 WL 6539909, at \*11-12; *see also, e.g.*, *Rivera v. First Databank, Inc.*, 187 Cal. App. 4th 709, 717-18 (2010) (applying statute to claims concerning First Databank database); *DuPont Merck Pharm. Co. v. Superior Court*, 78 Cal. App. 4th 562, 566-67 (2000) (applying statute to statements about generic drugs); *Vess*, 317 F.3d at 1101, 1110 (applying statute to information about drugs and diagnosic criteria); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001) (applying statute to statements about drug safety).  The same analysis applies here, as Alfasigma similarly concedes the matters at issue are matters of public interest.  (*See, e.g.*, Compl. ¶¶ 20-32)[5]

**B.     Alfasigma Cannot Establish a Probability of Prevailing on Its Claims**

Under the anti-SLAPP statute, Alfasigma must demonstrate "a probability of prevailing on [its] claim[s]."  *Varian Med. Sys.*, 35 Cal. 4th at 192 (citation omitted).  It cannot rely on the bare allegations of its own pleading to try to show that the complaint would survive a demurrer.  *See Navellier v. Sletten*, 106 Cal. App. 4th 763, 776 (2003).  Instead, it must "establish evidentiary support for [its] claim."  *Id.* at 775-76 (alteration in original) (citation and emphasis omitted).  Specifically, Alfasigma must demonstrate that its claims are "supported by a prima facie *showing of facts to sustain a favorable judgment* if the evidence submitted by the plaintiff is credited."  *Taus v. Loftus*, 40 Cal. 4th 683, 713-14 (2007) (emphasis added) (citation omitted).  Otherwise the court must strike the complaint.  *See* Cal. Civ. Proc. Code § 425.16(b)(1).

For the reasons discussed below, Alfasigma cannot meet its burden on any claim.

---

[5] The anti-SLAPP statute has been held to be inapplicable to federal claims.  *See, e.g.*, *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1115 (C.D. Cal. 2004).  But the same deficiencies discussed with respect to Alfasigma's state law claims mandate dismissed of the Lanham Act claim under Federal Rule of Civil Procedure 12(b)(6).  *See infra* Part II.

### 1.   First Databank's Speech Is Not Subject to Alfasigma's State Law Claims

First Databank's speech at issue—a database of descriptive information concerning pharmaceutical products published by an independent publisher with no stake in those products—is pure non-commercial speech outside of the scope of California's Unfair Competition Law, False Advertising Law, and unfair competition common law.

"California's consumer protection laws, like the unfair competition law, govern only commercial speech." *Stutzman v. Armstrong*, No. 2:13-CV-00116-MCE, 2013 WL 4853333, at *14 (E.D. Cal. Sept. 10, 2013) (quoting *Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140 (2004)). "Noncommercial speech is beyond their reach." *Id.* (quoting *Rezec*, 116 Cal. App. 4th at 140). "Thus, 'lawsuits premised on section 17200 are subject to being stricken because they are barred by the First Amendment where the speech complained of is not commercial speech.'" *Id.* (quoting *New.Net, Inc*, 356 F. Supp. 2d at 1110). Similarly, California's False Advertising law does not apply to non-commercial speech. *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 343 (2004). Common law unfair competition claims are also subject to the same limitations as Lanham Act claims, which include the commercial speech requirement as discussed below. *See Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) (equating common law and Lanham Act standards).

Commercial speech is "speech that does no more than propose a commercial transaction." *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). But the allegations of the Complaint make plain that First Databank's database does not propose any commercial transaction—it is an informational database concerning pharmaceutical products that is fully protected by the First Amendment. (*See, e.g.*, Compl. ¶¶ 22, 24, 27, 33 (alleging that First Databank compiles data from third-party sources and disseminates that data to subscribers for their own use in competition with other drug database publishers)) Regardless of how an audience may use this sort of speech, courts have had no trouble finding that it does not constitute commercial speech. *See Rivera*, 187 Cal. App. 4th at 718; *see also, e.g.*, *Theodosakis v. Clegg*, No. CV-14-2445-TUC-JAS, 2017 WL 1294529, at *19 (D. Ariz. Jan. 30, 2017) (finding educational report on

drug effectiveness not to be commercial speech where the report did not advocate the purchase of any particular drug product), *report and recommendation adopted*, No. 4:14-CV-2445-TUC-JAS, 2017 WL 1210345 (D. Ariz. Mar. 31, 2017).

