**SAUL PERLOFF**
Bar No. 157092
saul.perloff@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Telephone      (210) 224-5575
Facsimile      (210) 270-7205

Attorneys for Plaintiff
ALFASIGMA USA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ALFASIGMA USA, INC., a Delaware corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>FIRST DATABANK, INC., a Missouri corporation,<br><br>            Defendant. | Case No. 4:18-cv-06924-HSG<br><br>**PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE**<br><br>Motion Hearing:      March 28, 2019<br>Time:                      2:00 p.m. |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF ISSUES .....................................................................................1

III.    STANDARD OF REVIEW ......................................................................................2

IV.     PRESERVATION OF OBJECTIONS ....................................................................2

V.      STATEMENT OF FACTS ......................................................................................3

        A.      Alfasigma's medical foods must be used under physician supervision...................3

        B.      First Databank's MedKnowledge® database represents a key marketing
                channel for pharmaceutical products ........................................................................4

        C.      First Databank advertises its MedKnowledge® database as based on
                information from the FDA and manufacturers ..........................................................5

        D.      First Databank spent decades telling its customers that "O" means OTC
                drugs, then changed the coding of Alfasigma's medical foods to "O"...................6

        E.      Alfasigma's medical foods are not over-the-counter drugs...................................7

        F.      First Databank's advertising of Alfasigma's medical foods as "O" led
                third parties to treat Alfasigma's medical foods as over-the-counter drugs,
                to Alfasigma's injury ..................................................................................................8

        G.      The FDA specifically rejected First Databank's advertising of medical
                foods as over-the-counter drugs ...............................................................................9

        H.      First Databank's belated admission that medical foods are not OTC drugs...........11

        I.      Alfasigma brought suit under the Lanham Act for false advertising
                and unfair competition, and parallel California state law claims............................11

VI.     ARGUMENT ..........................................................................................................12

        A.      Alfasigma's allegations in *Nivagen* are consistent with its claims here ...............13

        B.      First Databank engages in "commercial speech"....................................................14

                1.      The Court should follow *Exeltis,* not the inapt and vacated
                        *Acella* decision ...........................................................................................18

                2.      Like *Exeltis*, other courts have rejected First Databank's
                        Anti-SLAPP motions ...................................................................................21

DOCUMENT PREPARED
ON RECYCLED PAPER

C. First Databank's advertising is false ..................................................22

   1. Medical foods may be labeled as prescription products and are
not OTC drugs ...................................................................22

   2. First Databank's redefinition is a mere fig-leaf .............................23

D. Alfasigma's unfair competition claims concern First Databank's
false representations regarding its own services, and is not subject
to Anti-SLAPP ......................................................................24

VII. CONCLUSION ...........................................................................25

DOCUMENT PREPARED

ON RECYCLED PAPER

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                           **Page(s)**

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ...................................................................................3

*Acella Pharma., LLC v. First Databank, Inc.*,
    No. 17-cv-5013 (N.D. Ga. June 4, 2018) ....................................................................18

*Ah Quin v. Cty. of Kauai Dep't of Transp.*,
    733 F.3d 267 (9th Cir. 2013) .....................................................................................14

*Ariix, LLC v. NutriSearch Corp.*,
    No. 17-cv-320, 2018 WL 1456928 (S.D. Cal. Mar. 23, 2018) ..................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................................2

*Asoc. De Labs. Clinicos, Inc. v. Med. Card Sys., Inc.*,
    No. 15-cv-1099, 2015 WL 13548474 (D.P.R. Jul. 24, 2015) ..............................15, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................2, 3, 12

*Bolger v. Youngs Drug Prod. Corp.*,
    463 U.S. 60 (1983) ...............................................................................................13, 15

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
    627 F. Supp. 2d 384 (D.N.J. 2009) ............................................................................16

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ....................................................................................................15

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ....................................................................................................15

*City of Hope v. Teamsters Local 631 Sec. Fund for S. Nevada*,
    141 F.3d 1174 (9th Cir. 1998) ....................................................................................14

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) ......................................................................................16

*Crossfit, Inc. v. Nat'l Str. and Cond. Assoc.*,
    No. 14-cv-1191, 2016 WL 5118530 (S.D. Cal. Sept. 21, 2016)..........................15, 16, 17

*Davis v. Avvo, Inc.*,
    No. 18-cv-2835, 2018 WL 662926 (S.D.N.Y. Dec. 19, 2018) ...........................19, 20

*Dependable Sales & Serv., Inc. v. Truecar, Inc.*,
    No. 15-cv-1742, 2016 WL 79992 (S.D.N.Y. Jan. 6, 2016) .......................................24

*Dex Media West, Inc. v. City of Seattle*,
    696 F.3d 952 (9th Cir. 2012) ......................................................................................15

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE iii           PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

*Exeltis USA, Inc. v. First Databank, Inc.*,
    No. 17-cv-4810, 2017 WL 6539909 (N.D. Cal. Dec. 21, 2017)..................................... *passim*

*Handsome Brook Farm LC v. Humane Farm Animal Care, Inc.*,
    700 Fed. Appx. 251 (4th Cir. 2017)..................................................................17, 20, 21

*Healthpoint Ltd. v. Rivers Edge Pharm., LLC*,
    No. 03-cv-984, 2005 WL 356839 (W.D. Tex. Feb. 14, 2005) .............................................24

*Hertz Corp. v. Avis, Inc.*,
    867 F. Supp. 208 (S.D.N.Y. 1994) .......................................................................................13

*Hilton v. Hallmark Cards*,
    599 F.3d 894 (9th Cir. 2010) ...............................................................................................2

*Hulett v. State Farm Mut. Auto. Ins. Co.*,
    974 F.2d 1342 (9th Cir. 1992) .............................................................................................14

*Hunt v. City of L.A.*,
    638 F.3d 703 (9th Cir. 2011) ...............................................................................................15

*Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*,
    934 F. Supp. 570 (S.D.N.Y. 1996), *aff'd in part, rev'd in part on other
    grounds*, 137 F.3d 75 (2d Cir. 1998) ..................................................................................16

*Jordan v. Jewel Food Stores, Inc.*,
    743 F.3d 509 (7th Cir. 2014) ...............................................................................................17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014)...................................................................................................12, 17

*Liberty Counsel, Inc., v. GuideStar USA, Inc.*,
    737 Fed. Appx. 171 (4th Cir. 2018) (per curiam)..............................................................20

*Liberty Counsel v. Guidestar*,
    No. 4:17-cv-71 (E.D. Va. Jan. 23, 2018) ...........................................................................20

*LifeScan, Inc. v. Shasta Tech., LLC*,
    No. 12-cv-6360, 2013 WL 12201564 (N.D. Cal. May 21, 2013).......................................24

*Merck Eprova AG v. Brookstone Pharma, LLC*,
    920 F. Supp. 2d 404 (S.D.N.Y. 2013)................................................................................16

*Metabolife Int'l, Inc. v. Wornick*,
    264 F.3d 832 (9th Cir. 2001) ...............................................................................................25

*Mindys Cosmetics, Inc. v. Dakar*,
    611 F.3d 590 (9th Cir. 2010) ...............................................................................................2

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ...............................................................................................3

*Novartis Cons. Health, Inc. v. Johnson & Johnson-Merck Cons. Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002).................................................................................................13

*NV Mach. Inc. v. Korean Cleaners Monthly*,
    No. 17-cv-12269, 2018 WL 2455926 (D.N.J. May 31, 2018)..........................18, 19

*Pharma. Care Mgt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005)................................................................15

*Ranbaxy Labs. Inc. v. First Databank, Inc.*,
    826 F.3d 1334 (11th Cir. 2016) ...........................................................21

*Rivera v. First Databank, Inc.*,
    187 Cal. App. 4th 709 (2010) ...............................................................21

*Schering Corp. v. First Databank Inc.*,
    No. 07-cv-01142, 2007 WL 1176627 (N.D. Cal. Apr. 20, 2007)..........................21

*Sciele Pharma, Inc. v. Brookstone Pharm., LLC*,
    No. 1:09-cv-3283, 2010 WL 9098290 (N.D. Ga. June 23, 2010) .......................24

