UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFASIGMA USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FIRST DATABANK, INC.,<br><br>Defendant. | Case No. 18-cv-06924-HSG<br><br>**ORDER DENYING SPECIAL MOTION TO STRIKE AND MOTION TO STRIKE; GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 18 |

Medical food manufacturer Alfasigma USA, Inc., brought Lanham Act and state law false advertising claims against First Databank, Inc., after it re-classified Alfasigma Products from Class F (prescription) to Class O (over-the-counter) in its widely-used MedKnowledge database. *See generally* Compl., Dkt. No. 1. First Databank moved to strike under California's anti-SLAPP statute and to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 18 ("Mot."). For the following reasons, the Court **DENIES** First Databank's special motion to strike but **GRANTS IN PART** and **DENIES IN PART** its motion to dismiss.[1]

I. **BACKGROUND**

   A. **Factual Allegations**

      i. **Medical Foods Are Initially Placed In Class F**

Alfasigma USA, Inc. ("Alfasigma" or "Plaintiff") is a pharmaceutical company that develops, manufactures, sells, and distributes medical foods. *See* Compl. ¶ 6. These medical foods include CerefolinNAC®, Deplin®, and Metanx® (collectively, the "Alfasigma Products" or "Products"), all of which contain the key ingredient L-methylfolate, an "essential human vitamin

---

[1] First Databank also noticed a motion to strike Alfasigma's request for injunctive relief, *see* Mot. at 1, but did not brief that issue. Accordingly, the motion is **DENIED**.

of the B complex that plays a key role in central metabolic pathways." *Id.* ¶¶ 6, 14. Federal law defines a medical food as "a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." *See id.* ¶ 17 (emphasis omitted) (quoting 21 U.S.C. § 360ee(b)(3)). Because medical foods "must be used under the supervision of [a] physician," Alfasigma markets them "directly to physicians." Compl. ¶ 19.

First Databank, Inc. ("First Databank" or "FDB") "operates, markets, and sells pharmaceutical information database products, including MedKnowledge." *Id.* ¶ 7. Drug databases or compendia are "a critical channel through which pharmaceutical companies, like Alfasigma, promote products to their customers." *Id.* ¶ 23. Customers "rely on the information drug databases provide to make decisions about which products to prescribe, purchase, dispense, and reimburse." *Id.* MedKnowledge is the largest and most widely used drug compendia, *id.* ¶ 24, and insurers rely on it to decide which products to cover, *id.* ¶ 32.

One of the "primary fields" in FDB's MedKnowledge database is the product's "Class." *Id.* ¶ 36. This "Class field currently contains one of two possible codes: O or F." *Id.* First Databank "has represented to its subscribers over many years" that an O-Class product is "Over-the-counter" ("OTC"), meaning that a "prescription is not required per the product labeling." *Id.* (emphasis omitted). Subscribers "universally understand[] that a product designated 'O' is an OTC drug, available over-the-counter and without physician supervision." *Id.* ¶ 37. By contrast, an F-Class product is a "prescription product." *Id.* ¶ 36.

Before introducing the Products, Alfasigma submitted information to First Databank so that the Products would be included in the MedKnowledge database. *Id.* ¶ 38. The Alfasigma Products were "historically and correctly" designated as F-Class. *Id.* ¶ 35. Because the Products were designated as requiring a prescription, "their cost was often covered by insurance plans that limit coverage to prescription products," which "assisted patients to purchase the Alfasigma Products prescribed by their physicians, and thus to be compliant in taking them." *Id.* ¶ 39.

//

### ii. Medical Foods Are Moved to Class O

Between February 29 and April 26, 2016, First Databank reclassified the Alfasigma Products to Class O. *Id.* ¶¶ 40–41. In doing so, FDB was "falsely representing that these products are available OTC, when in fact they are available by prescription, and should not be taken by a patient without physician supervision." *Id.* ¶ 40. The federal Food and Drug Administration ("FDA") defines OTC drugs as "drugs that are safe and effective for use by the general public without seeking treatment by a health professional." *Id.* ¶ 42. But the "Alfasigma Products are not OTC drugs"—rather, they are medical foods that "are to be used only with physician supervision." *Id.* ¶ 42–43. Thus, moving the Alfasigma Products to Class O was "false and misleading." *Id.* ¶ 42.