While this Court found in *Exeltis* that it could not conclude that there was "no reasonable probability" that the plaintiff in that case could show that First Databank's speech is commercial, subsequent authority along with binding circuit precedent support a different conclusion here.  In *Acella Pharmaceuticals, LLC v. First Databank, Inc.*, No. 17-cv-5013 [ECF No. 27] (N.D. Ga. June 4, 2018) (vacated) ("*Acella* Opinion") (attached as Sitwala Dec., Ex. S),[6] the court was faced with various claims challenging information in First Databank's Class value field.  The court held that "Information in First Databank's Database is Not Commercial Speech," as would be required to sustain the manufacturer's claims.  (*Id.* at 30)  The court explained that "the speech at issue in this case (i.e., the change in the classification of Acella's prenatal products from 'F,' indicating products which require a prescription for dispensing, to 'O,' for products with no federal legal prescription requirement) does not propose any commercial transaction," and the plaintiff had not alleged any facts "that would permit a finding that the speech at issue is an advertisement" or that First Databank had any economic interest in the products listed in the database.  (*Id.* at 31)  The court buttressed its holding by citing the Ninth Circuit's decision in *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952 (9th Cir. 2012), as well as *Ariix, LLC v. NutriSearch Corp.*, No. 17CV320-LAB (BGS), 2018 WL 1456928 (S.D. Cal. Mar. 23, 2018).

In *Dex Media*, the Ninth Circuit explained that the "community information and phone listings" in yellow pages directories are obviously non-commercial and that the presence of

---

[6] The district court vacated its opinion after First Databank announced that it no longer intended to proceed with the announced change in publication at issue in the complaint and Acella dismissed its appeal from the order granting the motion to dismiss.  *Acella Pharmaceuticals, LLC v. First Databank, Inc.*, No. 17-cv-5013 [ECF No. 35] (N.D. Ga. June 4, 2018) (attached as Sitwala Dec., Ex. T)  But the court's reasoning remains sound and persuasive.  Incidentally, Acella's sister company Avion filed suit to challenge First Databank's superseding policy using the same counsel.  But instead of suing again in Georgia, where both companies are based (in the same office), Avion filed suit in this Court and ultimately voluntarily dismissed its case.  *See* Plaintiff's Notice of Voluntary Dismissal Without Prejudice Pursuant to Rule 41 [ECF No. 29], *Avion Pharm., LLC v. First Databank, Inc.*, No. 4:18-CV-04224-HSG (Oct. 29, 2018).

third-party advertising in the directories does not render the publications commercial as a whole. *Id.* at 959. Here, as the *Acella* court recognized, First Databank's database does not even contain any advertising, which renders it even clearer that the database is not commercial speech. (*Acella* Opinion at 36) The *Dex Media* court also emphatically rejected the notion that factual directories are entitled to lesser First Amendment protection than newspapers, finding that "[b]oth newspapers and yellow pages directories contain noncommercial speech; a distinction in treatment on the basis of the perceived difference in worthiness of that noncommercial speech is not permitted." 696 F.3d at 965; *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374 (2018) ("[T]his Court has stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'") (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)).

In *Ariix*, the court dismissed pursuant to Rule 12(b)(6) Lanham Act claims against a publisher of a guide concerning nutritional products by a manufacturer alleging that the guide falsely promoted its competitor's products at the expense of the plaintiff's products. 2018 WL 1456928, at *7. The court held that a guide concerning numerous products that are not sold by its publisher, who does not have a financial interest in the sale of the products, is not commercial speech as a matter of law and therefore claims of bias or inaccuracy simply cannot be made under the Lanham Act. *Id.* at *3. The same is true here.