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ..............................................................12

*Theodosakis v. Clegg*,
    No. 14-cv-2445, 2017 WL 1294529 (D. Ariz. Jan. 30, 2017) ...........................19

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ...............................................................12

*U.S. v. Schiff*,
    379 F.3d 621 (9th Cir. 2004) ...........................................................14, 15

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    793 F. 2d 1034 (9th Cir. 1986) ............................................................13

*Williams v. Gerber Products Co.*,
    552 F.3d 934 (9th Cir. 2008) ...............................................................16

**Rules and Statutes**

15 U.S.C. § 1125(a) .........................................................11, 12, 16, 17, 24

15 U.S.C. § 1127 ....................................................................................12

21 U.S.C. § 360ee(b)(3) ..........................................................................4

Cal. Bus. & Prof. Code § 17200 *et seq.* ....................................................12

Cal. Bus. & Prof. Code § 17500 *et seq.* ....................................................12

Fed. R. Civ. P. 8(a) ................................................................................3

Fed. R. Civ. P. 12(b)(6) ..........................................................................3

**Other Authorities**

21 C.F.R. part 110...................................................................................3

21 C.F.R. § 190.6 ....................................................................................................................3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1    Plaintiff Alfasigma USA, Inc. ("Alfasigma") respectfully opposes Defendant First

2    Databank, Inc.'s ("First Databank" or "FDB") Special Motion to Strike, Motion to Dismiss, and

3    Motion to Strike (Doc. 18) ("Motion").

## I.    INTRODUCTION

5    Alfasigma's medical food products *must* be used under physician supervision, and are

6    usually prescribed by doctors and dispensed by pharmacists via prescriptions. Nevertheless, in its

7    MedKnowledge® database, First Databank falsely describes these medical foods as "O" class

8    products, widely understood by the market to mean "over-the-counter drugs." First Databank

9    further claims its representations came from the FDA itself, cloaking these false representations

10   with the FDA's own imprimatur. First Databank's false advertising of Alfasigma's medical

11   foods led many of its own customers to mistakenly believe that they in fact are over-the-counter

12   drugs, causing insurers to stop covering these products, to Alfasigma's significant injury.

13   First Databank's advertising, and its claim that the information came from the FDA are

14   false. Indeed, the FDA *told* First Databank it was misrepresenting FDA's policies, and

15   emphasized that medical foods are *not* over-the-counter drugs. First Databank ignored the FDA's

16   warnings, and continued to misrepresent the nature of Alfasigma's products, and the source of

17   First Databank's purported information. First Databank's false and misleading advertising and

18   false representations of sponsorship are commercial speech, and actionable under the Lanham

19   Act and California state law. For the same reasons this Court rejected First Databank's motion in

20   *Exeltis USA, Inc. v. First Databank, Inc.,* No. 17-cv-4810, 2017 WL 6539909, at *14 (N.D. Cal.

21   Dec. 21, 2017), *interlocutory appeal pending*, No. 18-15001 (9th Cir.) (appeal docketed Jan. 2,

22   2018), the Court should also deny First Databank's Motion in this case.

## II.    STATEMENT OF ISSUES

24   A.    Whether First Databank's motion to dismiss Alfasigma's federal Lanham Act

25   claims for false advertising and false designation must be DENIED in its entirety because

26   Alfasigma pleads facts which, if accepted as true, state plausible claims under the federal statute.

27   B.    Whether First Databank's motion to strike Alfasigma's state law claims must be

28   DENIED because, under the applicable "lenient standard," it cannot be said that Alfasigma has

1    no reasonable probability of succeeding on its claims.

2                         **III.    STANDARD OF REVIEW**

3           "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege 'enough facts to

4    state a claim to relief that is plausible on its face.'" *Exeltis USA, Inc. v. First Databank, Inc.,* No.

5    17-cv-4810, 2017 WL 6539909, at *4 (N.D. Cal. Dec. 21, 2017), *interlocutory appeal pending*,

6    No. 18-15001 (9th Cir.) (appeal docketed Jan. 2, 2018) ("*Exeltis*") (quoting *Bell Atl. Corp. v.*

7    *Twombly*, 550 U.S. 544, 570 (2007)). "This 'facial plausibility' standard requires the plaintiff to

8    allege facts that add up to 'more than a sheer possibility that a defendant has acted unlawfully.'"

9    *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The Court accepts as true a plaintiff's

10   well-pleaded factual allegations and construes all factual inferences in the light most favorable to

11   the plaintiff." *Id.* "The Court limits its review to the pleadings for purposes of the pending

12   motion to dismiss." *Id.* at *1, n.1 (citation omitted).

13          "California courts apply a two-step process for analyzing an anti-SLAPP motion." *Id.* at

14   *3 (citing *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010)). "Under the first prong,

15   the moving party must make a threshold showing that the act or acts of which the plaintiff

16   complains were taken 'in furtherance of the right of petition or free speech under the United

17   States or California Constitution in connection with a public issue,' as defined in the statute." *Id.*

18   (citations omitted). "If the moving party meets its threshold showing, then the burden shifts to

19   the non-moving party to prove a probability of prevailing on the claim." *Id.* (citation omitted).

20          "'Reasonable probability' in this context means 'only a minimum level of legal

21   sufficiency and triability.'" *Id.* at *12 (quoting *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590,

22   598 (9th Cir. 2010)). "Significantly, the trial court does not weigh the evidence or determine

23   questions of credibility; instead ***the court accepts as true all of the evidence favorable to the***

24   ***plaintiff***." *Id.* (quotations omitted, emphasis added). This is a "lenient standard." *Id.*

25                      **IV.    PRESERVATION OF OBJECTIONS**

26          As in *Exeltis,* "this is not the kind of obviously meritless or harassing case that the anti-

27   SLAPP statute was designed to discourage." 2017 WL 6539909, at *13. However, this Court

28   also noted "the tension between the anti-SLAPP statute and the Federal Rules of Civil

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 2                          PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
                                DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

Procedure," and referenced the split between the Ninth Circuit's application of state anti-SLAPP laws in cases pending in federal court, and other Circuits which have rejected this as an impermissible employment of state procedural laws in federal proceedings. *Id.* at 3, n.4 (citing *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-73 (9th Cir. 1999), *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015)). This Court must apply "the statute in this case as required by binding case law . . . ." *Id.* But as set forth in *Abbas*, the federal procedural rules, including the *Twombly* standard for a motion to dismiss, apply in a federal proceeding, and not a state procedural provision like an Anti-SLAPP law. *Abbas*, 783 F.3d at 1337. Alfasigma thus objects to the application of a state procedural standard that is different from, and precluded by, FED. R. CIV. P. 8(a) and 12(b)(6), as construed by *Twombly*.[1]

## V.    STATEMENT OF FACTS

Based in Covington, Louisiana, Alfasigma manufactures and sells the brand-name medical foods Deplin®, Metanx® and CerefolinNAC®. Declaration of Joseph Denney ("Denney Decl.") ¶ 2-3; Compl. (Doc. 1) ¶ 6. These medical foods provide L-methylfolate, under the ingredient brand name "Metafolin®." *Id.* ¶ 3. L-methylfolate is the biologically active form of folate, an essential B complex vitamin that plays a key role in central metabolic pathways, including cell division and repair. Denney Decl. ¶ 3, Compl. ¶ 14. Metafolin® is a patented and highly stable crystalline form of L-methylfolate, manufactured by Merck KGaA. Compl. ¶ 15.

### A.    Alfasigma's medical foods must be used under physician supervision

The FDA regulates Alfasigma's medical foods, and Alfasigma complies with FDA's requirements, including adhering to cGMP ("current good manufacturing practices) mandates, 21 C.F.R. part 110, in manufacturing and marketing these products. Compl. ¶ 16.[2]

---

[1] While Alfasigma does not agree that an Anti-SLAPP procedural motion applies in federal proceedings, it does not challenge this Court's ruling in *Exeltis* that First Databank's false and misleading advertisements in its MedKnowledge® database constitute a "matter of public concern," nor—except as stated with respect to the separate unfair competition claim—that the "commercial speech exception" applies. 2017 WL 6539909, at *12.