First Databank claimed that it moved the Alfasigma Products from the F-Class to the O-Class to be "in alignment with [] FDA standards." *Id.* ¶ 41 (brackets in original). But the "FDA has never advised FDB that it should change the listing or description of the Alfasigma Products in its MedKnowledge database." *Id.* ¶ 44. To the contrary, Andrea Lotze, the FDA's Medical Director for the Infant Formula and Medical Foods Staff, told FDB that "[m]edical foods are not OTC drugs." *Id.* ¶ 45. Moreover, Director Lotze advised FDB that its "misinterpretation of FDA's position and policies on medical foods" was leading to patients losing insurance coverage because "their insurance providers belie[ve] that the [Alfasigma Products] are over-the-counter (OTC) drugs." *Id.* ¶ 45. Further, she explained that "the FD&C Act does not prohibit physicians from writing prescriptions for medical foods" and that a patient taking medical foods "should see the physician on a recurring basis for, among other things, instructions on the use of the medical food as part of the dietary management of a given disease or condition." *Id.*

First Databank's reclassification caused confusion in the marketplace, leading insurers to deny coverage for the Alfasigma Products. *Id.* ¶ 49. The change cost patients more in out-of-pocket expenses, caused physicians to stop prescribing Alfasigma Products, and led to pharmacies not stocking the Products. *Id.* ¶¶ 49–50.

### iii. First Databank Announces Creation of Q-Class

In September 2018, First Databank announced that it was creating a new Q-Class for the

1  MedKnowledge database, in order to "distinguish" medical foods "from over-the-counter drugs
2  and devices." *Id.* ¶ 54. FDB tentatively said that it would implement the Q-Class in February
3  2019 but has since delayed the rollout until at least July 2019. *Id.* ¶ 55. Class Q will include
4  products "that are neither drugs nor devices, such as dietary supplements (including prenatal and
5  other vitamins), medical foods, herbal preparations, and bulk flavorings or colorants." *Id.* ¶ 56.
6  But Alfasigma points out that "[n]one of these products are regulated as medical foods, and none
7  of them carry a federal requirement that they be used under physician supervision." *Id.* ¶ 57.
8  Reclassifying the Alfasigma Products into the Q-Class "will cause further confusion among
9  physicians and other prescribers, pharmaceutical wholesalers and distributors, pharmacies,
10 pharmacists, and insurers, to Alfasigma's continuing injury." *Id.* ¶ 58.

### B. Alfasigma's Lawsuit

Alfasigma filed its complaint on November 15, 2018, asserting six causes of action: (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (2) contributory false advertising in violation of the Lanham Act, *id.* § 1125(a)(1)(B); (3) unfair competition and false description in violation of the Lanham Act, *id.* § 1125(a)(1)(A); (4) false advertising in violation of California Business & Professional Code § 17500 *et seq.*; (5) unlawful trade practice in violation of California Business & Professional Code § 17200 *et seq.*; and (6) common law unfair competition. *See* Compl.

### C. First Databank's Motion

On December 21, 2018, First Databank moved to strike under California's anti-SLAPP statute or to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* "Mot." Alfasigma opposed on February 1, 2019. *See* Dkt. No. 26 ("Opp."). First Databank replied on February 22. *See* Dkt. No. 31 ("Reply"). The Court held a hearing on April 4. *See* Dkt. No. 36 (minute entry).

## II. SPECIAL MOTION TO STRIKE

First Databank moved to strike Alfasigma's state law claims under California's anti-SLAPP statute. *See* Mot. at 9. The Court finds that Alfasigma has met its burden to show a reasonable probability of success and therefore **DENIES** the motion to strike.