There are several other recent decisions that support resolution of the commercial speech question on the pleadings in this context even under the more forgiving Rule 12(b)(6) standard. In *Liberty Counsel, Inc. v. GuideStar USA, Inc*., the court dismissed a case alleging that a publisher of a database of information about charities falsely advertised that the plaintiff charity was designated as a "hate group" in violation of the Lanham Act. No. 4:17-cv-71 [ECF No. 30] (E.D. Va. Jan. 23, 2018) (attached as Sitwala Decl., Ex. U), *aff'd*, 737 F. App'x 171, 172 (4th Cir. 2018) (affirming on the alternative ground that plaintiff failed to plausibly support allegation of consumer confusion with supporting facts). The court held that the speech in the defendant's database was akin to a consumer report and did not "request or propose a sale of its products or services." *Id.*, Slip. Op. at 8. Instead, the speech at issue was "intended . . . to be an informative

statement . . . ." *Id.* at 9.  The court rejected plaintiff's argument that the defendant's

advertisement of subscriptions to its service made the speech commercial, explaining that the

particular speech at issue "did not offer the reader anything for sale . . . ." *Id.*  Similarly, in

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, the Magistrate Judge has recommended

rejecting on a motion to dismiss the plaintiff's claim that the Southern Poverty Law Center's

("SPLC") designation of it as a "hate group" was commercial speech subject to the Lanham Act.

No. 2:17-cv-00566 [ECF No. 57] (M.D. Ala. Feb. 21, 2018) (attached as Sitwala Decl., Ex. V).

In recommending rejection of the plaintiff's "creative" and "far-fetched" arguments, the judge

found that the designation as a "hate group," while reflecting a "deeply held" and "societally

important" disagreement, "does not request or propose a sale of [SPLC's] products or services"

and therefore was not commercial speech. *Id.*, Slip Op. at 13-14.  *Davis v. Avvo, Inc.*, presents

yet another example of a court dismissing on a motion to dismiss false advertising claims where

the court determined that the challenged speech was not commercial speech as a matter of law.

No. 1:18-cv-02835-JGK [ECF No. 41]  (S.D.N.Y. Dec. 19, 2018) (Sitwala Decl., Ex. W).  In

*Avvo*, the court found that an informational directory of attorney ratings is not commercial

speech because it "simply provide[s] information" that "might be considered in making, but

do[es] not [itself] propose, a commercial transaction." *Id.* at 7.

  The facts of this case perfectly illustrate why treating First Databank's speech as

commercial would put publishers like First Databank in an untenable position and have a

profound chilling effect on speech.  Alfasigma seeks to avoid the First Amendment protections

afforded to non-commercial speech that would require it to prove substantial falsity of First

Databank's actual publication and actual malice in order to prevail.  Instead, it relies on alleged

third-party misunderstandings of First Databank's publication that are not based on the text of

the speech itself.  And, while Alfasigma claims in this case that publication of the "O" Class

value for medical foods would mislead payors into believing that its medical foods <u>are not</u>

reimbursable, its claims in the *Nivagen* case would require the conclusion that the publication of

the "F" Class value would mislead payors into believing that medical foods <u>are</u> reimbursable.  In

other words, there is nothing that First Databank could publish that Alfasigma believes is not

misleading.  Allowing the claims here to proceed therefore punishes First Databank for the mere act of speaking and leaves it with no safe alternative but to not speak at all.

### 2.  Alfasigma Cannot Show Any Falsity to Support Its Claims

Alfasigma bases all of its claims on two allegedly misleading statements.  (Compl. ¶¶ 95, 99, 102)  First, Alfasigma alleges that First Databank misleads as to "the source of its information."  (Compl. ¶ 95)  Second, Alfasigma alleges that First Databank misleads that Alfasigma's products are OTC products.  (Compl. ¶ 95)  Neither of these contentions is tenable.