[2] A New Dietary Ingredient ("NDI") Notification is a substantive process for disclosing new dietary ingredients to the FDA. *See* 21 C.F.R. § 190.6. In 2001, the FDA accepted Merck KGaA's NDI Notification for Metafolin®. *See* Letter from Felicia B. Satchell (May 23, 2001), attached as Exhibit 1 to the Declaration of Saul Perloff ("Perloff Decl.").

"For some patients, medical foods represent a lifesaving, medically necessary therapy." Compl. ¶ 18. Each of Alfasigma's medical foods is intended for the specific dietary management for serious diseases or conditions. Metanx® is indicated for the dietary management of diabetic peripheral neuropathy; Deplin® for the dietary management of depression and schizophrenia; and CerefolinNAC® for the dietary management of metabolic imbalances associated with mild cognitive impairment. Denney Decl. ¶¶ 4-6. Each of Alfasigma's medical foods launched years ago, and Alfasigma and its predecessors supported clinical trials for each, establishing their safety and efficacy. *Id.* ¶¶ 4-6; *see also* Doc. 18-1 at pp. 82-90 (labeling for medical foods).

"As a therapeutic category, medical foods are similar to, but distinct from, both drugs and dietary supplements." Compl. ¶ 17. "A medical food is 'a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation.'" *Exeltis,* 2017 WL 6539909, at *2 (quoting 21 U.S.C. § 360ee(b)(3)); Denney Decl. ¶ 7-8.

Alfasigma does not label or market its medical foods as "Prescription only" or "Rx Only," but does promote them as ***prescription medical foods***. Compl. ¶ 19; Denney Decl. ¶ 7-8. "Alfasigma markets its medical foods to doctors, who write prescriptions for them. Those prescriptions are filled by pharmacists, and reimbursed by insurers who cover medical food products." Denney Decl. ¶ 8. As required by federal law, Alfasigma's products should not be made available to any patient who is not under physician supervision. 21 U.S.C. § 360ee(b)(3).

**B.     First Databank's MedKnowledge® database represents a key marketing channel for pharmaceutical products**

First Databank, "part of the Hearst Health network," advertises itself as "the leading provider of drug knowledge that helps healthcare professionals make precise medication-related decisions." First Databank's MedKnowledge Brochure (Perloff Decl. Ex. 2). First Databank's MedKnowledge® "database describes a broad array of information about pharmaceutical products," and is "used by most state Medicaid programs and private insurers to make reimbursement determinations for consumers." *Exeltis*, 2017 WL 6539909, at *12.

"Compendia like First Databank play a critical role in providing pharmaceutical product information to [Alfasigma's] customers." Denney Decl. ¶ 9. Pharmaceutical companies "provide information about the availability and characteristics of our products to First Databank, and it provides information about our products to our customers who are First Databank subscribers." *Id.* "These customers include prescribers, pharmaceutical wholesalers and distributors, pharmacies, pharmacists, pharmacy benefit managers, insurance companies, and others," who "rely on the information drug databases provide to make decisions about which products to prescribe, purchase, dispense, and reimburse." *Id.* "First Databank is the most widely used of the drug information databases," *id.*, advertising itself as "an established market leader for decades," MedKnowledge Brochure (Perloff Decl. Ex. 2). First Databank claims its databases are used by virtually all top pharmacy benefit managers, health plans, and drug wholesales:



Compl. ¶ 26.

**C.    First Databank advertises its MedKnowledge® database as based on information from the FDA and manufacturers**

First Databank obtains revenue by selling subscriptions to its MedKnowledge® database to customers, "including E-prescribing technology vendors, pharmaceutical wholesalers and distributors, pharmacies, PBMs [pharmacy benefit managers], insurance companies, and others in the Healthcare Marketplace, as well as to many pharmaceutical companies." Compl. ¶ 33.

To promote its database in competition with other database providers, First Databank markets MedKnowledge® as "'encompassing FDA-approved prescription drugs, over-the-

DOCUMENT PREPARED
ON RECYCLED PAPER

counter medications and . . . medical devices,' offering a 'core knowledge base' that is 'persistently researched and verified.'" Compl. 25; *see also* MedKnowledge Brochure (Perloff Decl. Ex. 2). First Databank claims "its database is 'compiled' from third party sources including drug manufacturers and governmental agencies, 'using best practices research procedures with extremely thorough validation procedures.'" Compl. ¶ 27; *see also* MedKnowledge Brochure (Perloff Decl. Ex. 2).  This includes data it obtains from the FDA "through an examination of controlling regulations and consultation with FDA personnel." Compl. ¶ 27. First Databank claims that MedKnowledge® is "'continuously and reliably updated, thanks to our strong relationships with manufacturer and wholesaler communities, as well as with federal and state government entities.'" *Id.* ¶ 27; MedKnowledge Brochure (Perloff Decl. Ex. 2).

First Databank advertises MedKnowledge® as "'the most widely used and relied upon drug knowledge base in the United States and Canada,' and 'is so reliable, governments actually check with us to confirm their own data.'" Compl. ¶ 25; *see also* MedKnowledge Brochure (Perloff Decl. Ex. 2). Over the course of decades, First Databank's advertising and promotions convinced its customers that the information provided by MedKnowledge® concerning "the prescription or OTC status of pharmaceutical products," is sponsored or provided by the FDA and manufacturers. Compl. ¶ 28.

**D.     First Databank spent decades telling its customers that "O" means OTC drugs, then changed the coding of Alfasigma's medical foods to "O"**

One of the MedKnowledge® database's primary fields is a product's "class." "The Class field currently contains one of two possible codes: O or F." Compl. ¶ 36. First Databank "represented to its subscribers over many years" that "O" means a product is "'***Over-the-counter. A prescription is not required per the product labeling***.'" *Id.* "The value "F" signifies it is a prescription product." *Id.* "[A]s a result of FDB's commercial efforts over the span of decades, the Healthcare Marketplace universally understands that a product designated 'O' is an OTC drug, available over-the-counter and without physician supervision." *Id.* ¶ 37.

"Before February 2016, First Databank coded Alfasigma's medical foods as Class code 'F,' correctly describing them as prescription products." Denney Decl. ¶ 10; *see also* Compl. ¶

35. "Shortly before introducing each of the Alfasigma Products, Alfasigma submitted to FDB the necessary information to have the Alfasigma Products listed in the MedKnowledge database," Compl. ¶ 38. "Because federal law requires that medical foods be used under physician supervision, and because the Alfasigma Products are labeled as 'dispensed by prescription,'" *id.* ¶ 35, First Databank accurately "listed the Alfasigma Products as prescription pharmaceutical products in the MedKnowledge database with a Class value of 'F.'" *Id.* ¶ 38.

First Databank's customers historically received "accurate information about the Alfasigma Products and their commercial availability as products requiring physician supervision, and not available OTC." *Id.* ¶ 38. And "[b]ecause the Alfasigma Products were correctly described as prescription products, not 'over-the-counter' drugs, their cost was often covered by insurance plans that limit coverage to prescription products. This insurance coverage assisted patients to purchase the Alfasigma Products prescribed by their physicians, and thus to be compliant in taking them." *Id.* ¶ 39.

"But beginning in February 2016, First Databank began coding our medical foods as Class code 'O'-which always meant 'over-the-counter' (or 'OTC') drugs." Denney Decl. ¶ 10. By April 26, 2016, First Databank had reclassified all of Alfasigma's medical foods as "O." *Id.* "[B]y April 26, 2016, the FDB product portal listed Alfasigma's Metanx® Capsule as an OTC drug. Alfasigma's other products were listed similarly as OTC drugs. FDB advised customers it made these changes be 'in alignment with [] FDA standards.'" Compl. ¶ 41.