//

### A. Legal Standard

Under California's anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1). The statute was enacted to curtail strategic lawsuits against public participation that were "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." *Id.* § 425.16(a). Because "it is in the public interest to encourage continued participation in matters of public significance, and [because] this participation should not be chilled through abuse of the judicial process," the anti-SLAPP statute is to be "construed broadly." *Id.*

California courts apply a two-step process when analyzing an anti-SLAPP motion. *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010). Under the first prong, the moving party must make "a threshold showing . . . that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute." *Equilon Enters., LLC v. Consumer Cause, Inc.*, 52 P.3d 685, 694 (Cal. 2002) (alteration in original) (quoting Cal. Civ. Proc. Code § 425.16(b)(1)). If the moving party meets its threshold showing, the burden shifts to the non-moving party to prove a probability of prevailing on the claim. *See id.* In deciding whether the plaintiff has a probability of prevailing, "the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant." *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002). And "though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." *Id.* The anti-SLAPP statute applies to state-law claims in federal court. *See United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190

F.3d 963, 973 (9th Cir. 1999).[2]

**B.    Discussion**

    **i.    Acts in Furtherance**

First Databank argues that it has met the first prong because "[t]his Court has already held that the anti-SLAPP statute applies to state-law claims challenging the accuracy of First Databank's Class value field." Mot. at 10 (citing *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-CV-04810-HSG, 2017 WL 6539909, at *11–12 (N.D. Cal. Dec. 21, 2017)).

Covered acts include, but are not limited to, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code §§ 425.16(e)(3)–(e)(4). Speech is considered "in connection with an issue of public interest" if it concerns: (1) "a person or entity in the public eye"; (2) "conduct that could directly affect a large number of people beyond the direct participants"; or (3) "a topic of widespread, public interest." *Rivero v. Am. Fed'n of State, Cty., & Mun. Emps., AFL–CIO*, 105 Cal. App. 4th 913, 924 (Cal. Ct. App. 2003).

Given that Alfasigma does not contest this prong and has pled that FDB's reclassification affected a large number of people, the Court finds the acts within the scope of the anti-SLAPP statute.

---

[2] The Ninth Circuit has held that the motion to strike and attorneys' fees provisions of California's anti-SLAPP statute, California Civil Procedure Code §§ 425.16(b)–(c), are available in federal court because there is no "direct collision with the Federal Rules." *See United States ex rel. Newsham*, 190 F.3d at 972–73 (quotation omitted). Yet a number of judges have questioned this holding. *See, e.g.*, *Travelers Cas. Ins. Co. of Am. v. Hirsh*, 831 F.3d 1179, 1182–86 (9th Cir. 2016) (Kozinski, J., concurring), 1186 (Gould, J., concurring); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 274–75 (9th Cir. 2013) (Kozinski, J., concurring), 275–76 (Paez, J., concurring), petition for rehearing en banc denied, 736 F.3d 1180, 1188–89 (Watford, J., dissenting from denial); *In re Gawker Media LLC*, 571 B.R. 612, 628–32 (Bankr. S.D.N.Y. 2017). And, in contrast to the Ninth Circuit, the D.C. Circuit held that the District of Columbia's anti-SLAPP statute could not be applied in federal court. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333–37 (D.C. Cir. 2015) (Kavanaugh, J.). The Court applies the statute in this case as required by binding case law but reiterates its concern that the anti-SLAPP statute is incompatible with Rule 12 and its plausibility standard. *See Makaeff*, 715 F.3d at 274 (opining that application of California's anti-SLAPP statute in federal court "cuts an ugly gash through [the] orderly process" created by the Federal Rules of Civil Procedure) (Kozinski, J., concurring).

### ii. Probability of Prevailing

The anti-SLAPP statute "subjects to potential dismissal only those actions in which the plaintiff cannot state and substantiate a legally sufficient claim." *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002) (internal quotations and alterations omitted). To survive an anti-SLAPP motion, the plaintiff need only "show a reasonable probability of prevailing in its claims." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) (quotation omitted). "Reasonable probability" in this context means "only a minimum level of legal sufficiency and triability." *Id.* (quotation omitted). Thus, "the trial court does not weigh the evidence or determine questions of credibility; instead the court accepts as true all of the evidence favorable to the plaintiff." *Nagel v. Twin Labs., Inc.*, 109 Cal. App. 4th 39, 45–46 (Cal. Ct. App. 2003); *see also* Cal. Civ. Proc. Code § 425.16(b)(2).