In terms of the "source" allegation, Alfasigma appears to argue that First Databank's statements that it obtains some information from third party sources including the FDA and pharmaceutical manufacturers and that it examines FDA regulations in authoring some of the information it publishes are misleading.  (*See, e.g.*, Compl. ¶ 27)  But these statements are plainly true as Alfasigma's own Complaint makes clear.  (*See, e.g.*, Compl. ¶¶ 22, 38 (explaining how drug database publishers including First Databank obtain information from manufacturers and the FDA); Compl. ¶ 40 (referencing First Databank announcement that extensively discusses its examination of FDA regulations))  To the extent that Alfasigma is claiming that First Databank misrepresents that the information in the Class value field originates from either it or the FDA, its claim is both entirely unsupported by its allegations and wrong on the merits.  In terms of the former, Alfasigma does not allege any representation by First Databank that every piece of information in its database originates from either the FDA or a manufacturer.  Nor does it identify any representation that the Class value field is based on such information.  But, in any event, the Class value information is derived from both manufacturer-reported and FDA information.  The information submitted by Alfasigma to First Databank identifies its products as "medical foods" and the "O" value today and the forthcoming "Q" value explicitly include "medical foods" among the products to which those values apply.  (*See* Lupinetti Dec. Exs. K-M, H-J)  And the FDA has officially stated that medical foods are not subject to prescription requirements and cannot bear prescription labeling, which means that they cannot be given an "F" Class value, which is defined (and will continue to be defined) to be limited to those products with federal prescription requirements.  (*Id.*, Ex. A)

Similarly, Alfasigma's contention that First Databank is misleading payors to believe that its products are OTC products does not support its claims.  First Databank's publication is clear—the "O" Class value explicitly includes medical foods (and the "Q" Class value will once it is published).  This designation means that the products do not require a prescription under federal law, and also includes other products that fit that description including OTC drugs as well as dietary supplements.  It does <u>not</u> mean that the products <u>cannot</u> be dispensed by prescription, but simply that federal law does not require that.  In fact, medical foods, OTC drugs and supplements can all be prescribed by doctors.  *See, e.g.*, CMS, Release No. 178 at 3 (Oct. 5, 2016) (explaining that an over-the-counter vitamin is a "prescribed drug" for purposes of Medicaid reimbursement if it is prescribed by a doctor to treat or prevent a disease), https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/downloads/rx-releases/state-releases/state-rel-178.pdf; IRS, *Affordable Care Act: Questions and Answers on Over-the-Counter Medicines and Drugs* (Aug. 2, 2018) ("distributions from health FSAs and HRAs will be allowed to reimburse the cost of over-the-counter medicines or drugs only if they are purchased with a prescription"), https://www.irs.gov/newsroom/affordable-care-act-questions-and-answers-on-over-the-counter-medicines-and-drugs.[7]

What Alfasigma really seems concerned about is that some payors have allegedly chosen to treat medical foods similarly to OTC drugs, having realized that they do not require a prescription under federal law.  (*See, e.g.*, Compl. ¶ 48 (purporting to show an announcement from a First Databank subscriber that equates medical foods with over-the-counter items because "[f]ederal regulations require medical 'food' to be identified as not requiring a prescription"))  But that is their prerogative and does not show that First Databank's publication is false or

---

[7] Alfasigma attempts a sleight of hand in attempting to distinguish its products from OTC products based on the fact that, although no prescription is required to dispense medical foods, doctors do write prescriptions for them.  (*See* Compl. ¶ 21 ("Prescription products are prescribed by a doctor or other authorized medical professional, dispensed by professional pharmacists, and often reimbursed by either public or private insurance.  OTC drugs are also regulated as drugs by the FDA, but are available without a prescription, and are often not covered by insurance."))  But that is also true of OTC drugs and dietary supplements, as explained above.

misleading.[8]  None of the purported statements from payors cited in the Complaint show that payors believe that Alfasigma's products are not medical foods—instead, they simply show that payors understand that medical foods can be grouped with OTC products with respect to the need for a prescription under federal law.  (*See* Compl. ¶ 48)  This is entirely correct, and consistent with Alfasigma's own allegations in the *Nivagen* case that many payors treat medical foods similarly to OTC drugs in their coverage decisions and that its own medical foods are "non re-imbursible."  (*See, e.g.*, Nivagen Compl. ¶ 14; Nivagen PI Motion at 7-8)  Ultimately, whether or not a particular payor chooses to pay for Alfasigma's product is a matter of its own judgment, and whether a product is "reimbursable" is not a provable fact that can form the basis of a falsity claim.  *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (requiring "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact").

Alfasigma's grievance with the publication of the forthcoming "Q" code is similarly misguided.  Essentially, Alfasigma claims that it is misleading to include medical foods with other kinds of products for which there is no federal prescription requirements because they (allegedly) are different from those products in other ways.  (*See* Compl. ¶ 57)  But the Class value field only concerns prescription requirements, so Alfasigma's alleged differentiation is entirely beside the point.