**E.     Alfasigma's medical foods are not over-the-counter drugs**

Alfasigma's medical foods are not OTC drugs. By law they *must* be used under physician supervision while OTC drugs do *not* require such physician supervision:

> Over-the-Counter (OTC) Drug: An OTC or nonprescription drug is a drug product marketed for use by the consumer without the intervention of a health care professional in order to obtain the drug. Any drug that is not a prescription drug is an OTC or nonprescription drug. An OTC drug is considered safe and effective for use by the general public without a prescriber's authorization. Necessary characteristics for OTC drugs include:
>
> • The product has an acceptable safety margin.
> • The product has low misuse and abuse potential under conditions of widespread availability
> • A healthcare practitioner is not needed for the safe and effective

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 7                    PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

use of the product.

- The product has adequate labeling.

FDA OTC Glossary (Perloff Decl. Ex. 3). "In addition, consumers must be able to self-diagnose, self-select the medication, self-treat, and self-manage the condition for which the OTC drug is intended." *Id.* None of this is true for Alfasigma's medical foods, nor the diseases and conditions for which they are prescribed. *E.g.*, Denney Decl. ¶¶ 7-8.

**F.    First Databank's advertising of Alfasigma's medical foods as "O" led third parties to treat Alfasigma's medical foods as over-the-counter drugs, to Alfasigma's injury**

Although First Databank purported to redefine its "O" classification to mean "over-the-counter drugs" and *also* other "[p]roducts with no federal legal prescription requirement," including "medical foods, dietary supplements, [and] non-prescription medical devices," Doc. 18-1 at p. 53, that purported effort is reflected on page 2529 of a reference guide that goes on for more than another thousand pages. *Id.* The "portal" First Databank provides to Alfasigma expressly labels the medical foods' "drug class" as "OTC." Compl. ¶ 41:



**Product Details - METANX CAPSULE**

**Product Information**

Product Code: 00525-8049-18

Drug Class: OTC

Label Name: METANX CAPSULE

Compl. ¶ 41.

Moreover, First Databank's customers continue to believe—as First Databank had told them for decades—that "O" means an OTC drug. In 2016, Express Scripts, the largest pharmacy benefit manager (and largest mail order pharmacy) in the United States, cited First Databank as the basis of its conclusion that "Medical 'Food'" had become "Now Over the Counter":

## Medical 'Food' Now Over the Counter

Federal regulations require medical "food" be identified as not requiring a prescription. First DataBank (FDB) has revised its policy accordingly for this drug classification, and FDB now classifies all medical foods as over-the-counter (OTC) items.

We have responded to this change by updating the Express Scripts drug file starting May 5, 2016.

Compl. ¶ 48. Express Scripts further noted that "some pharmacy benefit plans do not cover OTC products, *including the newly reclassified medical food products.*" *Id.* (emphasis added). Express Scripts listed L-methylfolate as one of four "Top examples of medical foods that have moved to OTC," and directed pharmacies to communicate this message to their own customers. *Id.* ("Please do not tell members they need a prescription for medical food products. If an item does not process through the member's benefit, it is likely his/her plan does not cover OTC products."). A communication from Premara Blue Cross, already lodged with this Court in the *Exeltis* case, makes this similarly plain. Perloff Decl. Ex. 4 (*Exeltis USA Inc. v. First Databank, Inc.*, Case No. 4:17-cv-4810, Opp'n to Motion to Strike, Doc. 36-7 (N.D. Cal. Nov. 6, 2017), page 2 of 2) (entitled: "Medical Foods Labeling Changed," citing both the FDA and First Databank, and stating "the coding was corrected to switch their formulary status from Rx only to over-the-counter (OTC). . . . Because these products are similar to what can be found at a supermarket, drugstore, or supplement store, they're considered OTC products and **aren't covered**.").

First Databank's classification of Alfasigma's medical food products as "O" immediately and negatively impacted Alfasigma's sales. Denney Decl. ¶ 13; Compl. ¶ 46, 53. Insurance plans generally will not cover OTC drugs, and insurers that previously covered medical foods discontinued coverage after First Databank's reclassification. Denney Decl. ¶ 13, Compl. ¶ 21, 45, 49. As the FDA would later warn First Databank, its actions caused some patients, facing the loss of coverage, to stop buying and taking medical foods. Denney Decl. ¶ 13; Compl. ¶ 45, 50.

**G.     The FDA specifically rejected First Databank's advertising of medical foods as over-the-counter drugs**

Consistent with its advertising of MedKnowledge® as providing information originating

from the FDA, First Databank told customers that its reclassification of medical foods to "O" was driven by the FDA. *E.g.*, Doc. 18-1 at p. 28 ("Customer Connection" ad dated Dec. 7, 2015) ("While certain medical foods labels bear an 'Rx' or prescription dispensing limitations, FDA regulations limit such designations to drugs and expressly prohibit their application to medical foods," and First Databank will start listing medical foods as "O" class). As FDA explained, First Databank's statement was false. While medical foods may not be labeled "Rx only," they *may* be labeled and dispensed as "prescription" products, and they definitely are not OTC drugs.

In her June 29, 2017 letter, Dr. Andrea Lotze, the FDA's Medical Director for the Infant Formula and Medical Foods Staff, wrote to First Databank, expressing FDA's concerns regarding "First Databank's misinterpretation of FDA's position and policies on medical foods":

> We believe First Databank has misinterpreted FDA's response regarding the labeling of medical foods and mistakenly classified all medical food products as over-the-counter (OTC) drugs. We would like to clarify the regulatory classification of these products by providing additional information from FDA's final guidance on medical foods published on May 13, 2016.

Perloff Decl. Ex. 5; *see also Exeltis*, 2017 WL 6539909, at *8 (discussing Lotze letter). Dr. Lotze clarified that "physicians can and do write prescriptions for medical foods," and that, unlike OTC drugs, medical foods "must be acquired through pharmacies, physicians, or directly from manufacturers based on evidence of a diagnosis of a disorder responsive to such a product." *Id.*

Dr. Lotze explained that "[m]edical foods are a crucial and necessary component of the dietary management of a disease or condition for which distinctive nutritional requirements have been established," and "are indispensable for individuals affected by these diseases and conditions." *Id.* (warning: "If medical foods are not accessible to these individuals and consumed as medically indicated, they can suffer severe, and even life-threatening, health consequences").

Consistent with Alfasigma's own labeling and marketing, Dr. Lotze confirmed that while medical foods are not Rx only products, "they are intended to be used under the supervision of a physician," and a "patient should see the physician on a recurring basis for, among other things, instructions on the use of the medical food as part of the dietary management of a given disease or condition." *Id.* The "FD&C Act does not prohibit physicians from writing prescriptions for medical foods," and the "FDA does not object to manufacturers also ***indicating in the labeling***

***of such products that prescriptions may be written for the product*** if doing so is consistent with applicable local, state, and federal laws." *Id.* (emphasis added). By contrast, "OTC drugs" are "drugs that have been found to be safe and appropriate for use without the supervision of a health care professional such as a physician, and they can be purchased by consumers without a prescription as they are generally available at retail level." *Id.* "Medical foods are not OTC drugs and are not generally available at retail level." *Id.*

Although the FDA was specifically concerned that patients "'are losing or have lost insurance coverage for their products marketed as medical foods' because 'insurance providers belie[ve] that the products are over-the-counter (OTC) drugs,'" *Exeltis,* 2017 WL 6539909, at *8 (quoting Lotze letter), First Databank failed to correct its advertising, or to alert its customers that its advertising was directly contrary to the FDA's actual and stated position.

**H.      First Databank's belated admission that medical foods are not OTC drugs**

In September 2018, more than two years after the FDA raised concerns that it was misclassifying medical foods as OTC drugs, First Databank announced a "'New FDB Class Value for Dietary Supplements and Non-Drug Products.'" Compl. ¶ 54. The "Q" code would eventually "distinguish" products like medical foods "from over-the-counter drugs . . . ." *Id.* However, "Q" will also refer to: "dietary supplements," as well as "herbal preparations, and bulk flavorings or colorants"—none of which are akin to medical foods or require physician supervision of any sort. *Id.* ¶ 56; *id.* ¶ 57 ("the hallmark of dietary supplements, herbal preparations, flavorings, and colorants is that they may be safely used without medical supervision"). First Databank claims this new code—never hinted at by Dr. Lotze—is based on "[f]ederal guidance," *id.*. ¶ 55. First Databank has repeatedly delayed implementation of the "Q" code, which apparently may take effect "late" this year.  In the meantime, First Databank continues to misrepresent Alfasigma's medical foods.