#### a. Commercial Speech

First Databank contends that because the information in the MedKnowledge database is "pure non-commercial speech outside of the scope of California's Unfair Competition Law, False Advertising Law, and unfair competition common law," Alfasigma cannot possibly prevail on its state law claims and thus they must be stricken under the anti-SLAPP statute. Mot. at 11.

"[F]ederal and state consumer protection statutes apply exclusively to commercial speech." *Exeltis*, 2017 WL 6539909, at *6; *see also Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140 (Cal. Ct. App. 2004) ("California's consumer protection laws, like the unfair competition law, govern only *commercial* speech."). But federal law is not "clear" about "what type of speech qualifies as commercial speech." *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004).

The Supreme Court has held that the "core notion of commercial speech" encompasses "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (quotation omitted). Further, communications may "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues." *Id.* at 67–68. The Supreme Court has laid out three factors to determine whether statements are commercial speech: (1) whether they were in an advertising format, (2) whether they referred to a specific product, and (3) the economic motivation for publication. *Id.* at 66–67.

7

And it has alternatively defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). In any event, courts are loath to identify a strict test. *Cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (acknowledging "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category"); *Kasky v. Nike, Inc.*, 45 P.3d 243, 257 (Cal. 2002) (noting that the "United States Supreme Court has never decided whether false statements about a product or service of a competitor of the speaker would properly be categorized as commercial speech" and "offer[ing] no view on how" that question "should be resolved").

In *Exeltis*, the Court relied on evidence submitted by the plaintiff to find that there was enough evidence that the MedKnowledge database constituted commercial speech to deny the anti-SLAPP motion:

> According to Plaintiff, Defendant's database is not simply utilized as a factor in payors' reimbursement decisions, but is in fact the linchpin of these determinations. *See* Compl. ¶¶ 2, 46–51, 67–69. In support of this argument, Plaintiff identifies an expert, a former California Chief Medicaid Pharmacist, who explains that the database is at "the heart of every pharmacist claims processing system." Dkt. No. 3-3, Ex. B ¶ 22. In his role with the Department of Health Care Services, Plaintiff's expert "was responsible for setting and implementing California's Medicaid (Medi-Cal) reimbursement policy and rebate contracting." *Id.* ¶ 2. And he explains that reimbursement decisions are determined "instantly" based on information from databases like Defendant's. *Id.* ¶¶ 21–23. He further suggests that this is by design, and the databases market themselves to enter and facilitate reimbursement transactions between third-parties. *Id.* ¶¶ 22–23. Although the Court has concerns about expanding the commercial speech doctrine, its application is fact dependent, and payors' actual use of the database and the database's primacy in actually effectuating reimbursement decisions may suggest that the database is commercial in nature. Accepting Plaintiff's evidence as true, the Court cannot conclude that there is no reasonable probability (as defined by the applicable lenient standard described above) of succeeding on this argument.

2017 WL 6539909, at *13.

First Databank acknowledges the *Exeltis* decision but contends that "subsequent authority along with binding circuit precedent support a different conclusion here." Mot. at 12. The Court finds these arguments unpersuasive.

First, FDB points to the vacated decision by the Northern District of Georgia in *Acella*

8

*Pharmaceuticals, LLC v. First DataBank, Inc. See* No. 1:17-CV-5013-MHC, 2018 WL 7199992, at *1 (N.D. Ga. June 4, 2018), *vacated*, No. 1:17-CV-5013-MHC, 2018 WL 7199807 (N.D. Ga. Oct. 4, 2018). The *Acella* court agreed with (and cited) *Exeltis* when it held that a preliminary injunction against the MedKnowledge database would be an unconstitutional prior restraint. *See* 2018 WL 7199992, at *14. In addition, the *Acella* court held (again, consistent with *Exeltis*) that under the standard applied on a motion for a preliminary injunction, the plaintiff had not shown that First Databank's reclassification of the products at issue constituted commercial speech. *See id.* at *12. This was because FDB did "not propose any commercial transaction" and the *Bolger* factors did not weigh in favor of characterizing the speech as commercial. *See id.* at *11–12. But First Databank did not bring a special motion to strike under an anti-SLAPP statute in *Acella* and thus there was no cause to determine whether there was "reasonable probability" that the plaintiff would be able to show that FDB engaged in commercial speech. Thus, the *Acella* decision, beyond the fact that it was vacated, does not provide any basis for the Court to diverge from its holding in *Exeltis*.