Instead of publishing this accurate information, Alfasigma demands that the Court compel First Databank to publish an "F" code as the Class value for its products, to signify that they are prescription products.  But the "F" code is limited to products that require a prescription under federal law—something the FDA has unequivocally stated is not the case with respect to medical foods.  (*See* Lupinetti Dec. Ex. A)  And Alfasigma knows this would be false, having sued one of its competitors for the "improper[] label[ing of] its product as a 'prescription'

---

[8] Surely if the payors truly misunderstood First Databank's accurate publication and were taking actions based on that misunderstanding (something that First Databank should not legally be liable for in any event), Alfasigma and other manufacturers of medical foods would have raised this issue during the two-and-a-half years since First Databank changed its policy to reflect the FDA's May 2016 guidance.

DEFENDANT'S SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS
CASE NO. 4:18-cv-06924-HSG

product" and declared that indicating that the product is "prescription" would be "literally false." (Nivagen Compl. ¶ 69; Nivagen PI Motion at 7-8)  Alfasigma further recognizes that the designation would also "falsely represent to payors and customers that [the product] is eligible for government reimbursement."  (*Id.*)  But that is exactly what Alfasigma seeks from this litigation—that First Databank be forced to publish false information to mislead payors into paying for its products as if they are prescription drugs.  This abusive litigation should be ended immediately.[9]

## II.   ALFASIGMA'S CLAIMS SHOULD BE DISMISSED UNDER RULE 12(b)(6)

While Alfasigma's state law claims should be stricken under the anti-SLAPP statute, all of its claims including its federal Lanham Act claims are subject to dismissal for failure to state a claim under Rule 12(b)(6).  Under the familiar motion to dismiss standard, a complaint must be dismissed where it fails to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A plaintiff must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Gershman v. Bayer HealthCare LLC*, No. 14-CV-05332-HSG, 2015 WL 2170214, at *2 (N.D. Cal. May 8, 2015) (quoting *Twombly*, 550 U.S. at 555).  In addition, "[a] court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or other materials central to or incorporated by reference into the complaint, including allegedly false advertising.  *Id.* (citation and quotation marks omitted); *Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 883 (C.D. Cal. 2013) (considering allegedly false labeling).

---

[9] This Court declined to strike the complaint in *Exeltis* because it found that the change at issue in that case was subtle and could be misleading.  While First Databank respectfully disagrees with the Court's finding in that regard, it does not have any bearing on this case.  Here, the present "O" and forthcoming "Q" Class value definitions explicitly include medical foods.  And there can be no argument at all that the "F" Class value correctly describes Alfasigma's medical foods, since the FDA has expressly decreed that they cannot be described as requiring a prescription and Alfasigma itself has recognized that it would be false to describe medical foods in that manner.

**A.      The Lanham Act Does Not Apply to First Databank's Non-Commercial Speech**

The Lanham Act as a whole applies only to commercial speech. *See Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013) ("Every circuit court of appeals to address the scope of [the Lanham Act sections] has held that they apply only to commercial speech."). This is consistent with Congressional intent to limit reach of the Act to commercial speech, *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003), and the Act's "design[] to balance the needs of merchants for identification as the provider of the goods with the needs of society for free communication and discussion," *Kelly-Brown v. Winfrey*, 717 F.3d 295, 316 (2d Cir. 2013) (Sack, J., concurring). As discussed above, First Databank's database is not commercial speech, and therefore all of Alfasigma's Lanham Act claims should be dismissed. (*See supra* at 11-15)

In addition to the commercial speech requirement, Lanham Act false advertising claims are further limited to "commercial advertising and promotion," which is speech (1) by a defendant who is in commercial competition with plaintiff; (2) for the purpose of influencing consumers to buy defendant's goods or services; (3) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Coastal Abstract*, 173 F.3d at 734-35 (quoting *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)). The information in First Databank's database clearly does not meet these elements. Nor are the parties commercial competitors—First Databank is not alleged to (and does not) sell pharmaceutical products and Alfasigma does not publish drug compendia.[10] And First Databank's database is <u>not</u> published to influence