**I.      Alfasigma brought suit under the Lanham Act for false advertising and unfair competition, and parallel California state law claims**

Alfasigma brought the instant suit on November 15, 2018, seeking recovery under the Lanham Act, 15 U.S.C. § 1125(a), for First Databank's false and misleading advertising of

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 11                           PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
                                 DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

Alfasigma's medical food products as OTC drugs, Compl. ¶¶ 59-72, contributory false advertising, *id.* ¶¶ 73-80, and unfair competition and false description of the source and sponsorship of the information provided in its database, *id.* ¶¶ 81-90, and for parallel California state law claims. *Id.* ¶¶ 91-97 (false advertising in violation of Cal. Bus. & Prof. Code § 17500 *et seq.*); *id.* ¶¶ 98-100 (unlawful trade practice in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*); *id.* ¶¶ 101-106 (common law unfair competition).

## VI.    ARGUMENT

Alfasigma's Lanham Act and state law claims require essentially the same analysis, *Exeltis,* 2017 WL 6539909 at * n.7, though the Court reviews the federal claims solely under the *Twombly* standard. *Id.* "[A]t heart a consumer protection statute," *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011), Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), allows an action against "[a]ny person who," in connection with goods or services, uses in commerce "any word" or "misleading description of fact" which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" The claim's elements include:

> (1)    the ads of the opposing party were false or misleading;
> (2)    the ads deceived, or had the capacity to deceive, consumers;
> (3)    the deception had a material effect on purchasing decisions;
> (4)    the misrepresented product affects interstate commerce; and
> (5)    the claimant has been, or is likely to be, injured by the false advertising.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). The "intent" of this provision is "'to protect persons engaged in such commerce against unfair competition.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014) (quoting 15 U.S.C. § 1127). To state a Lanham Act false advertising claim, "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark,* 134 S. Ct. at 1395.

First Databank's advertising is actionable if it is (1) literally false or (2) literally true, but likely to mislead or confuse consumers. *Southland Sod,* 108 F.3d at 1139; *see also Exeltis,* 2017 2017 WL 6539909 at *6, n.7. When a statement is literally false, the court presumes deception.

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 12    PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

1    *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986). A "literally false"

2    may be "conveyed by necessary implication when, considering the advertisement in its entirety,

3    the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis*

4    *Cons. Health, Inc. v. Johnson & Johnson-Merck Cons. Pharm. Co.*, 290 F.3d 578, 586-87 (3d

5    Cir. 2002). "The Court may rely on its own common sense and logic in interpreting the message

6    of the advertisement." *Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994).

7    **A.    Alfasigma's allegations in *Nivagen* are consistent with its claims here**

8            Rather than addressing its own misconduct and the merits of Alfasigma's claims in this

9    suit, First Databank focuses on the allegations brought in a different suit, involving different

10   products. *See* Motion at 1-2, 5, 7-8, 14, 17-18 (discussing *Alfasigma USA, Inc. v. Nivagen*

11   *Pharm., Inc.,* No. 2:17-cv-01974 (E.D. Cal)); *see also* Doc. 18-2 at pp. 5-25 ("*Nivagen* Compl.")

12   First Databank references *Nivagen* dozens of times in the course of its Motion, falsely

13   characterizing the suit as alleging "Nivagen is engaged in false advertising by describing its

14   products as 'prescription,'" and claiming that "Alfasigma is suing First Databank for false

15   advertising for refusing to state what Alfasigma claims in another case would itself be false

16   advertising." *Id.* at 1.

17           First Databank's characterizations of the *Nivagen* suit are factually wrong, and legally

18   irrelevant. Nivagen markets a *dietary supplement* it calls "Niva-Fol®," *Nivagen* Compl. ¶ 29, as a

19   generic substitute for Foltx®, an Alfasigma medical food not currently marketed, and Folbic™, a

20   licensed generic offered by Breckenridge Pharmaceuticals, Inc. *Id.* ¶¶ 16, 19, and 29-31. As

21   alleged in the complaint, Nivagen falsely advertises Niva-Fol as a ***drug*** that "requires an Rx on

22   the label," and that is "Made in USA." *Id.* ¶¶ 35-55. In this effort, Nivagen allegedly obtained a

23   National Drug Code (or "NDC") for Niva-Fol, *id.* ¶¶ 47-52, which is "prohibited" for a non-drug

24   product. Nivagen's false representations of being a prescription drug made it more appealing to

25   consumers because it would be seen as reimbursable by insurers. *Id.* ¶ 54.

26           Nowhere in the *Nivagen* Complaint did Alfasigma allege it is "'literally false' to describe

27   a medical foods as 'prescription,'" Motion at 1. Rather, it alleged that "medical foods are not

28   drugs," and the FDCA "does not require medical foods to be dispensed by prescription," but that

they are intended to be used under the supervision of a physician; thus, medical foods are often dispensed via a prescription, but a prescription is not required.

*Nivagen* Compl. ¶ 11. This is an accurate statement of law, and entirely consistent with the Complaint in this action. *See* Compl. ¶ 6 ("medical foods [are] to be used under physician supervision and typically dispensed by prescription").

First Databank also contends that Alfasigma's allegation in *Nivagen* that medical foods are not "eligible for reimbursement by many private insurers," *Nivagen* Compl. ¶ 14, somehow contradicts its allegation in the instant suit that First Databank's false and misleading advertising has caused insurers and PBMs to discontinue coverage of Alfasigma's medical foods. Motion at 2, 7. But both statements are correct and consistent. As the FDA itself communicated to First Databank, its false description of medical foods as over-the-counter drugs caused insurers to stop covering these products, causing a steep loss of sales. Adding further injury, Nivagen falsely advertises its products as reimbursable prescription drugs with NDC numbers, giving it an unfair competitive advantage over Breckenridge's medical foods—which are no longer reimbursed due to First Databank's false and misleading advertising.

Beyond First Databank's factual errors, it never explains why the allegations in another suit could possibly matter. To date, the *Nivagen* suit remains pending, and there has been no adjudication on the merits for anyone involved. Thus, neither collateral estoppel, judicial estoppel, nor res judicata apply. *Hulett v. State Farm Mut. Auto. Ins. Co.,* 974 F.2d 1342, 1992 WL 219063, at *2 (9th Cir. Sept. 11, 1992); *Ah Quin v. Cty. of Kauai Dep't of Transp.,* 733 F.3d 267, 270–71 (9th Cir. 2013); *City of Hope v. Teamsters Local 631 Sec. Fund for S. Nevada*, No. 97-15988, 141 F.3d 1174, 1998 WL 133456, at *1 (9th Cir. 1998). While Alfasigma believes it will ultimately prevail in the *Nivagen* suit, it has no bearing on this suit.

**B.     First Databank engages in "commercial speech"**

With respect to the claims actually asserted in this case, First Databank contends that its commercial database is outside the reach of the Lanham Act because it is not "commercial speech." As this Court already held, First Databank is sufficiently "commercial" for claims to proceed. *Exeltis,* 2017 WL 6539909, at *13.

"The Ninth Circuit has highlighted that federal law is not 'clear' about 'what type of

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 14                    PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

speech qualifies as commercial speech.'" *Id.* at *6 (quoting *U.S. v. Schiff,* 379 F.3d 621, 626 (9th Cir. 2004)); *see also Hunt v. City of L.A.*, 638 F.3d 703, 715-16 (9th Cir. 2011) (analyzing authority, and holding that boardwalk vendors engaged in commercial speech). While the "core notion of commercial speech" is "speech which does no more than propose a commercial transaction," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993), "commercial speech" encompasses more than this "core notion." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (commercial speech includes "expression related solely to the economic interests of the speaker and its audience").