Second, First Databank cites *Dex Media West, Inc. v. City of Seattle*, in which the Ninth Circuit held that "telephone listings and community information contained in [a yellow pages phone book directory] constitute noncommercial speech." 696 F.3d 952, 957 (9th Cir. 2012). First Databank does not spell out its theory, but presumably it is that the MedKnowledge database is to drugs as a yellow pages directory is to telephone numbers, in that both are noncommercial speech. Of course, *Dex Media* predates *Exeltis*. And it arose in a substantially different context: the Ninth Circuit, reviewing a grant of summary judgment, was applying strict scrutiny in evaluating an ordinance that imposed costs on phone books. *See id.* at 965–66. By contrast, Alfasigma has pled enough facts to satisfy the low threshold of showing a reasonable probability that FDB engaged in commercial speech for purposes of sustaining a false advertising claim.

Third, First Databank relies on *Ariix, LLC v. Nutrisearch Corp.*, in which a court in the Southern District of California dismissed a Lanham Act claim because the statute "doesn't apply to reviews of consumer products." No. 17CV320-LAB (BGS), 2018 WL 1456928, at *3 (S.D. Cal. Mar. 23, 2018). First Databank does not articulate why it believes a database of

9

pharmaceutical products is equivalent to consumer reviews. And unlike the consumer reviews at issue in *Ariix*, Alfasigma has alleged that MedKnowledge subscribers rely on the database in making purchasing decisions, which is enough to show a reasonable probability that Alfasigma will prevail. *See* Compl. ¶¶ 23, 32.

In short, Alfasigma's allegations, including that First Databank customers "rely on the information drug databases provide to make decisions about which products to prescribe, purchase, dispense, and reimburse," *see* Compl. ¶ 23, create a reasonable probability that it will be able to show FDB engaged in commercial speech. *Cf. Exeltis*, 2017 WL 6539909, at *23 (holding that "payors' actual use of the database and the database's primacy in actually effectuating reimbursement decisions may suggest that the database is commercial in nature"). Ultimately, the question of whether the database is commercial speech is one better answered with a more complete record, when the Court will have greater visibility into the relationship between First Databank, Alfasigma, the FDA, and customers.

### b. Falsity

First Databank contends that Alfasigma has not adequately alleged that First Databank made any false or misleading statements. *See* Mot. at 15. The Court disagrees.

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Similarly, the UCL prohibits any "unlawful, unfair or fraudulent business act or practice," California Business & Professions Code § 17200, and the FAL prohibits any "unfair, deceptive, untrue, or misleading advertising," California Business & Professions Code § 17500.

Alfasigma's first theory of liability is that coding the Products as Class O is misleading because it falsely represents that they are OTC drugs. *See* Compl. ¶ 95; Opp. at 22. First Databank responds that the MedKnowledge database is entirely accurate: "the 'O' Class value explicitly includes medical foods" because "the products do not require a prescription under federal law." Mot. at 16. But Alfasigma has pled that MedKnowledge database subscribers

10

"universally understand[] that a product designated 'O' is an OTC drug, available over-the-counter and without physician supervision." Compl. ¶ 37. Thus, according to Alfasigma, classifying the Alfasigma Products as OTC drugs is false or misleading, because the FDA explained to First Databank that "[m]edical foods are not OTC drugs." *Id.* ¶ 45. Even if First Databank has redefined Class O to expressly include medical foods, the understanding and expectations of its subscribers based on an earlier, stable definition may override a subtle definitional change, particularly when Alfasigma has pled that consumers are confused. *See Exeltis*, 2017 WL 6539909, at *23. Accepting as true all evidence in favor of the plaintiff, as the Court must do on a special motion to strike, Alfasigma has shown a reasonable probability that it will prevail on its theory that categorizing the Products within Class O is false or misleading.