---

[10] While the Supreme Court in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), held that the Lanham Act generally does not require direct competition in order to have standing to sue, the Court explicitly stated that it was not addressing the "commercial advertising or promotion" requirement. *Id.* at 123 n.1. While some courts have recognized that *Lexmark* may abrogate the substantive requirement that the commercial advertising or promotion be by a direct competitor, the Ninth Circuit has not held this to First Databank's knowledge. *See Ariix*, 2018 WL 1456928, at *4 n.3. Moreover, it is highly questionable whether Alfasigma has statutory standing under the Lanham Act to bring the claims here per the proximate cause test laid out in *Lexmark*, given the entirely speculative chain of causation it alleges. *See* Plaintiffs' Opposition to Defendant's Motion to Dismiss Amended Complaint [ECF. No 48] at 9 (attached as Sitwala Decl., Ex. Q) ("The [*Lexmark*] Court also

19

customers to buy First Databank's goods or services—the database is First Databank's offering. (*See* Compl. ¶ 33)  Accordingly, Alfasigma's Lanham Act false advertising claims cannot stand because the alleged false information disseminated by First Databank does not constitute commercial speech or commercial advertising or promotion.

## B.    Alfasigma Fails to Plausibly Allege Falsity

Even if Alfasigma were actually challenging advertising (as opposed to non-commercial speech), the Lanham Act claims would still fail because Alfasigma does not plausibly allege falsity.  "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication," when viewed and analyzed in the statement's full context. *See Rimini Street, Inc. v. Oracle Int'l Corp.*, No. 2:14-CV-1699-LRH-CWH, 2017 WL 4227939, at *8 (D. Nev. Sept. 22, 2017) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)).  That context includes the defendant's own definitions of terms it uses. *See, e.g.*, *Gallagher v. Chipotle Mexican Grill, Inc.*, No. 15-CV-03952-HSG, 2016 WL 454083, at *4 (N.D. Cal. Feb. 5, 2016) (dismissing claim where defendant's definitions of the terms it uses defeated any claim of falsity).  "Even if an advertisement is not literally false, relief is available under Lanham Act § 43(a) if it can be shown that the advertisement has misled, confused, or deceived the consuming public." *Rimini Street*, 2017 WL 4227939, at *8 (quoting *Southland Sod Farms*, 108 F.3d at 1140).[11]

Here, Alfasigma has not plausibly alleged falsity for the reasons discussed above. (*See supra* at 15-18)  In particular, Alfasigma has recognized that medical foods are not subject to federal prescription requirements and cannot legally be described as prescription.  It has further explained that it would be literally false to describe medical foods as prescription and that it would mislead payors.  Accordingly, it cannot plausibly say that it is false to describe medical

made clear that Lanham Act claims are not available to consumers, but only to plaintiffs who are in competition with the defendant engaged in false advertising (as in this case), who 'allege an injury to a commercial interest in reputation or sales,' and whose alleged 'injuries are proximately caused by violations of the statute.'") (quoting *Lexmark*, 572 U.S. at 131–32).

[11] While Alfasigma purports to state a claim under § 43(a)(1)(A) of the Lanham Act for "false description," this claim still relies on an (implausible) allegation that First Databank has published false statements.  (*See* Compl. ¶¶ 83-84)

DEFENDANT'S SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS
CASE NO. 4:18-cv-06924-HSG

foods as not requiring a prescription under federal law.  Similarly, it has alleged that First Databank <u>does</u> compile information from manufacturers and the FDA as part of its authoring process and therefore its argument that First Databank misleads in allegedly saying this is implausible as a matter of law.

### **CONCLUSION**

For the foregoing reasons, First Databank respectfully requests that Plaintiff's state law claims be stricken in their entirety, with prejudice, that all claims be dismissed with prejudice for failure to state a claim, and that the Court grant First Databank such other relief as it deems just.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE

THE HEARST CORPORATION
RAVI V. SITWALA
SARAH S. PARK

By:   s/ Ravi V. Sitwala
       Ravi V. Sitwala

Attorneys for Defendant
FIRST DATABANK, INC.

Dated:  December 21, 2018

21