For example, in *Bolger v. Youngs Drug Prods. Corp*., 463 U.S. 60 (1983), the Court held informational pamphlets about contraceptives, which included discussions about "important public issues such as venereal disease and family planning," constituted "commercial speech." *Id.* at 68. While the pamphlets could not "be characterized merely as proposals to engage in commercial transactions," a close examination revealed they referred to a specific product, were used as advertising, and the company sending them had "an economic motivation for mailing the pamphlets." Together, these facts provided "strong support" to conclude "that the informational pamphlets are properly characterized as commercial speech." *Id.* at 67; *see also Asoc. De Labs. Clinicos, Inc. v. Med. Card Sys., Inc.*, No. 15-cv-1099, 2015 WL 13548474, at *2 & *9-10 (D.P.R. Jul. 24, 2015) ("*ALC v. MCS*") (letters telling patients that ALC's members "were no longer part of" MCS's "Medicare Advantage Network" was commercial speech actionable as false advertising) (citing *Pharm. Care Mgt. Ass'n v. Rowe*, 429 F.3d 294, 309-10 (1st Cir. 2005) (law requiring PBMs to disclose third party financial relationships regulated commercial speech as it was "overtly geared at the economic interests of the PBMs and the covered entities")). By contrast, in *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952 (9th Cir. 2012), which did not involve allegations of false advertising, the could held a Seattle ordinance imposing "substantial conditions and costs on the distribution of" the plaintiff's yellow pages phone directories, which contained both advertising and non-commercial speech, could not pass strict scrutiny.

"When commercial speech is false or misleading, it 'is not protected by the First Amendment at all.'" *Crossfit, Inc. v. Nat'l Str. and Cond. Assoc.*, No. 14-cv-1191, 2016 WL

5118530, at *6 (S.D. Cal. Sept. 21, 2016) (quoting *City of Cincinnati.*, 507 U.S. at 434 (1993) (Blackmun, J. Concurring)). In *CrossFit*, the plaintiff offered fitness programs, credentialed trainers, and licensed its mark to gyms. NSCA published educational materials about fitness, certified trainers, and offered national conferences. An article published in NSCA's "flagship journal" highlighted a Crossfit training program, with data showing a high rate of injury. *Id.* at *1-2. CrossFit, claiming the injury data were false, sued for false advertising. On summary judgment cross-motions, the court held that the NSCA's "injury" data were false, *id.* at *10-11, and rejected the NSCA's argument that the speech was not "commercial." *Id.* at *5-8.

"The Lanham Act proscribes misrepresentation of another's goods or services in 'commercial advertising or promotion,'" *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (quoting 15 U.S.C. § 1125(a)(1)(B)). Though not defined by the statute, *id.,* advertising "is not limited to newspaper, television or radio announcements; any notice addressed to the public serves the same purpose." *Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 934 F. Supp. 570, 580 (S.D.N.Y. 1996), *aff'd in part, rev'd in part on other grounds*, 137 F.3d 75 (2d Cir. 1998); *see also Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (juice packaging was "advertising"). "Courts have applied the Lanham Act to just about every imaginable print and media form, including press releases, print ads, posters, and websites." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 462 (D.N.J. 2009) (continuing medical education presentations were "advertising" because "they have been designed by GEH to deliver a specific message related to Visipaque renal superiority"); *id*. at 459 (secondary distribution of medical journal articles was "advertising").

While First Databank's MedKnowledge® database "is not a traditional advertisement," *Exeltis,* 2017 WL 6539909, at *7, it is a critical channel for the marketing of pharmaceutical products. Denney Decl. ¶ 9; *see also Merck Eprova AG v. Brookstone Pharma, LLC*, 920 F. Supp. 2d 404, 425 (S.D.N.Y. 2013). In *Merck*, after a bench trial, the court found the defendant liable under § 43(a) for both direct and *contributory* false advertising of its prescription products. The defendant had convinced First Databank to "link" defendant's products to brand products formulated with Merck's Metafolin® ingredient. The defendant thus "led the databases to make

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 16

PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

misleading claims" about the products, and further "intentionally induced the databases to falsely advertise" the defendant's products, giving rise to contributory false advertising liability. *Id.*

In a footnote, First Databank seems to imply that it is an open question whether a plaintiff must be a "direct competitor" for its advertising to be actionable. Motion at 19, n.10. In *Lexmark*, the Supreme Court expressly held that "direct" competition was not a requirement for standing to bring suit under the Lanham Act's false advertising provision. 134 S. Ct. 1393 ("But although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a).") Construing *Lexmark,* courts have also held that a "direct competition" element for the definition of *advertising* similarly no longer can apply. *Handsome Brook Farm LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. Appx. 251, 256 (4th Cir. 2017) (analyzing authorities, and concluding: "we also do not require a competitive relationship when determining whether a communication is advertising or promotion"); *see also ALC v. MCS*, 2015 WL 13548474, at *10-11 ("If noncompetitors may sue under § 43(a) for false advertising, it cannot be that only a competitor's speech may form the basis for such an action."). Thus, actionable false advertising "does not necessarily need to mention one's own product to be commercial, just as an advertisement may impliedly promote one product by disparaging another." *Crossfit*, 2016 WL 5118530, at *7 (citing *Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 518 (7th Cir. 2014) ("The notion that an advertisement counts as 'commercial' only if it makes an appeal to purchase a particular product make no sense today, and we doubt that it ever did.")).

First Databank's speech is *commercial advertising*, and subject to both Lanham Act and state law claims. First Databank offers the MedKnowledge® database to make money, and provides it to subscribing customers to make purchasing and dispensing decisions—in short, solely for the economic interests of the speaker and its audience. Compl. ¶¶ 33, 61. As this Court held in *Exeltis*, "Defendant's database is not simply utilized as a factor in payors' reimbursement decisions, but is in fact the linchpin of these determinations." 2017 WL 6539909, at * 13 (citing evidence "that the database is at 'the heart of every pharmacist claims processing system'"). Application of the commercial speech doctrine "is fact dependent," and evidence of "payors'

1  actual use of the database and the database's primacy in actually effectuating reimbursement

2  decisions may suggest that the database is commercial in nature." *Id.*

3  **1.    The Court should follow *Exeltis,* not the inapt and vacated *Acella* decision**

4      Asking the Court to disregard its *Exeltis* ruling that First Databank's false statements in

5  its database are subject to liability under the Lanham Act and state law, First Databank instead

6  relies on *Acella Pharma., LLC v. First Databank, Inc.*, No. 17-cv-5013 (N.D. Ga. June 4, 2018)

7  ("Acella Slip. Op."), an unpublished, out-of-circuit, and *vacated* ruling. (Doc. 18-2 at 115).

8      Acella markets prescription prenatal vitamins, and sued First Databank in Georgia state

9  court, solely for Georgia state law claims, based on the potential recoding of its products from

10  "F" to "O." *Acella* Slip Op. at 5 (Doc. 18-2 at 120). First Databank removed to federal court, and

11  moved to dismiss. *See generally Acella* Slip Op. The bulk of the *Acella* ruling addressed Acella's

12  arguments with respect to its "emergency motion" remand to state court, *id.* at 6-26 (Doc. 18-2 at

13  121-141), its motion for a preliminary injunction, *id.* at 26-48 (Doc. 18-2 at 141-163), and First

14  Databank's motion to transfer. *Id.* at 48-51 (Doc. 18-2 at 163-166). While the *Acella* court

15  briefly addressed First Databank's motion to dismiss, *id.* at 53-55 (Doc. 18-2 at 168-170), it

16  conflated its analysis of the merits of the Georgia state law claims with its denial of Acella's

17  motion for injunctive relief, which in turn had relied in part on the court's acceptance of First

18  Databank's factual assertions. *Id.* at 2-3 (Doc. 18-2 at 117-118). Notably, the *Acella* court based

19  its finding that First Databank's database was not "commercial speech" on limitations in Acella's

20  pleadings. *Id.* at 32-33 (Doc. 18-2 at 147-148). Before the ruling could be reviewed on appeal,

21  First Databank agreed to delay re-coding Acella's products (which remain "F" products), and

22  Acella agreed to dismiss its appeal. Doc. 18-2 at 173-74. The ruling not only is inapposite and

23  non-precedential, but reflects a strategic choice by First Databank to ensure it would not be

24  scrutinized and reversed on appeal by the Eleventh Circuit.