Alfasigma's second theory of liability is that First Databank misled its subscribers when it claimed that "the source of its information," Compl. ¶ 95, was Alfasigma and the FDA, *id.* ¶ 3. *See also* Mot. at 15 (acknowledging that "the Class value information *is* derived from both manufacturer-reported and FDA information"). To the contrary, Alfasigma alleges that the FDA had warned First Databank that it "misinterpret[ed]" the agency's "position and policies on medical foods" and explained that "the FD&C Act does not prohibit physicians from writing prescriptions for medical foods." *Id.* ¶ 45. Taken at face value, the FDA's statements, as relayed by Alfasigma, tend to support Alfasigma's inference that First Databank could not be telling the truth when it said that it decided to reclassify the Products based on information received from the FDA.

First Databank also relies heavily on Alfasigma's pleadings in another case, which First Databank asserts are inconsistent with Alfasigma's position here. *See* Mot. at 5 (citing *Alfasigma USA, Inc. v. Nivagen Pharms., Inc.*, C.A. No. 2:17-cv01974-MCE-GGH (E.D. Cal. filed Sept. 22, 2017)). Despite First Databank's characterizations, it is not obvious to the Court that Alfasigma's representations in the two cases are incompatible with one another or, more generally, that a party's pleadings (which are, of course, allowed to be internally inconsistent) in a separate case should bear much weight in assessing a motion to strike.

The Court concludes that Alfasigma has met its burden to show a reasonable probability

11

that it will prevail on its claim that First Databank's speech was false or misleading.

*      *      *

The Court finds that Alfasigma has met its (fairly low) burden of showing a reasonable probability of success on the merits of its state law claims and thus **DENIES** the special motion to strike.

### III. MOTION TO DISMISS

#### A. Legal Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). And even where facts are accepted as true, "a plaintiff may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quotation marks and citation omitted).

#### B. Discussion

First Databank moves to dismiss all of Alfasigma's causes of action. *See* Mot. at 18. The parties devoted comparatively little space in their briefs to discussing the motion to dismiss. The

Court notes that the issues largely overlap (particularly with respect to the state law causes of action), and though the plausibility standard of a motion to dismiss is lower than the probability standard of an anti-SLAPP motion, the two motions are independent of one another. *See Hilton*, 599 F.3d at 902. Thus, the Court will discuss these arguments separately from those in the motion to strike, with a focus on those that pertain only to the federal claims.

### i. Commercial Speech

First Databank contends that all of Alfasigma's claims fail because it has not met the commercial speech requirement. *See* Mot. at 19. As explained in greater detail above, the Court concludes that Alfasigma has sufficiently alleged that MedKnowledge customers rely on the database to make decisions, thus making it plausible that First Databank engaged in commercial speech.

### ii. Commercial Advertising and Promotion

In addition, First Databank argues that Alfasigma's false advertising Lanham Act claims, (those brought under 15 U.S.C. § 1125(a)(1)(B)) must be dismissed because the complaint does not establish that FDB made representations for the purpose of "commercial advertising and promotion." *See* Mot. at 19. The Court agrees.[3]

The Lanham Act prohibits a person from "misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" in "commercial advertising or promotion." *See* 15 U.S.C. § 1125(a)(1)(B). Though the Lanham Act does not define "commercial advertising or promotion," the Ninth Circuit has.

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

---

[3] In its motion to dismiss in *Exeltis*, First Databank raised (in passing) the commercial advertising or promotion requirement, but it did not focus on this requirement at argument or in its motion for reconsideration, and the Court did not reach the issue. *See* Mot. Hr'g Tr., Dkt. No. 39 at 8–9.

13

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734–35 (9th Cir. 1999) (quoting *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994)).[4]

Alfasigma has not plausibly alleged, as required under *Coastal Abstract*, that First Databank's representations were made for the purpose of influencing customers to purchase FDB's services. To review, Alfasigma alleges that First Databank's representation that the Products were OTC was false and misleading, which influenced decisions made by prescribers and payors. *See, e.g.*, Compl. ¶ 64 ("Defendant's false and misleading representations concerning the status of the Alfasigma Products as 'OTC' drug products are material, and have influenced or will influence the purchasing decisions of Alfasigma's customers."). In other words, Alfasigma is alleging that First Databank influenced decisions that consumers made to buy *Alfasigma's* goods—not First Databank's own goods or services. Those allegations do not satisfy the third *Coastal Abstract* element. *See Genus Lifesciences*, 378 F. Supp. 3d at 844–47 (dismissing Lanham Act false advertising claim because plaintiff failed to "allege that the information contained in First Databank's pricing list is for the purpose of inducing [plaintiff's] customers to enter into a commercial transaction with First Databank").