25      Not cited by First Databank, *NV Mach. Inc. v. Korean Cleaners Monthly*, No. 17-cv-

26  12269, 2018 WL 2455926 (D.N.J. May 31, 2018), recently rejected a publisher's "non-

27  commercial speech" challenge to § 43(a) Lanham Act claim. Defendant, the publisher of a

28  laundry industry trade magazine, published allegedly false articles disparaging the plaintiff, its

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 18                    PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

1   former customer.  Plaintiff sued, and the publisher moved to dismiss the Lanham Act claims,

2   arguing the articles were "non-commercial speech."  The court disagreed:

> [T]he Complaint alleges that Defendants falsely criticized Plaintiffs' goods and
> services in a publication in an effort to promote the businesses of NYM's
> competitors, for the benefit of Defendants. (*See* Compl. ¶¶ 16–19, 38.) Thus, in
> accepting the allegations as true, Plaintiffs have sufficiently pled that these
> statements are commercial speech made in commercial advertising or promotion.

6   *Id.* at *3.

7       First Databank also cites *Theodosakis v. Clegg*, No. 14-cv-2445, 2017 WL 1294529, at

8   *1 (D. Ariz. Jan. 30, 2017), report and recommendation adopted, 2017 WL 1210345 (D. Ariz.

9   Mar. 31, 2017), but fails to note the full scope of the ruling. There, the producer of dietary

10  supplements sued researchers for a case study report published in the New England Journal of

11  Medicine. *Id.* at *2. Plaintiffs alleged the authors of the report, who had an economic interest in a

12  competing prescription drug, had misrepresented the benefits of the drug, and then used reprints

13  of the article in promoting it. The Court held that the *initial* publication of the report did not

14  constitute "commercial speech," but its subsequent use could be actionable. *Id.* at *19. Plaintiffs

15  were given leave to amend, and the case later resolved.

16      First Databank also relies on *Ariix, LLC v. NutriSearch Corp.*, No. 17-cv-320, 2018 WL

17  1456928, at *5 (S.D. Cal. Mar. 23, 2018), in which the court rejected a dietary supplement

18  manufacturer's false advertising Lanham Act claims against the publisher of a supplements guide

19  with product reviews that favored a competitor's product. Contrary to the Supreme Court's

20  aversion to "identify[ing] a strict test," *Exeltis,* 2017 WL 6539909, at *6, *Arrix*—while

21  acknowledging that *false* product reviews are actionable—created a bright line rule that "if a

22  publication that appears to be a consumer product review is in fact a consumer product review, it

23  falls outside the scope of the Lanham Act's false advertising provision." *Arrix,* 2018 WL

24  1456928, at *3. Here, First Databank is not offering consumer product reviews. Its database is

25  sold to medical professionals and businesses in the pharmaceutical distribution and insurance

26  industries, purporting to provide information from manufacturers and the FDA about the identity

27  and characteristics of pharmaceutical products—information central to purchasing decisions.

28      In this same vein, *Davis v. Avvo, Inc.*, No. 18-cv-2835, 2018 WL 662926 (S.D.N.Y. Dec.

DOCUMENT PREPARED
ON RECYCLED PAPER

19, 2018), concerned an attorney suing an attorney review website. Dismissing, the court noted that "statements of pure opinion" are "incapable of being proven false," *id.* at \*2. Avvo's challenged "rating system is inherently subjective," and if the attorney ratings offered on the site "are opinions, it is irrelevant whether or not they are misleading because they are protected in any event." *Id.* at \*3. But First Databank does not claim to offer "subjective" opinions that are incapable of being true. The database it provides is used by doctors, pharmacists, and insurers making crucial decisions on behalf of patients—and First Databank touts its objectivity claiming the information comes from the FDA.

Finally, First Databank relies on *Liberty Counsel v. Guidestar*, No. 4:17-cv-71 (E.D. Va. Jan. 23, 2018), an unpublished district court opinion, which dismissed claims by a religious organization against a non-profit website for publishing the literally true statement that the Southern Poverty Law Center had designated the organization as a "hate group." Motion, Doc. 18-2 at 183, 185. Affirming, the Fourth Circuit declined to address the district court's analysis of whether the publication was "commercial advertising or promotion," but held that the plaintiff failed to allege the publication was false or misleading. *Liberty Counsel, Inc., v. GuideStar USA, Inc.*, 737 Fed. Appx. 171 (4th Cir. 2018) (per curiam).[3]

In *Liberty Counsel,* the Fourth Circuit cited its prior ruling in *Handsome Brook*, 700 Fed. Appx. at 253, where the non-profit defendant, HFAC, certified egg producers for humane treatment. It sent emails to thirty-six grocery retailers, telling them that plaintiff HBF, "an egg producer HFAC does not certify, lacked up-to-date certifications to supports its representations that its eggs are organic and pasture raised." *Id.* at 252. It asked retailers to "reconsider changing suppliers." *Id.* HBF lost customers, sued HFAC under the Lanham Act, and received a preliminary injunction. Affirming, the Fourth Circuit held that while HFAC was a nonprofit, it

---

[3] First Databank also cites *Coral Ridge v. Amazon*, an unpublished Report and Recommendation that relied on the *Liberty Counsel* district court decision. Doc. 18-2 at 187. Although issued nearly a year ago, the Report and Recommendation has not been adopted. The court heard oral argument in May 2018 on an objection, then withdrew its referral of the motion to dismissal from the Magistrate Judge, and thereafter the case was assigned to another district judge. Perloff Decl. Ex. 6 (*Coral Ridge* docket sheet).

1   still made money by offering its certification services, and the speech at issue was "commercial

2   speech." *Id.* at 255 & 258-63 (speech was "placed in a commercial context and is directed at the

3   providing of services rather than toward an exchange of ideas"). The court explained that "any

4   communication that is commercial speech, promotes a good, and is sufficiently disseminated is

5   an advertisement for the promoted good, regardless of the speaker." *Id.* at 256. Because HFAC's

6   emails met these elements, it was "advertising." *Id.* at 262. As *false* advertising, it was

7   actionable. *Id.* at 262-63.

8         2.    **Like *Exeltis*, other courts have rejected First Databank's Anti-SLAPP**

9                  **motions**

10         While First Databank apparently treats every suit against it as a "direct assault on the

11   First Amendment," Motion at 1, courts disagree. In *Schering Corp. v. First Databank Inc*., No.

12   07-cv-01142, 2007 WL 1176627, at \*9 (N.D. Cal. Apr. 20, 2007), the court denied First

13   Databank's motion to strike under California's Anti-SLAPP statute. In *Ranbaxy Labs. Inc. v.

14   First Databank, Inc.*, 826 F.3d 1334 (11th Cir. 2016), the trial court also denied motions to

15   dismiss Lanham Act claims and to strike state law claim under a state Anti-SLAPP law, and the

16   case proceeded through discovery. The court later granted summary judgment, affirmed by the

17   Eleventh Circuit, finding the plaintiff failed to create a disputed issue of fact that First

18   Databank's database statements about the plaintiff's product were false. 826 F.3d at 1337-38.

19         While First Databank cites *Rivera v. First Databank, Inc.,* 187 Cal. App. 4th 709 (2010),

20   it bears no resemblance to this case. There, the survivors of a suicide victim who used the anti-

21   depressant Paxil sued First Databank for negligence and breach of contract, alleging its

22   monograph on the antidepressant failed to include a black-box warning. Concluding that the

23   action should have been dismissed, the state appellate court held that the plaintiffs did not enjoy

24   a probability of success on the merits because they "failed to demonstrate defendant owed them

25   any duty." *Id.* at 719, 720 ("They failed to substantiate their allegations that defendant owed

26   them any duty vis-à-vis the monograph, which disposes of both causes of action.")

27         In short, Alfasigma's Complaint alleges, and the evidence shows, there is at least "a

28   minimum level of legal sufficiency and triability" that First Databank's MedKnowledge®

database represents commercial speech, allowing Alfasigma's claims to proceed.