At the hearing, counsel for Alfasigma suggested that it had satisfied the commercial advertising or promotion requirement by alleging that First Databank falsely claimed that its data came from the FDA, which was a representation that it made to encourage consumers to purchase a subscription to its database. *See* Mot. Hr'g Tr. at 9–10. To be sure, Alfasigma alleges that First Databank falsely represents that its information comes from the FDA—but only in its third cause of action, for false description under the Lanham Act. *See* Compl. ¶¶ 81–90. By contrast,

---

[4] The Court agrees with other courts in this district and circuit that *Coastal Abstract* is still controlling but that its second element likely has been abrogated by the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). *See, e.g.*, *Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 844 (N.D. Cal. 2019) (collecting cases); *Ariix, LLC v. NutriSearch Corp.*, No. 17CV320-LAB (BGS), 2018 WL 1456928, at *4 (S.D. Cal. Mar. 23, 2018) ("After *Lexmark*, the second element is likely in need of revision . . . [b]ut the first and fourth elements were not implicated by *Lexmark*'s holding, and remain good law."). However, because the Court finds that Alfasigma has not satisfied the third *Coastal Abstract* element, it need not reach the other elements or determine the extent to which the second element may have been overruled or altered by *Lexmark*.

14

nowhere in the false advertising causes of action does Alfasigma assert that First Databank made the allegedly false and misleading statements for the purpose of influencing consumers to subscribe to its MedKnowledge database. Thus, because Alfasigma has not alleged that these representations were for the purpose of influencing consumers to purchase First Databank's products, the false advertising causes of action must be dismissed. *See, e.g.*, *Prager Univ. v. Google LLC*, No. 17-CV-06064-LHK, 2018 WL 1471939, at *10 (N.D. Cal. Mar. 26, 2018) (dismissing Lanham Act false advertising claims after finding that YouTube did not restrict access to plaintiff's videos for a promotional purpose); *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *9 (S.D.N.Y. Sept. 24, 2007) (holding that because communications were "designed to structure nascent or existing business relationships, but are in any case not a solicitation of new business, they do not meet the prong of the [*Gordon & Breach/Coastal Abstract*] test requiring 'commercial advertising or promotion' to be made 'for the purpose of influencing consumers to buy defendant's goods or services.'").

### iii. Falsity

First Databank also argues that Alfasigma has not plausibly alleged falsity. Mot. at 20. But, as discussed above, the Court finds that Alfasigma has sufficiently alleged that First Databank made false or misleading statements by suggesting that the Products were available over-the-counter and that the source of its information was the FDA, neither of which First Databank says are true.

\*   \*   \*

The Court finds that Alfasigma has met its burden under Rule 12(b)(6) to plead commercial speech and falsity. However, the Court concludes that Alfasigma has not alleged that First Databank made the false and misleading statements in the course of "commercial advertising and promotion," as required under *Coastal Abstract*. Thus, the Court **DENIES** the motion to dismiss as to the false description and state law claims but **GRANTS** the motion to dismiss as to the false advertising claims. Because the Court cannot say that amendment would be futile, the Court allows Alfasigma leave to amend its complaint.

//

15

## IV. CONCLUSION

For the foregoing reasons, the Court:

1. **DENIES** the special motion to strike;
2. **DENIES** the motion to strike;
3. **DENIES IN PART AND GRANTS IN PART** the motion to dismiss. The first and second causes of action, brought under 15 U.S.C. § 1125(A)(1)(B), are **DISMISSED** with leave to amend.

If Alfasigma intends to file an amended complaint, it must do so by August 29, 2019. Further, the Court **SETS** a case management conference for 2:00 p.m. on September 17, 2019 in Courtroom 2, Fourth Floor, Oakland to discuss a schedule for an expeditious resolution to this case.

**IT IS SO ORDERED.**

Dated: 8/2/19

HAYWOOD S. GILLIAM, JR.
United States District Judge