**C.    First Databank's advertising is false**

First Databank's coding of Deplin®, Metanx® and CerefolinNAC® as "O"—understood by the market to mean "over-the-counter drugs," is doubly wrong. As medical foods, these products are to be used only with physician supervision, and they are not "drugs." As this Court again held in *Exeltis,* "the Court finds that Plaintiff has raised a legally sufficient argument that Defendant's new coding is false or misleading." 2017 WL 6539909, at *13 ("the Court cannot say that this stage that no reasonable factfinder could conclude from the legal morass described in the letter that the database misleads payors into concluding that Plaintiff's products are available over-the-counter and that payors should withhold coverage on this basis").

While in *Exeltis,* the products at issue had not yet been recoded as "O," in the instant case, the impact of First Databank's advertising is apparent. Express Scripts, citing First Databank's purported interpretation of federal regulation, communicated to its own customers that "FDB now classifies all medical foods as over-the-counter items." Compl. ¶ 48. Premara Blue Cross told its customers that "Medical Foods Labeling Changed," that they are "over-the-counter (OTC)," and that because they are "similar to what can be found at a supermarket," they would no longer be covered. Premara Notice (Perloff Decl. Ex. 4).

**1.    Medical foods may be labeled as prescription products and are not OTC drugs**

Distorting the *Nivagen* Complaint while ignoring the FDA's instructions, First Databank turns Alfasigma's evidence and allegations on its head to contend that "medical foods cannot legally be described as prescription," Motion at 1, thus, somehow, leaving First Databank no choice but to falsely advertise them as over-the-counter drugs. But the FDA's Guidance—the only authority on which First Databank claims to rely—says nothing of the sort. Nowhere does the Guidance suggest that medical foods should be available over-the-counter. To the contrary, it reinforces the requirement that medical foods be used under "physician supervision. Doc. 18-1 at 13-14 ("[T]he intended use of a medical food is for the dietary management of a patient receiving active and ongoing medical supervision . . . The patient should generally see the

physician on a recurring basis for, among other things, instructions on the use of the medical food as part of the dietary management of a given disease or condition.") While the Guidance states that an "Rx only" label—a label uniquely associated with drugs—is inapt for medical foods, it does not state that medical foods may not be labeled, marketed, prescribed, or dispensed as prescription products. Rather, the FDA is aware that medical foods are prescribed by doctors and dispensed by pharmacists via prescription, a practice accepted by the agency. *See generally* Lotze Letter (Perloff Decl. Ex. 5).

The Guidance, though important, is not "binding," and instead encourages stakeholders to "contact the FDA staff responsible for implementing this guidance" about possible "alternative approach[es]." Doc. 18-1 at 9. And here, the responsible FDA staff did not wait for First Databank to contact them, but instead reached out to First Databank. In June 2017, Dr. Lotze sent First Databank the agency's detailed letter, explaining that medical foods *could* be labeled as "prescription" products: "FDA does not object to manufacturers also indicating in the labeling of such products that prescriptions may be written for the product if doing so is consistent with applicable local, state, and federal laws." Perloff Decl. Ex. 5. First Databank was on express notice that "Medical foods are not OTC drugs and are not generally available at retail level." *Id.* But First Databank disregarded this specific and precise correction, and instead continued to disseminate false and misleading information that Alfasigma's medical foods are OTC drugs.

### 2.    First Databank's redefinition is a mere fig-leaf

First Databank also claims that by redefining the "O" code, it has precluded any finding of falsity. *E.g.*, Motion at 3 ("Alfasigma's products do not require a prescription under federal law and this is all that First Databank is stating.") But this is *not* "all" First Databank is stating. First, it is *still* using "O" expressly to mean "Drug class: OTC." Compl. ¶ 36, 37, 45, 54. Moreover, it is undisputed that customers—including, for example, Express Scripts, continue to understand "O" to mean "over-the-counter." *Id.* ¶ 37, 45, 47-48. And it is natural that they would; First Databank spent *decades* telling customers that "O" means "over-the-counter."

Nor is there any reason to expect First Databank's customers—including busy pharmacists filling hundreds of prescriptions every day—to pore over a four *thousand* page

reference guide to find First Databank's one-sentence statement buried on page 2,529. *See* Doc. 18-1 at 53. At best, this is a poor attempt at a disclaimer. And in a Lanham Act case, a disclaimer's effectiveness is a fact question. *Dependable Sales & Serv., Inc. v. Truecar, Inc.*, No. 15-cv-1742, 2016 WL 79992, at *5 (S.D.N.Y. Jan. 6, 2016) ("At this stage, the Court cannot conclude whether the disclaimer effectively turns an otherwise false advertising claim into a true one, in such a manner that the consumers are not misled, or whether the few words of disclaimer are lost when the ads are considered as a whole") (quotations and citations omitted); *Sciele Pharma, Inc. v. Brookstone Pharm., LLC*, No. 1:09-cv-3283, 2010 WL 9098290, at *7 (N.D. Ga. June 23, 2010) (effectiveness of disclaimer could not be decided on motion to dismiss); *see also LifeScan, Inc. v. Shasta Tech., LLC*, No. 12-cv-6360, 2013 WL 12201564, at *9-10 (N.D. Cal. May 21, 2013) (on motion for preliminary injunction in trademark case, finding that size and placement of disclaimers insufficient to eliminate perception of endorsement or sponsorship). And here, the only evidence demonstrates that the disclaimer was notably ineffective. *E.g.*, Denney Decl. ¶ 12.

Finally, First Databank's proposed launch of a new "Q" code itself illustrates its awareness that the "O" code was false and misleading with respect to medical foods. Unfortunately, rather than helping cure the injuries already caused by First Databank's false and misleading advertising, it is likely that the "Q" code will only cause more confusion. Compl. ¶¶ 54-58.

**D.** **Alfasigma's unfair competition claims concern First Databank's false representations regarding its own services, and is not subject to Anti-SLAPP**

Apart from false advertising, the Lanham Act creates a separate cause of action for unfair competition. 15 U.S.C. § 1125(a)(1)(A); *Healthpoint Ltd. v. Rivers Edge Pharm., LLC*, No. 03-cv-984, 2005 WL 356839, at *3 (W.D. Tex. Feb. 14, 2005). This Section allows a claim against

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact which—is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 24   PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

By falsely representing to its customers that its information is sourced from, or sponsored by, the FDA and manufacturers, including Alfasigma, First Databank violated this provision. Compl., ¶¶ 81-90.

Notably, Alfasigma's unfair competition claim is *not* subject to California's Anti- SLAPP statute. *See Exeltis,* 2017 WL 6539909, at *12 (noting statute "does not apply" if the challenged speech "consists of representations of fact about that person's . . . business operations" and the "audience is an actual buyer or potential buyer or customer") (quotations and citations omitted). And although well-pled in the Complaint, First Databank's Motion barely addresses this separate unfair competition claim. *See* Motion at (asserting its "source" "statements are plainly true").

In fact, First Databank's statements are plainly false; neither Alfasigma nor FDA told First Databank that medical foods may not be labeled prescription products, or that they should be considered OTC products. To the contrary, Dr. Lotze specifically corrected First Databank on both these points, while Alfasigma accurately informed it that these are "prescription" products. Compl. ¶ 45.

## VII.   CONCLUSION

As this Court summarized in *Exeltis*:

> To the extent that Defendant believes Plaintiff must supply even more evidence than it has, the Court disagrees and declines to grant the motion to strike at this early stage in the litigation. As the Ninth Circuit has cautioned, discovery is "require[ed]" where "the nonmoving party has not had the opportunity to discover information that is essential to its opposition." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001). The Court finds that, in particular, discovery may be necessary to obtain further information about payors' use of Defendant's database, Defendant's role in the related reimbursement transactions, payors' awareness of Defendant's proposed changes, and Defendant's own awareness of the above issues.

2017 WL 6539909, at *13. The same result is warranted here. The Court therefore should DENY First Databank's Special Motion to Strike, Motion to Dismiss and Motion to Strike.

Dated: February 1, 2019                    NORTON ROSE FULBRIGHT US LLP

                                           By:   */s/Saul Perloff*
                                                 Saul Perloff
                                           Attorney for Plaintiff
                                           ALFASIGMA USA, INC.

Document Prepared on Recycled Paper

PAGE 25

PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE