**SAUL PERLOFF** (157092)
saul.perloff@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205-3792
Telephone      (210) 224-5575
Facsimile      (210) 270-7205

Attorneys for Plaintiff
ALFASIGMA USA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ALFASIGMA USA, INC.,<br>a Delaware corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>FIRST DATABANK, INC.,<br>a Missouri corporation,<br><br>            Defendant. | Case No. 4:18-cv-06924-HSG<br><br>**PLAINTIFF ALFASIGMA USA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Motion Hearing:      February 13, 2020<br>Time:                          2:00 p.m. |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF ISSUES ...................................................................... 2

III.  STANDARD OF REVIEW ........................................................................ 2

IV.  STATEMENT OF FACTS ....................................................................... 3

     A.    First Databank's First Motion To Strike And To Dismiss ........................ 5

     B.    First Databank's Answer And Alfasigma's First Amended Complaint ................ 7

V.   ARGUMENT ......................................................................................... 9

     A.    The Law Of The Case Precludes Re-Litigation Of The Court's
          Prior Holdings ................................................................................ 10

     B.    Alfasigma's First Amended Complaint Plausibly Alleges That First
          Databank's False Commercial Speech Promotes First Databank's
          Own Products And Services ............................................................ 13

          1.    The First Amended Complaint satisfies either Rule 8(a) or 9(b) .............. 13

          2.    The FAC sufficiently alleges that First Databank's false commercial
                 speech promotes First Databank's own products and services ................ 16

          3.    *Lexmark* abrogated the "direct competition" element of "advertising" ...... 19

          4.    First Databank's advertising is sufficiently disseminated .......................... 19

     C.    Alfasigma Sufficiently Alleges That First Databank Proximately
          Caused Injuries ............................................................................... 21

     D.    First Databank Is Also Liable For Contributory False Advertising ................ 22

     E.    First Databank's Attempt To Mislead Consumers Through A "Q"
          Code Is Actionable ......................................................................... 23

VI.  CONCLUSION ...................................................................................... 25

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acella Pharm., LLC v. First Databank, Inc.*,
  No. 1:17-cv-5013, 2018 WL 7199992 (N.D. Ga. June 4, 2018), *vacated*, 2018
  WL 7199807 (N.D. Ga. Oct. 4, 2018) .................................................................5, 12

*ADT Sec. Serv., Inc. v. Sec. One Int'l, Inc.*,
  No. 11-cv-05149, 2012 WL 4068632 (N.D. Cal. Sept. 14, 2012) ..........................23

*Alfasigma USA, Inc. v. First Databank, Inc.*,
  No. 18-cv-6924, 2019 WL 3532844 (N.D. Cal. Aug. 2, 2019) ..........................1-9, 12, 15, 25

*Ames v. T-Mobile USA, Inc.*,
  No. 3:17-cv-1666, 2019 WL 366210 (S.D. Cal. Jan. 30, 2019) ......................10, 11

*Ariix, LLC v. Nutrisearch Corp.*,
  No. 17-cv-320, 2018 WL 1456928 (S.D. Cal. Mar. 23, 2018) ..........................6, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................3

*Axcan Scandipharm Inc. v. Ethex Corp.*,
  585 F. Supp. 2d 1067 (D. Minn. 2007) ........................................................14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................3

*Biocell Tech. LLC v. Arthro-7*,
  No. 12-cv-516, 2012 WL 12892937 (C.D. Cal. Nov. 19, 2012) ..........................23

*Boltex Mfg. Co., LP v. Galperti, Inc.*,
  No. 17-cv-1439, 2018 WL 1535199 ............................................................20

*Cisco Sys., Inc. v. Beccela's Etc., LLC*,
  No. 18-cv-477, 2019 WL 3944986 (N.D. Cal. Aug. 21, 2019) ..............................14

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) ...........................................1, 7, 9, 19, 21

*Dex Media West, Inc. v. City of Seattle*,
  696 F.3d 952 (9th Cir. 2012) ...............................................................5, 12

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
  797 F.3d 1248 (11th Cir. 2015) ...............................................................23

*Exeltis USA Inc. v. First Databank, Inc.*,
  No. 17-cv-4810, 2017 WL 6539909 (N.D. Cal. Dec. 21, 2017)..................5, 6, 9, 12, 13

*Franklin Fueling Sys., Inc. v. Veeder-Root Co.*,
  No. 09-cv-580, 2009 WL 2462505 (E.D. Cal. Aug. 11, 2009)..............................24

DOCUMENT PREPARED
ON RECYCLED PAPER

*Genus Lifesciences, Inc. v. Lannett Co.*,
No. 18-cv-7603, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019)............12

*Genus Lifesciences, Inc. v. Lannett Co.*,
No. 18-cv-7603 (N.D. Cal.) ............12, 13

*Handsome Brook Farm LLC v. Humane Farm Animal Care, Inc.*,
700 Fed. Appx. 251 (4th Cir. 2017)............19

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) ............24

*Ingle v. Circuit City*,
408 F.3d 592 (9th Cir. 2005) ............13

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982)............22, 23

*John P. Villano Inc. v. CBS, Inc.*,
176 F.R.D. 130 (S.D.N.Y. 1997) ............14

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.*,
No. 3:16-cv-1651, 2016 WL 4944370 (N.D. Tex. Sept. 16, 2016) ............22

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ............13

*Marcyan v. Nissen Corp.*,
578 F. Supp. 485 (N.D. Ind. 1982) ............20, 21

*Meggitt Orange Cnty. Inc. v. Yongzhong*,
No. 13-cv-239, 2014 WL 12588633 (C.D. Cal. Jul. 17, 2014)............14

*Merck Eprova AG v. Gnosis S.p.A.*,
901 F. Supp. 2d 436 (S.D.N.Y. 2012)............23

*Merck Eprova AG v. Gnosis S.p.A.*,
760 F.3d 247 (2d Cir. 2014)............23

*Messinger v. Anderson*,
225 U.S. 436 (1912)............10

*Mutual Pharm. Co. v. Ivax Pharm. Inc.*,
459 F. Supp. 2d 925 (C.D. Cal. 2006) ............23

*Nat'l Grange of the Order of Patrons v. Cal. Guild*,
334 F. Supp. 3d 1057 (E.D. Cal. 2018) *appeal docketed*, No. 18-cv-16671
(9th Cir. Sept. 5, 2018)............24

*New.Net, Inc. v. Lavasoft*,
356 F. Supp. 2d 1090 (C.D. Cal. 2004) ............20

*RA Med. Sys., Inc. v. PhotoMedex, Inc.*,
373 Fed. Appx. 784 (9th Cir. 2010)............14

*Ray Charles Found. v. Robinson,*
    795 F.3d 1109 (9th Cir. 2015) ................................................................21

*Rocky Mountain Farmers Union v. Corey,*
    913 F.3d 940 (9th Cir. 2019) ................................................................10

*Sirius Labs, Inc. v. Rising Pharms., Inc.,*
    No. 03-cv-6965, 2004 WL 51240 (N.D. Ill. Jan. 7, 2004) .....................20

*Societe des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.,*
    380 F.3d 126 (2d Cir. 2004) ..........................................................21, 22

*Southland Sod Farms v. Stover Seed Co.,*
    108 F.3d 1134 (9th Cir. 1997) ...........................................................6, 9

*Thomas v. Bible,*
    983 F.2d 152 (9th Cir. 1993) ................................................................10

*Thomas v. Hickman,*
    No. 06-cv-215, 2008 WL 2233566 (E.D. Cal. May 28, 2008) ........10, 11

*True Health Chiropractic, Inc. v. McKesson Corp.,*
    No. 13-cv-2219, 2019 WL 3804713 (N.D. Cal. Aug. 13, 2019) ............13

*TYR Sport Inc. v. Warnaco Swimwear Inc.,*
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ...............................................24

*U-Haul Int'l, Inc. v. Jartran, Inc.,*
    793 F.2d 1034 (9th Cir. 1986) ...............................................................9

*United States v. Lewis,*
    611 F.3d 1172 (9th Cir. 2010) ..............................................................10

*UPS Store Inc. v. Hagan,*
    No. 14-cv-1210, 2015 WL 9256973 (S.D.N.Y. Nov. 18, 2015)............22

*Vector Prod., Inc. v. Hartford Fire Ins. Co.,*
    397 F.3d 1316 (11th Cir. 2005) ...........................................................14

*Vess v. Ciba-Geigy Corp., USA,*
    317 F.3d 1097 (9th Cir. 2003) ..............................................................13

*Vidillion, Inc. v. Pixalate, Inc.,*
    No. 18-cv-7270, 2019 WL 3308768 (C.D. Cal. Jun. 5, 2019)..............19

**Rules and Statutes**

15 U.S.C. § 1125(a) ...............................................1, 5, 8, 9, 11, 14, 16, 17, 19, 21, 22

21 U.S.C. § 360..............................................................................................3

Cal. Bus. Code § 17200 ..............................................................................11

Cal. Civ. Proc. Code § 425.16 ......................................................................5

California Unfair Competition Law .............................................................11

DOCUMENT PREPARED
ON RECYCLED PAPER

Fed. R. Civ. P. 8 ...................................................................................................2, 13, 14

Fed. R. Civ. P. 9 .........................................................................................................13, 14

Fed. R. Civ. P. 12 .........................................................................................................1, 3, 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Document Prepared
on Recycled Paper

Page v

PLAINTIFF ALFASIGMA USA, INC.'S MEM. OF POINTS AND AUTHORITIES IN OPP'N TO DEF. FIRST DATABANK, INC.'S
SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE FIRST AMENDED COMPLAINT

Plaintiff Alfasigma USA, Inc. ("Alfasigma") respectfully opposes Defendant First Databank, Inc.'s ("First Databank") Special Motion to Strike and Motion to Dismiss the First Amended Complaint (Dkt. 48) ("Motion").

## I.    INTRODUCTION

In resolving First Databank's previous motion (Dkt. 18), this Court denied First Databank's motion to strike Alfasigma's state law claims based on California's Anti-SLAPP statute and denied First Databank's Rule 12(b)(6) motion to dismiss those state law claims and Alfasigma's claim for unfair competition (false description) under § 43(a)(1)(A) of the Lanham Act. The Court also held Alfasigma plausibly alleged that First Databank's communications with customers were false and constituted "commercial speech." Dkt. 41 (Aug. 2, 2019), *Alfasigma USA, Inc. v. First Databank, Inc.*, No. 18-cv-6924, 2019 WL 3532844, at *7-9 (N.D. Cal. Aug. 2, 2019) ("Order"). The sole basis upon which the court granted in part First Databank's motion was that Alfasigma had not alleged sufficient facts under *Coastal Abstract* "that First Databank's representations were made for the purpose of influencing customers to purchase FDB's services." *Id.* at *8. The Court, however, granted Alfasigma leave to amend. *Id.* at *9.

In amending its Complaint, Alfasigma preserved its previously-sustained claims and factual allegations, and stated additional facts detailing how First Databank engages in its false commercial speech to influence customers to purchase First Databank's own products and services. The amended pleading clarifies that First Databank's false advertising includes both false representations about First Databank's own products and services (that the information it sells is sourced from the FDA and manufacturers like Alfasigma), and false representations about Alfasigma's products (that Alfasigma's medical foods are "OTC drugs"). Because First Databank disseminates each of these false representations to influence its own customers and potential customers to purchase and continue purchasing First Databank's products and services, they are "advertising" under *Coastal Abstract*. And because these false representations proximately cause Alfasigma harm, they constitute actionable false advertising under the Lanham Act.

In now moving to strike and to dismiss Alfasigma's First Amended Complaint, Dkt. 46

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 1        PLAINTIFF ALFASIGMA USA, INC.'S MEM. OF POINTS AND AUTHORITIES IN OPP'N TO DEF. FIRST DATABANK, INC.'S
SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE FIRST AMENDED COMPLAINT

(Aug. 29, 2019) ("FAC"), First Databank virtually ignores the only issue that should be before the Court—whether the facts pled in the FAC, taken as true, plausibly state that First Databank's false commercial speech was made to try and sell First Databank's own products and services. Instead, First Databank re-asserts arguments this Court previously rejected, including recycling its attack on Alfasigma's state law claims based on California's Anti-SLAPP statute, and relying on the same authority already rejected to argue its advertising is not false or commercial speech.

First Databank's arguments fail as a matter of law because they already failed as a matter of law. Under the law of the case, a defendant may not reassert attacks on previously sustained claims merely because the claims are restated in an amended pleading. Here, First Databank points to no intervening change in law or manifest error, and does not even try to meet this high standard. For the reasons this Court already stated, First Databank's re-used arguments again fail.

Based on its prior Order, this Court's review of First Databank's new motion should be limited to whether Alfasigma's FAC sets forth sufficient facts to plausibly state claims for relief for false advertising. Because Alfasigma's factual allegations are detailed and, if accepted as true, plausibly state a claim that First Databank's false commercial speech was made to influence customers to purchase First Databank's own products and services, and proximately caused harm to Alfasigma, the Court should deny First Databank's Motion in its entirety.

## II.    STATEMENT OF ISSUES

1.    Whether First Databank's motion to strike Alfasigma's state law claims and its motion to dismiss Alfasigma's Lanham Act false description claim must be DENIED because this Court previously considered and rejected these same arguments in sustaining these claims.

2.    Whether First Databank's motion to dismiss Alfasigma's Lanham Act false advertising and contributory false advertising claims must be DENIED because the factual allegations in the FAC, accepted as true, plausibly state a claim that First Databank's false commercial speech was made to influence customers to purchase First Databank's own products and services, and further proximately caused harm to Alfasigma.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires only that a complaint "contain a short and

DOCUMENT PREPARED ON RECYCLED PAPER

plain statement of the claim showing that the pleader is entitled to relief[.]" Order, 2019 WL
3532844, at *7 (quotations omitted). "'Dismissal under Rule 12(b)(6) is appropriate only where
the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal
theory.'" *Id.* (quoting *Mendiondo v. Centinela Hosp. Med.* Ctr., 521 F.3d 1097, 1104 (9th Cir.
2008)). "To survive a Rule 12(b)(6) motion, a plaintiff must plead 'enough facts to state a claim
to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007)). "A claim is facially plausible when a plaintiff pleads 'factual content that allows the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"
*Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## IV.    STATEMENT OF FACTS

In denying First Databank's motion to strike in its entirety and its motion to dismiss in
part, the Court discussed in detail the factual allegations raised in the original Complaint. Order,
2019 WL 3532844, at *1-2. As the Court summarized, Alfasigma

> is a pharmaceutical company that develops, manufactures, sells, and distributes
> medical foods. *See* Compl. ¶ 6. These medical foods include CerefolinNAC®,
> Deplin®, and Metanx® (collectively, the "Alfasigma Products" or "Products"),
> all of which contain the key ingredient L-methylfolate, an "essential human
> vitamin of the B complex that plays a key role in central metabolic pathways." *Id.*
> ¶¶ 6, 14. Federal law defines a medical food as "a food which is formulated to be
> consumed or administered enterally under the supervision of a physician and
> which is intended for the specific dietary management of a disease or condition
> for which distinctive nutritional requirements, based on recognized scientific
> principles, are established by medical evaluation." *See id.* ¶ 17 (emphasis omitted)
> (quoting 21 U.S.C. § 360ee(b)(3)). Because medical foods "must be used under
> the supervision of [a] physician," Alfasigma markets them "directly to
> physicians." Compl. ¶ 19.

*Id.* at *1 (brackets in original). First Databank operates the drug information database (or
compendium) MedKnowledge, "'a critical channel through which pharmaceutical companies,
like Alfasigma, promote products to their customers.'" *Id.* (quoting Complaint ¶ 23). First
Databank's "[c]ustomers 'rely on the information drug databases provide to make decisions
about which products to prescribe, purchase, dispense, and reimburse.' MedKnowledge is the
largest and most widely used drug compendia, and insurers rely on it to decide which products to
cover." *Id.* (citations omitted) (quoting Complaint ¶¶ 24, 32).

The Class field in First Databank's MedKnowledge database historically has been limited

DOCUMENT PREPARED
ON RECYCLED PAPER

to "O" or "F." *Id.* First Databank "'represented to its subscribers over many years' that an O-Class product is 'Over-the-counter' ('OTC'), meaning that a 'prescription is not required per the product labeling.'" *Id.* (quoting Complaint ¶ 36). As a result of First Databank's efforts, its "[s]ubscribers 'universally understand that a product designated 'O' is an OTC drug, available over-the-counter and without physician supervision,'" while "an F-Class product is a 'prescription product.'" *Id.* (quoting Complaint ¶¶ 36, 37).

"The Alfasigma Products were 'historically and correctly' designated as F-Class," allowing the cost of these products to be "covered by insurance plans that limit coverage to prescription products,' which 'assisted patients to purchase the Alfasigma Products prescribed by their physicians, and thus to be compliant in taking them.'" *Id.* (quoting Complaint ¶¶ 35, 39).

But by "April 26, 2016, First Databank reclassified the Alfasigma Products to Class O." Order, 2019 WL 3532844, at *2.[1] "In doing so, F[irst Databank] was 'falsely representing that these products are available OTC, when in fact they are available by prescription, and should not be taken by a patient without physician supervision.'" *Id.* (quoting Complaint ¶ 40). Because the "'Alfasigma Products are not OTC drugs,'" and instead "are medical foods that 'are to be used only with physician supervision,'" First Databank's representation "was 'false and misleading.'" *Id.* (quoting Complaint ¶¶ 42, 43).

Moreover, First Databank "*claimed that it moved the Alfasigma Products from the F-Class to the O-Class to be 'in alignment with FDA standards*,'" which also was false: "the 'FDA has never advised First Databank that it should change the listing or description of the Alfasigma Products in its MedKnowledge database.'" *Id.* (quoting Complaint ¶¶ 41, 44) (emphasis added). Rather, and directly contrary to First Databank's assertion, "Andrea Lotze, the FDA's Medical Director for the Infant Formula and Medical Foods Staff, told F[irst Databank] that 'medical foods are not OTC drugs,'" and that First Databank's "'misinterpretation of FDA's position and policies on medical foods' was leading to patients losing insurance coverage because 'their insurance providers believe that the Alfasigma Products are over-the-counter

---

[1] This is a critical distinction between Alfasigma's case and the lawsuits brought by various prenatal vitamin companies: First Databank already engages in the conduct harming Alfasigma.

DOCUMENT PREPARED
ON RECYCLED PAPER

(OTC) drugs.'" *Id*. (quoting Complaint ¶ 45).

Director Lotze further "explained that 'the FD&C Act does not prohibit physicians from writing prescriptions for medical foods' and that a patient taking medical foods 'should see the physician on a recurring basis for, among other things, instructions on the use of the medical food as part of the dietary management of a given disease or condition.'" Order, 2019 WL 3532844, at *2 (quoting Complaint ¶ 45). First Databank's false statements to its customers that Alfasigma's products are OTC "caused confusion in the marketplace, leading insurers to deny coverage for the Alfasigma Products." *Id*. (citing Complaint ¶ 49). This caused Alfasigma to lose sales of its products: "The change cost patients more in out-of-pocket expenses, caused physicians to stop prescribing Alfasigma Products, and led to pharmacies not stocking the Products." *Id*. (construing Complaint ¶¶ 49-50).

**A.      First Databank's First Motion To Strike And To Dismiss**

Alfasigma sued First Databank under § 43(a)(1)(A) & (B) of the Lanham Act for false advertising, contributory false advertising, and false description, as well as under California state law for false advertising, unlawful trade practice, and common law unfair competition. *See* Dkt. 1.

First Databank moved to strike Alfasigma's state law claims under California's Anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16. *See* Dkt. 18. First Databank argued primarily that it was immune from suit because its communications with its customers did not constitute commercial speech, and that its representations were not false. The Court rejected each of these arguments. *See* Order, 2019 WL 3532844 at *4-6 (commercial speech); *6-7 (falsity).

The Court observed that its prior ruling in *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-cv-4810, 2017 WL 6539909 (N.D. Cal. Dec. 21, 2017), informed its commercial speech analysis. Order, 2019 WL 3532844, at *5 ("Defendant's database is not simply utilized as a factor in payors' reimbursement decisions, but is in fact the linchpin of these determinations.") (quoting *Exeltis*, 2017 WL 6539909, at *13). While First Databank argued that *Exeltis* was unpersuasive in light of other authority, including *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012), *Acella Pharm., LLC v. First Databank, Inc.*, No. 1:17-cv-5013, 2018 WL 7199992, at *1 (N.D. Ga. June 4, 2018), *vacated*, 2018 WL 7199807 (N.D. Ga. Oct. 4,

DOCUMENT PREPARED
ON RECYCLED PAPER

2018); and *Ariix, LLC v. Nutrisearch Corp.,* No. 17-cv-320, 2018 WL 1456928, at *3 (S.D. Cal. Mar. 23, 2018), the Court analyzed each of these cases, and found First Databank's "arguments unpersuasive." Order, 2019 WL 3532844, at *5-6. This Court explained that:

> In short, Alfasigma's allegations, including that First Databank customers "rely on the information drug databases provide to make decisions about which products to prescribe, purchase, dispense, and reimburse," *see* Compl. ¶ 23, create a reasonable probability that it will be able to show F[irst Databank] engaged in commercial speech. *Cf. Exeltis,* 2017 WL 6539909, at *23 (holding that "payors' actual use of the database and the database's primacy in actually effectuating reimbursement decisions may suggest that the database is commercial in nature"). Ultimately, the question of whether the database is commercial speech is one better answered with a more complete record, when the Court will have greater visibility into the relationship between First Databank, Alfasigma, the FDA, and customers.

*Id.* at *6.

The Court also rejected First Databank's challenge to the sufficiency of Alfasigma's allegations that First Databank made false or misleading statements. *Id.* The Court explained that under controlling Ninth Circuit authority, the "falsity" element of a Lanham Act false advertising claim (and a claim under the California UCL) could be satisfied if "the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.* (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)) (other citations omitted). The Court rejected First Databank's contention that its purported redefinition of the "O" Class immunized it from liability:

> Alfasigma has pled that MedKnowledge database subscribers 'universally understand that a product designated 'O' is an OTC drug, available over-the-counter and without physician supervision.' Thus, according to Alfasigma, classifying the Alfasigma Products as OTC drugs is false or misleading, because the FDA explained to First Databank that 'medical foods are not OTC drugs.' Even if First Databank has redefined Class O to expressly include medical foods, the understanding and expectations of its subscribers based on an earlier, stable definition may override a subtle definitional change, particularly when Alfasigma has pled that consumers are confused.

*Id.* at *6 (citing *Exeltis*, 2017 WL 6539909, at *23) (record citations omitted). Thus, "[a]ccepting as true all evidence in favor of the plaintiff, as the Court must do on a special motion to strike," the Court held "Alfasigma has shown a reasonable probability that it will prevail on its theory that categorizing the Products within Class O is false or misleading." *Id.*

The Court also sustained "Alfasigma's second theory of liability"—that First Databank

DOCUMENT PREPARED ON RECYCLED PAPER

"misled its subscribers when it claimed that 'the source of its information' was Alfasigma and the FDA." *Id.* at *7 (record citations omitted) (quoting Complaint ¶ 95). Contrary to First Databank's representations, "the FDA had warned First Databank that it 'misinterpreted' the agency's 'position and policies on medical foods' and explained that 'the FD&C Act does not prohibit physicians from writing prescriptions for medical foods.'" *Id.* (quoting Complaint ¶ 45). Thus, "[t]aken at face value, the FDA's statements, as relayed by Alfasigma, tend to support Alfasigma's inference that First Databank could not be telling the truth when it said that it decided to reclassify the Products based on information received from the FDA." *Id.*

Because Alfasigma met its "burden of showing a reasonable probability of success on the merits of its state law claims," the Court denied the motion to strike. *Id.* The Court similarly denied First Databank's motion to *dismiss* the state law claims, and its motion to dismiss Alfasigma's Lanham Act false description claim. *Id.* at *9.

With respect to Alfasigma's Lanham Act false advertising claims, the Court found "that Alfasigma has met its burden under Rule 12(b)(6) to plead commercial speech and falsity." *Id.* However, the Court also held that under *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734-35 (9th Cir. 1999), a necessary element of "advertising" is that the false or misleading commercial speech at issue be "'for the purpose of influencing consumers to buy defendant's goods or services.'" Order, 2019 WL 3532844, at *8. The Court found that the allegations in the original Complaint did not sufficiently set forth facts to support this element, and thus dismissed Alfasigma's false advertising claims, with leave to re-plead. *Id.* at *8-9.

**B.     First Databank's Answer And Alfasigma's First Amended Complaint**

On August 28, 2019, First Databank answered Alfasigma's original Complaint. Dkt. 45. While largely consisting of single-word denials and assertions it "lacks knowledge" sufficient to admit or deny the facts pled, First Databank admitted a handful of allegations, including:

> 2.      Defendant admits that medical foods such as those Alfasigma offers are not over-the-counter drugs . . . . [Answer ¶ 2]

> 23.      Defendant admits that subscribers to its publications include prescribers, pharmaceutical wholesalers and distributors, pharmacies, pharmacy-benefit managers, Medicaid and Medicare payers, and insurance companies. . . . [Answer ¶ 23]

DOCUMENT PREPARED
ON RECYCLED PAPER

24. [With respect to the allegations that "First Databank touts itself as 'the leading provider of drug knowledge' with 'thousands of customers worldwide.'"] Defendant admits that the partially quoted language in Paragraph 24 is found on its website. . . . ." [Answer ¶ 24]

25. Defendant admits that it offers a database called MedKnowledge, which it markets on its website as "encompassing FDA-approved prescription drugs, over-the-counter medications and commonly-prescribed medical supplies," as "researched, verified, and continuously updated," and as "the most widely used integrated drug database in the United States." . . . [Answer ¶ 25]

26. [With respect to a screenshot stating that MedKnowledge is the "market leader in the U.S. and Canada" and "the market share leader in the U.S," followed by a bullet-point list that MedKnowledge is used by "4 of the top 6 largest retail pharmacy chains"; "8 of the top 9" PBMs; "8 of the top 10 health plans"; "Top 2 largest long term care pharmacy systems"; and "Top 3 major drug product wholesalers," averring:]

Defendant admits that the website page depicted in Paragraph 26 markets MedKnowledge . . . . [Answer ¶ 26]

*See also id.* ¶ 36 (admitting that "currently, the Class value field of its MedKnowledge database contains two possible codes: O or F"); ¶ 38 ("Defendant admits that it has listed Alfasigma products with a Class value of 'F' in the MedKnowledge database"); ¶ 41 ("Defendant admits that in 2016 it reclassified Alfasigma medical food products as 'O' in its MedKnowledge database"); ¶ 45 (Complaint "partially quotes from a letter sent to Defendant" from Dr. Andrea Lotze, FDA's Medical Director for the Infant Formula and Medical Foods Staff).

Alfasigma's FAC, filed on August 28, 2019, re-alleges all of the facts previously found sufficient for the causes of action the court refused to strike or dismiss, and stated additional facts in support of the element of "commercial advertising" this Court found insufficient. The FAC also clarified there are two factual bases for First Databank's Lanham Act false advertising liability, and states a separately enumerated false advertising Count for each factual basis. The first false advertising claim, Count I, is based on First Databank's false representations that Alfasigma's products are OTC drugs. FAC ¶¶ 76-92. The second, Count II, is based on First Databank's false representation its information comes from the FDA and/or Alfasigma. *Id.* ¶¶ 93-104. This claim relies on the same factual underpinning as Alfasigma's claim for false description claim under § 43(a)(1)(A) of the Lanham Act, which this Court previously sustained, Order, 2019 WL 3532844 at *9, and which is restated as Count IV, FAC ¶¶ 113-122. Count III

DOCUMENT PREPARED
ON RECYCLED PAPER

of the FAC restates Alfasigma's previously pled claim for contributory false advertising, *id.* ¶¶ 105-112, while ¶¶ 123-138 restate Alfasigma's state law claims as Counts V-VII.

First Databank's instant Motion followed.

## V. ARGUMENT

To state a false advertising claim under § 43(a)(1)(B) of the Lanham Act, the FAC must allege facts which, if accepted as true, are sufficient to plausibly show that:

> (1)    the ads of the opposing party were false or misleading;
> (2)    the ads deceived, or had the capacity to deceive, consumers;
> (3)    the deception had a material effect on purchasing decisions;
> (4)    the misrepresented product affects interstate commerce; and
> (5)    the claimant has been, or is likely to be, injured by the false advertising.

*Southland Sod*, 108 F.3d at 1139. The Lanham Act imposes liability if First Databank's ads are (1) literally false or (2) literally true, but likely to mislead or confuse consumers. *Id.*; *see also Exeltis*, 2017 WL 6539909, at *6 n.7. When a statement is literally false, the court presumes deception. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986).

To be actionable, First Databank's statement must be:

> (1)    commercial speech; . . .
>
> [2]    for the purpose of influencing consumers to buy defendant's goods or services[; and]
>
> [3]    [w]hile the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations [] must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

Order, 2019 WL 3532844, at *8 (quoting *Coastal Abstract*, 173 F.3d at 734-35).

This Court already held that the facts in Alfasigma's original Complaint satisfied the commercial speech and falsity elements, and First Databank does not challenge deception (which may be presumed), materiality (which is demonstrably well pled, *e.g.*, FAC ¶¶ 84, 99), or that First Databank's products and services are in interstate commerce. *Id.* ¶ 12 (First Databank "operates, markets, and sells pharmaceutical information database products, including MedKnowledge, in interstate commerce"). Accordingly, the only issues properly before the Court are whether the FAC alleges facts sufficient to show that First Databank engaged in its

Document Prepared on Recycled Paper

false commercial speech for the purpose of influencing consumers to buy its own goods or services, and whether the facts are sufficient to show that First Databank's false commercial speech proximately caused injury to Alfasigma.

**A.      The Law Of The Case Precludes Re-Litigation Of The Court's Prior Holdings**

The law of the case doctrine "generally precludes reconsideration of 'an issue that has already been decided by the same court, or a higher court in the identical case.'" *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 951 (9th Cir. 2019). "The law of the case doctrine exists so that, for important policy reasons, parties in such situations are not allowed 'a second bite at the apple.'" *Thomas v. Hickman*, No. 06-cv-215, 2008 WL 2233566, at *3 (E.D. Cal. May 28, 2008).

To show that an issue is not controlled by the law of the case, a party "must show that it was not 'decided explicitly or by necessary implication' by a prior decision." *Rocky Mountain*, 913 F.3d at 951; *see also United States v. Lewis*, 611 F.3d 1172, 1179 (9th Cir. 2010) (law of the case doctrine "'expresses the practice of courts generally to refuse to reopen what has been decided'") (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)).

"While courts have some discretion not to apply the doctrine of law of the case, that discretion is limited." *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993) (citation omitted). Factors influencing the Court's exercise of its discretion include:

> (1)      the first decision was clearly erroneous;
> (2)      an intervening change in the law has occurred;
> (3)      the evidence on remand is substantially different;
> (4)      other changed circumstances exist;
> (5)      a manifest injustice would otherwise result.

*Id.* (citations omitted). "Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Ames v. T-Mobile USA, Inc.*, No. 3:17-cv-1666, 2019 WL 366210, at *3 (S.D. Cal. Jan. 30, 2019) (construing *Thomas*).

Law of the case applies where a defendant challenges a claim in an amended complaint that was already addressed and decided in the plaintiff's favor in an earlier pleading and motion. *Id.* In *Ames*, the plaintiff alleged the defendant, a mobile phone service provider, misled him into believing a completed credit application was necessary to receive a price quote, and later sought

DOCUMENT PREPARED
ON RECYCLED PAPER

to collect on fees for a plan he never purchased. Plaintiff sued under several theories, including the California Unfair Competition Law ("UCL"), Cal. Bus. Code § 17200. Defendant had moved to dismiss a prior version of the complaint, and the court rejected the argument that the plaintiff lacked statutory standing under the UCL. Following an amendment to the complaint, the defendant again moved to dismiss, and again argued plaintiff lacked standing. The court held this attempt to re-litigate an issue already decided could not be considered under law of the case:

> Here, the issue Defendant raises is whether or not Plaintiff has statutory standing to sue under the UCL, and this issue was explicitly adjudicated by this Court in its prior order. Both Plaintiff and Defendant had a prior chance to brief this issue. Defendant does not cite any authority for the proposition that when a Court relies on a case, *sua sponte*, within the context of an existing issue, doing so creates a new, justiciable issue. As indicated above, the central issue was whether Plaintiff had statutory standing to sue under the UCL, and this issue was previously adjudicated. Therefore, the law of the case doctrine applies and the Court DENIES Defendant's request to reconsider its earlier UCL statutory standing ruling.

*Id.* at *4; *see also Thomas*, 2008 WL 2233566, at *3 (applying doctrine as to motion to dismiss amended complaint where "the Court previously considered and decided precisely the same issues raised in Defendant's instant motion," and declining to reconsider prior ruling).

Here, the bulk of First Databank's current Motion is not directed to the sufficiency of the allegations in Alfasigma's FAC—that First Databank's false commercial speech promotes First Databank's own products and services—but rather to challenging rulings made by this Court in its order denying First Databank's prior motion to strike. In particular, First Databank *again* challenges the sufficiency of both Alfasigma's state law claims and its claim under § 43(a)(1)(A) of the Lanham Act for false description. *See* Motion at 4 (re-asserting motion to strike); 12-15 (section of brief entitled "Alfasigma's Source Claims are Also Untenable"). Even with respect to false advertising, most of First Databank's arguments are directed against this Court's conclusion that First Databank's communications with customers constitute "commercial speech," and that Alfasigma plausibly alleged First Databank's speech is false and misleading. *Id.* at 6 & 10.

In reasserting arguments this Court already rejected, First Databank does not (nor could it) argue that there has been any clear error, intervening change in the law, or manifest injustice. For example, in again arguing that it does not engage in "commercial speech," First Databank cites

exactly the same authority it previously cited. *See* Motion at 6 (citing *Dex,* 696 F.3d at 954-57 & 965; *Acella*, 2018 WL 7199992; *Ariix*, 2018 WL 1456928, at *3). But this Court considered and rejected or distinguished each of these authorities. *See* Order, 2019 WL 3532844, at *5-6:

- *Dex Media* predates *Exeltis*. And it arose in a substantially different context: the Ninth Circuit, reviewing a grant of summary judgment, was applying strict scrutiny in evaluating an ordinance that imposed costs on phone books. By contrast, Alfasigma has pled enough facts to satisfy the low threshold of showing a reasonable probability that F[irst Databank] engaged in commercial speech for purposes of sustaining a false advertising claim.

- [T]he Acella decision, beyond the fact that it was vacated, does not provide any basis for the Court to diverge from its holding in *Exeltis*.

- [U]nlike the consumer reviews at issue in *Ariix*, Alfasigma has alleged that MedKnowledge subscribers rely on the database in making purchasing decisions, which is enough to show a reasonable probability that Alfasigma will prevail.

First Databank also cites two decisions recently issued in *Genus Lifesciences, Inc. v. Lannett Co.*, No. 18-cv-7603 (N.D. Cal.). Neither reflects any intervening change in the law. First Databank submitted the first of these decisions, 378 F. Supp. 3d 823 (N.D. Cal. May 3, 2019), to the Court in a "Statement of Recent Decision." Dkt. 40 (May 8, 2019). The Court cited the opinion in a footnote, agreeing with *Genus* that the second element of *Coastal Abstract's* "advertising" test, that a defendant must be in commercial competition with the plaintiff, likely had been abrogated by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Order, 2019 WL 3532844, at *8 n.4 (citing *Genus*, 378 F. Supp. 3d at 844).

Another decision in *Genus* issued about a month after this Court's ruling on First Databank's original motion. *Genus Lifesciences, Inc. v. Lannett Co.*, No. 18-cv-7603, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019). Although all of Genus' claims against First Databank had been dismissed in the prior ruling, the court allowed Genus to re-plead. As with its earlier complaint, however, and in sharp contrast to this Court's analysis of Alfasigma's own initial pleading, Genus again failed to plead facts sufficient to show that First Databank engaged in "commercial speech." *Id.* at *14-15. Genus also alleged that First Databank's statements that its database is "reliable" and "accurate" were false and misleading, but the court held these allusions to superiority were puffery and unrelated to Genus' claim that First Databank's alleged misstatements about Lannett's product caused Genus injury. *Id.* at *15. The *Genus* court's prior

decision had distinguished *Exeltis*. 378 F. Supp. 3d at 846-47 ("*Exeltis* is of no help to Genus. While I agree that at the motion to dismiss stage it is inappropriate to resolve contested facts or address the substantive merits of Genus's case, Genus has not plausibly pleaded that First Databank's price list constitutes commercial speech."). In its more recent ruling, the *Genus* Court did not address this Court's decisions in this case or in *Exeltis* at all.

*Genus* neither constitutes nor reflects an intervening change in the law, nor did it consider allegations similar to those presented here. And because First Databank can cite no clear error, manifest injustice, or change in the law, its attempt to re-litigate settled issues must be rejected. *E.g.*, *True Health Chiropractic, Inc. v. McKesson Corp.*, No. 13-cv-2219, 2019 WL 3804713, at *15 (N.D. Cal. Aug. 13, 2019) (Law of the case "'maintain[s] consistency and avoid[s] reconsideration of matters once decided during the course of a single continuing lawsuit,'" and "precludes a court 'from reconsidering an issue previously decided by the same court, or a higher court in the identical case.'") (quoting *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005)).

Because they challenge matters that are settled as law of the case, First Databank's motion to strike, its motion to dismiss Alfasigma's state law claims and its Lanham Act false description claim, and its attack on this Court's finding that Alfasgima plausibly alleges that First Databank engages in false "commercial speech" all must be rejected.

**B.     Alfasigma's First Amended Complaint Plausibly Alleges That First Databank's False Commercial Speech Promotes First Databank's Own Products And Services**

Ignoring the FAC's actual allegations, First Databank declares it is a "given" that "Alfasigma cannot plausibly allege that First Databank's database is published to influence other transactions with First Databank[.]" Motion at 8-9. First Databank then argues for a heightened pleading standard, stating "Alfasigma unquestionably accuse[d] First Databank of fraud." *Id.* at 14.

**1.     The First Amended Complaint satisfies either Rule 8(a) or 9(b)**

First Databank cites two cases in support of applying a heightened pleading standard, *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009), and *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097 (9th Cir. 2003). Motion at 5, 13, 14. But neither of these cases involved false advertising claims under the Lanham Act. In fact, "the Ninth Circuit has yet to decide whether

DOCUMENT PREPARED ON RECYCLED PAPER

Rule 9(b) applies to Lanham Act claims," *Cisco Sys., Inc. v. Beccela's Etc., LLC*, No. 18-cv-477, 2019 WL 3944986, at *7 (N.D. Cal. Aug. 21, 2019). To the contrary, in *RA Med. Sys., Inc. v. PhotoMedex, Inc.*, 373 Fed. Appx. 784, 787 (9th Cir. 2010), the court assumed without deciding that a Lanham Act false advertising claim was subject only to "the applicable liberal notice pleading standards of Rule 8 of the Federal Rules of Procedure," and rejected as waived the defendant's attempt to impose a heightened pleading standard. *Id.* at n.3.

Here, Alfasigma has not alleged that First Databank is liable for fraud, and instead states detailed facts plausibly showing that First Databank violated the Lanham Act through false advertising. A key difference between a common law fraud claim and the one actually asserted here for false advertising is that, while the former requires proof of intent, "[i]t is well-settled that no proof of intent or willfulness is required to establish a violation of Lanham Act § 43(a) for false advertising. Rather, Section 43(a) provides a strict liability tort cause of action." *Vector Prod., Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1319 (11th Cir. 2005) (citations and footnote omitted). Nevertheless, some district courts have analyzed false advertising claims under Rule 9(b). *E.g.*, *Cisco*, 2019 WL 3944986, at *7. Other courts have rejected this approach. *E.g.*, *John P. Villano Inc. v. CBS, Inc.*, 176 F.R.D. 130, 131 (S.D.N.Y. 1997) ("No matter how parsed, a claim of false advertising under the Lanham Act—one of a panoply of trademark torts created by the Act—is not identical to a claim of fraud."). And still others have declined to apply a "categorical answer" to this question. *Meggitt Orange Cnty. Inc. v. Yongzhong*, No. 13-cv-239, 2014 WL 12588633, at *3 (C.D. Cal. Jul. 17, 2014).

Under either Rule 8(a) or 9(b), Alfasigma's detailed amended pleading sufficiently states the circumstances of First Databank's false advertising to allow it to prepare its defense. *E.g.*, *Axcan Scandipharm Inc. v. Ethex Corp.*, 585 F. Supp. 2d 1067, 1084 (D. Minn. 2007) ("Rule 9(b) does not require that the exact particulars of every alleged instance of 'false' advertising be specified in the Complaint. Rather, that Rule is satisfied if the plaintiff's complaint sufficiently apprises the defendant of the nature of the claim and the acts relied upon by the plaintiff as constituting the unlawful conduct.") (quotations omitted) (citing 5A Wright & Miller, FED. PRAC. & PRO., CIV.2d § 1297 (3rd ed. 2007)).

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 14          PLAINTIFF ALFASIGMA USA, INC.'S MEM. OF POINTS AND AUTHORITIES IN OPP'N TO DEF. FIRST DATABANK, INC.'S
SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE FIRST AMENDED COMPLAINT

In answering the Complaint, First Databank admitted it "markets" its MedKnowledge database "on its website," and that it markets MedKnowledge as "researched, verified, and continuously updated." Answer ¶ 25. The FAC further alleges that First Databank "claims the content of its database is 'compiled' from third party sources including drug manufacturers and governmental agencies," including data First Databank "obtains from the FDA 'through an examination of controlling regulations *and consultation with FDA personnel*.'" FAC ¶ 32 (emphasis added). And when it began advertising Alfasigma's products as "O" or over-the-counter drugs, First Databank falsely claimed that this information came from the FDA. *Id.* ¶ 52 ("First Databank falsely advised customers it made these changes [to] be 'in alignment with FDA standards.'") But as this Court observed, Dr. Lotze "told F[irst Databank] that 'medical foods are not OTC drugs,'" and further advised First Databank that its 'misinterpretation of FDA's position and policies on medical foods' was leading to patients losing insurance coverage because 'their insurance providers believe that the Alfasigma Products are over-the-counter (OTC) drugs.'" Order, 2019 WL 3532844, at *2.

The FAC further alleges First Databank's false advertising is directed at First Databank's own customers with the goal of selling subscriptions to MedKnowledge. This includes advertising that the source of First Databank's information is the FDA and manufacturers:

> 4. First Databank's makes these false and misleading statements, both about the purported OTC status of medical foods and the supposed source of First Databank's false information regarding the Alfasigma Products, in commercial speech to customers with the purpose and effect of influencing those customers to purchase (either initially or upon renewal of subscriptions) First Databank's own services and products, including MedKnowledge, rather than those of a competitor.

> 5. In commercial speech to customers, First Databank states and implies that its information comes from FDA and manufacturers like Alfasigma in order to make First Databank's services and products appear more authoritative and reliable, and thus more attractive to customers. First Databank does this to influence customers to purchase or renew subscriptions to First Databank's services and products, including MedKnowledge.

FAC ¶¶ 4-5; *see also id.* ¶¶ 33 & 34:

> 33. First Databank's false and misleading statements in commercial speech that the information it provides is sourced from the FDA and manufacturers is a key selling point in its promotion and advertising of its

DOCUMENT PREPARED ON RECYCLED PAPER

products and services. For example, in a brochure entitled "Manufacturer Relations," First Databank touts: "You tell us. We tell the world." First Databank admits that "Your customers and our customers rely on the information you provide to understand drug names, descriptions, and pricing, and to make clinical and business decisions."

34.    First Databank's promotion and advertising influences customers to purchase its services and products. It is important for First Databank's customers that the compendia services and products they purchase be accurate. For pharmaceutical products, accuracy requires that the information provided be consistent with the FDA's position, as well as manufacturer labeling. Over several decades, First Databank has succeeded in convincing E-prescribing vendors, drug wholesalers and distributors, pharmacies, pharmacists, PBMs, insurance companies, and others in the Healthcare Marketplace that First Databank is connected, affiliated, and/or associated with the FDA and that the information MedKnowledge provides concerning, for example, the prescription or OTC status of pharmaceutical products, originates from and/or is sponsored, or approved by the FDA and/or the manufacturer of the pharmaceutical product, thus making First Databank's services and products appear more authoritative and reliable, and thus more attractive to customers.

*See id.* ¶¶ 93-104 (Count II, False Advertising in Violation of 15 U.S.C. § 1125(A)(1)(B)—False

Representation that First Databank's Information Comes From the FDA and/or Alfasigma). The

FAC identifies specific statements in specific publications in which First Databank makes false

and misleading claims. First Databank has enough information with which to prepare its defense.

**2.    The FAC sufficiently alleges that First Databank's false commercial speech promotes First Databank's own products and services**

The FAC also states, plausibly and with particularity, that First Databank falsely

advertises Alfasigma's products as "O" or OTC drugs ***to promote its own products and***

***services***. [2] First Databank's decision to falsely advertise Alfasigma's products as "O" was

economically motivated to sell and continue selling subscriptions to customers, including PBMs:

6.    Similarly, First Databank promotes and advertises itself as providing a collaborative approach in tailoring its products and services to allow its customers to be more profitable and commercially successful. To that end, First Databank solicits from customers their opinions and preferences regarding First Databank's coding for pharmaceutical products, and makes coding decisions based on customer preferences in order to sell (or continue selling) its own services and products to those customers.

---

[2] First Databank's repeated insistence that it "has never called Alfasigma's medical food products 'OTC drugs,'" Motion at 2; *see also id.* at 13, is a demonstrable falsehood. *See* FAC ¶ 52 (image of First Databank portal, falsely listing "drug class" for Metanx as "OTC").

Document Prepared on Recycled Paper

PAGE 16                    PLAINTIFF ALFASIGMA USA, INC.'S MEM. OF POINTS AND AUTHORITIES IN OPP'N TO DEF. FIRST DATABANK, INC.'S SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE FIRST AMENDED COMPLAINT

7.     Certain of First Databank's customers, including, for example, pharmacy benefit managers (PBMs), are benefited economically from reducing the insurance plan coverage for pharmaceutical products, thus limiting their own obligation to reimburse patients who purchase those products. Because OTC products are less likely to be covered by insurance, First Databank's recoding of medical foods from "F" to "O" benefits those customers.

8.     On information and belief, certain customers, including Express Scripts, Inc. ("Express Scripts"), the largest PBM in the nation and a key First Databank customer, advised First Databank it would prefer medical foods to be coded "O" or OTC, rather than "F." First Databank complied, and recoded medical foods as O, with the purpose and effect of making it more likely that Express Scripts and others will purchase or continue to purchase First Databank's services and products, rather than those of a competitor. First Databank's recoding of medical foods as "O" is thus intended to make its services and products more attractive to customers, and to influence them in purchasing or continuing to purchase First Databank's services and products, including subscriptions for MedKnowledge.

9.     While First Databank began falsely and misleading advertising Alfasigma's medical foods as "O" or OTC products at the direction of certain customers, First Databank's false advertising impacted all of its customers, including many who did not know that First Databank's recoding was a commercial decision intended to enhance the profits of PBM and insurance company customers, rather than based on information from the FDA or Alfasigma. The confusion caused by First Databank's false advertising and misrepresentations costs Alfasigma sales of its medical foods when doctors no longer prescribe, pharmacists no longer dispense, and insurers no longer reimburse its products. This confusion also injures patients, who no longer have access to the benefits provided by these medical foods.

FAC ¶¶ 6-9; *see also id.* ¶¶ 76-92 (Count I: False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B)—False Representation that Alfasigma's Products are OTC Drugs).

The FAC alleges detailed facts that First Databank's "commercial advertising emphasizes that PBM customers can 'leverage' First Databank's products and services to reduce costs, thus 'magnifying profits,'" *id.* ¶ 46, a point made clear in First Databank's own words:

## Drug Claims Processing

**Streamlining decision making, magnifying profits.**

The challenge for HMOs, PPOs, PBMs, and other payers is clear: Drug claims processing and adjudication, once just business as ordinary, has become increasingly pivotal. Effectively managed, payers achieve key performance metrics in categories that range from profitability to physician and patient satisfaction. Mishandled, the risks are enormous. Your best policy: Leverage the value of highly reliable drug knowledge to provide your decision makers with all the information they need and in precisely the way they need it.

*Id.*; *see also id.* ¶ 47 (First Databank's "Customer Success Team" works with customers as "true partners" to "anticipate and address [customer] needs, and help drive [customer] business success.") Consistent with its "collaborative" approach to improve the profitability of its PBM customers, First Databank "communicates with certain customers regarding coding decisions, and makes coding decisions that comply with customer preferences." *Id.* ¶ 49. It does so, "and modifies coding to comply with certain customer preferences, in order to sell its products and services to those customers, and to continue selling its products and services, for example, through renewed subscriptions to MedKnowledge." *Id.*

PBMs are financially benefited by limiting the pharmaceutical products covered by the plans they oversee, and OTC products are rarely covered. Thus, with regard to medical foods,

> certain First Databank customers, including, for example, Express Scripts, wished to avoid reimbursing prescriptions for medical foods. Express Scripts and others thus collaborated and communicated with First Databank, and expressed a preference for recoding medical foods as "O" or OTC products, thus making medical foods uncovered and non-reimbursable.

*Id.* ¶ 50. In order "to satisfy the preferences of certain customers, including, on information and belief, Express Scripts and other PBMs," First Databank "change[d] the class description of the Alfasigma Products in its database from 'F' to 'O,' thus falsely representing that these products are available OTC, when in fact they are available by prescription, and should not be taken by a patient without physician supervision." *Id.* ¶ 51. "This action resulted in medical foods, including the Alfasigma Products, to be less likely to be covered and thus reimbursable, resulting in a cost-savings for PBMs." *Id.*[3]

Alfasigma's FAC sets forth detailed facts which, accepted as true, show First Databank engages in false commercial speech in its database and other customer communications for the purpose of selling and continuing to sell subscriptions to First Databank's MedKnowledge

---

[3] Moreover, because other compendia (including Medi-Span and Gold Standard) refused to join First Databank in its false advertising of medical foods as OTC drugs, FAC ¶ 53, First Databank's "false and misleading advertising of Alfasigma's products as 'O' sets First Databank apart from its competitors," making its "services and products more attractive to certain customers, including, for example, PBMs, who are able to maximize their own profits at the expense of patients who can no longer obtain reimbursement for medical foods." *Id.* ¶ 54.

database. Alfasigma thus satisfies this element of "advertising" under *Coastal Abstract*.

### 3. *Lexmark* abrogated the "direct competition" element of "advertising"

First Databank recites the second element of *Coastal Abstract* (that First Databank must be "in commercial competition" with Alfasigma), Motion at 8, and invites the Court to dismiss on the grounds that First Databank and Alfasigma are not direct competitors. *Id.* at 9 ("Alfasigma does not allege that it competes with First Databank, and if that requirement is still in force in the Ninth Circuit, it cannot be met here.") As this Court indicated, however, "that requirement" of direct competition is *not* in force in the Ninth Circuit, because the Supreme Court expressly rejected direct competition as a prerequisite for a § 43(a) Lanham Act false advertising claim. *Lexmark*, 572 U.S. at 136 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors."); *see also id.* at 138 ("although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)"); *id.* ("when a party claims reputational injury from disparagement, competition is not required for proximate cause"). Construing *Lexmark*, courts thus hold a "direct competition" element for the definition of *advertising* no longer can apply. *Handsome Brook Farm LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. Appx. 251, 257 (4th Cir. 2017) ("we also do not require a competitive relationship when determining whether a communication is advertising or promotion"); *Vidillion, Inc. v. Pixalate, Inc.*, No. 18-cv-7270, 2019 WL 3308768, at *1 n.1 (C.D. Cal. Jun. 5, 2019) ("The section portion of the test–'2) by a defendant who is in commercial competition with plaintiff'–has been abrogated by the Supreme Court.")

### 4. First Databank's advertising is sufficiently disseminated

Finally, First Databank argues its false statements were not "sufficient[ly] disseminat[ed] to the relevant purchasing public" to constitute "advertising" because they were only made to *current* customers. Motion at 9. But First Databank falsely advertises using media available to the general public, including its website and brochures, FAC ¶ 94, as well as through communications directed at current customers. Moreover, First Databank's current customers include a substantial part of the Healthcare Marketplace, including "pharmaceutical wholesalers

DOCUMENT PREPARED
ON RECYCLED PAPER

and distributors, pharmacies, pharmacy-benefit managers, Medicaid and Medicare payers, and insurance companies." Answer ¶ 23; *see also* Complaint ¶ 24 (First Databank claims to be "'the leading provider of drug knowledge' with 'thousands of customers worldwide'"); Answer ¶ 24 (admitting these statements are "found on its website"). Indeed, First Databank claims it dominates the compendium market. FAC ¶ 31 (screenshot of First Databank website claiming First Databank's customers include, *e.g.*, 8 of the top 9 PBMs).

More fundamentally, First Databank's argument that false commercial speech intended to influence *current* customers to *continue* purchasing its goods and services somehow is exempt as "advertising" makes no sense. *E.g.*, *Boltex Mfg. Co., LP v. Galperti, Inc.*, No. 17-cv-1439, 2018 WL 1535199, at *5 & 1 n.1 (S.D. Tex. Mar. 29, 2018) (rejecting argument that "post-sale communications to consumers who have already purchased a product" could not be actionable as false advertising, where allegedly false statements appeared on shipping documents and commodity goods); *Sirius Labs, Inc. v. Rising Pharms., Inc.*, No. 03-cv-6965, 2004 WL 51240, at *4 (N.D. Ill. Jan. 7, 2004) (pharmaceutical labeling and inserts are "advertising").

*Marcyan v. Nissen Corp.*, 578 F. Supp. 485 (N.D. Ind. 1982), cited by First Databank, is inapposite. *Following a bench trial*, the court rejected a false advertising claim based on a statement in an automobile's owner's manual. The court found the statement at issue was only seen post-purchase, was not false, and there was no evidence any consumer was impacted by the statement. *Id.* at 507.[4] But First Databank's false advertising is not hidden in a manual for a major purchase that occurs once every few years. Instead, First Databank presents its false advertising in frequent commercial speech for a *subscription* product, for which customers can choose to let subscriptions lapse in favor of other products. First Databank's false commercial speech proposes a commercial transaction—new or renewed subscriptions to MedKnowledge. In

---

[4] *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090 (C.D. Cal. 2004), a pre-*Lexmark* case also cited by First Databank, concerned the defendant's "Ad-aware" software that, once downloaded, installed, and operated, detected on user's computers spyware that was bundled in plaintiff's programs. Because the Ad-aware software was free, its detection of bundled spyware only occurred after users acquired and installed the Ad-aware software, and the parties were not in direct competition, the court held the software itself did not constitute "advertising." *Id.* at 1118.

DOCUMENT PREPARED
ON RECYCLED PAPER

order to keep selling subscriptions, First Databank "communicates with certain customers regarding coding decisions, and makes coding decisions that comply with customer preferences." FAC ¶ 49. And First Databank falsely advertises Alfasigma's Products "in order to sell its products and services to those customers, and to continue selling its products and services, for example, through renewed subscriptions to MedKnowledge." *Id*.

Because First Databank's false commercial speech meets all the applicable elements set forth by *Coastal Abstract*, it is actionable as false advertising under the Lanham Act.

## C. Alfasigma Sufficiently Alleges That First Databank Proximately Caused Injuries

First Databank's false advertising devastated Alfasigma. Its medical food products are among its flagship offerings; once First Databank falsely used the imprimatur of the FDA to advertise, untruthfully, that these products are "OTC drugs," insurers stopped covering and patients stopped purchasing these critical products prescribed by doctors to address significant medical conditions. Alfasigma lost millions upon millions of dollars as a result of these lost sales—and these lost sales were directly caused by First Databank's false and misleading advertising, false description, and unfair competition. The FAC overwhelmingly demonstrates that First Databank "proximately caused" Alfasigma's injury.

Under *Lexmark*, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 133-34; *see also Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1121 (9th Cir. 2015). This proximate cause requirement "bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Ray Charles Found.*, 795 F.3d at 1124 (in copyright suit, holding: "There is no remoteness here. . . . Far from barring the Foundation's suit, the proximate cause test suggests that the Foundation is indeed a party whose injuries may have been proximately caused by violations of the statute.") (quotations omitted).

As First Databank acknowledges, "proximate cause was satisfied by the allegations in" *Lexmark* "because the defendant had allegedly cast aspersions on the plaintiff's business for the purpose of promoting its own interests that led to lost sales for plaintiff." Motion at 9-10. Thus,

Document Prepared
on Recycled Paper

proximate cause "extend[ed] past the first step of a causational chain . . . because of the one-to-one relationship between plaintiff's lost sales and the third parties directly affected by the advertising." *Id*. at 10. "This direct connection negated the speculative nature of indirect causation that usually results in a finding of no proximate cause." *Id*. Just so here. First Databank seeks "to promote its own interests" at Alfasigma's expense, and there is a "direct connection between First Databank's statements (which are . . . advertising) and Alfasigma's sales." *Id.*

Alfasigma alleges specific facts showing that First Databank's false advertising caused Alfasigma a loss of sales, a "paradigmatic direct injury from false advertising." *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, No. 3:16-cv-1651, 2016 WL 4944370, at *7 (N.D. Tex. Sept. 16, 2016). Alfasigma is not suing based on "harms derivative of 'misfortunes visited upon a third person,'" *id.*, but rather because First Databank's advertising has caused physicians to stop prescribing Alfasigma's Products, FAC ¶ 66, pharmacies from stocking its products, *id.* ¶ 67, insurers from covering them, *id.* ¶ 64 , and patients from purchasing them. *Id.* ¶ 65. This is a cognizable injury proximately caused by First Databank's tortious conduct. *E.g.*, *UPS Store Inc. v. Hagan*, No. 14-cv-1210, 2015 WL 9256973, at *8 (S.D.N.Y. Nov. 18, 2015).

**D.     First Databank Is Also Liable For Contributory False Advertising**

Beyond its own false advertising, First Databank caused and provided support to third parties, who falsely described Alfasigma's Products as "OTC" in their own commercial advertising. *E.g.*, FAC ¶ 63 (Express Scripts advertisement stating "FDB now classifies all medical foods as over-the-counter (OTC) items"). First Databank's Motion barely mentions contributory false advertising, apparently suggesting, but without any analysis, that the Court need not "recognize at all" this well-established Lanham Act cause of action. Motion at 5.

In *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982), the Supreme Court held a manufacturer of an infringing product may be held liable under the Lanham Act for contributory trademark infringement. If a manufacturer "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit." *Id.*

The Second Circuit later applied this reasoning to § 43(a) of the Lanham Act. *Societe des*

DOCUMENT PREPARED
ON RECYCLED PAPER

PAGE 22       PLAINTIFF ALFASIGMA USA, INC.'S MEM. OF POINTS AND AUTHORITIES IN OPP'N TO DEF. FIRST DATABANK, INC.'S
SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE FIRST AMENDED COMPLAINT

*Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 132-33 (2d Cir. 2004) ("Meridien has also stated claims for contributory liability under the Lanham Act and the District Court erred in dismissing them"); *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 456 (S.D.N.Y. 2012) ("Gnosis is liable to Merck for contributory false advertising because its false use of the common name caused its distributors to also falsely advertise."), *aff'd*, 760 F.3d 247 (2d Cir. 2014). The Eleventh Circuit followed suit. *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1275-76 (11th Cir. 2015) ("[t]he rationale for allowing contributory trademark infringement actions," that is, protecting persons engaged in commerce against unfair competition, "supports recognizing a similar theory of liability in the false advertising context").

While the Ninth Circuit has yet to consider the issue, California federal district courts recognize this cause of action. *E.g.*, *ADT Sec. Serv., Inc. v. Sec. One Int'l, Inc.*, No. 11-cv-05149, 2012 WL 4068632, at *3 (N.D. Cal. Sept. 14, 2012) ("In light of other courts' reasoned extension of a claim for contributory false advertising . . . under the Lanham Act, the Court similarly finds such an extension to be appropriate."); *Biocell Tech. LLC v. Arthro-7*, No. 12-cv-516, 2012 WL 12892937, at *12 (C.D. Cal. Nov. 19, 2012) (denying motion to dismiss, noting: "[c]ontributory liability under the Lanham Act is based on the theory that one who intentionally induces another to directly violate the Act is contributorily liable"); *Mutual Pharm. Co. v. Ivax Pharm. Inc.*, 459 F. Supp. 2d 925, 942-43 (C.D. Cal. 2006) (analyzing contributory false advertising, and holding that under *Inwood Labs* "only proof that defendants knew their products were being falsely advertised by third party retailers is enough to trigger liability").

Beyond its arguments common to Counts I and II, First Databank offers no challenges specific to Count III for contributory false advertising. Because the FAC sets forth sufficient facts to plausibly assert contributory liability, *e.g.*, FAC ¶¶ 105-112, First Databank's Motion should be denied as to this claim as well.

### E. First Databank's Attempt To Mislead Consumers Through A "Q" Code Is Actionable

First Databank's reclassification of Alfasigma's medical foods as "Q" is also false and misleading, and will further injure Alfasigma by creating more confusion in the marketplace:

72.    First Databank's proposed plan to reclassify medical foods as "Q" likely will cause further confusion among the Healthcare Marketplace, to Alfasigma's continuing injury. First Databank states that "Q" will refer to: "Products that are neither drugs nor devices, such as dietary supplements (including prenatal and other vitamins), medical foods, herbal preparations, and bulk flavorings or colorants."

73.    A medical food is not an "herbal preparation," a dietary supplement, or a "flavoring[] or colorant[]." None of these products are regulated as medical foods, and none of them carry a federal requirement that they be used under physician supervision. To the contrary, the hallmark of dietary supplements, herbal preparations, flavorings, and colorants is that they may be safely used without medical supervision.

74    On information and belief, Defendant's proposed reclassification of the Alfasigma Products as similar to "herbal preparations," "dietary supplements," and "flavorings or colorants," will cause further confusion among physicians and other prescribers, pharmaceutical wholesalers and distributors, pharmacies, pharmacists, and insurers, to Alfasigma's continuing injury.

FAC ¶¶ 72-74.[5] First Databank argues, however, that its coding of medical foods, which must be used under a physician's supervision, as belonging in the same "Q" class as flavorings and colorants *cannot* be false or misleading, but rather is a mere matter of "opinion." Motion at 3. Courts, however, reject this excuse. *E.g.*, *Nat'l Grange of the Order of Patrons v. Cal. Guild*, 334 F. Supp. 3d 1057, 1067-68 (E.D. Cal. 2018) ("defendants' statements," including that they were part of a "grass roots organization that began in 1870," were "clearly assertions of fact, not mere opinion or criticism, and thus are not protected"), *appeal docketed*, No. 18-cv-16671 (9th Cir. Sept. 5, 2018); *Franklin Fueling Sys., Inc. v. Veeder-Root Co.*, No. 09-cv-580, 2009 WL 2462505, at *4 (E.D. Cal. Aug. 11, 2009) (defendant's "assertions represent misdescriptions of specific or absolute characteristics of the Healy System and as such, are not mere opinions"); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1138 (C.D. Cal. 2009) ("because TYR alleges that Schubert's statements purported to be factual and not mere opinions, and were false or misleading commercial speech, Speedo's First Amendment argument fails here").

_____
[5] In passing, First Databank argues the Court should "strike" these allegations under California's Anti-SLAPP statute. Motion at 12 n.1. But only Alfasigma's Lanham Act false advertising claims are properly before the Court, and the Anti-SLAPP statute has no bearing on the sufficiency of the pleading of these *federal* claims. *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010) ("the anti-SLAPP statute does not apply to federal law causes of action").

Document Prepared
on Recycled Paper

PAGE 24    PLAINTIFF ALFASIGMA USA, INC.'S MEM. OF POINTS AND AUTHORITIES IN OPP'N TO DEF. FIRST DATABANK, INC.'S
SPECIAL MOTION TO STRIKE, MOTION TO DISMISS, AND MOTION TO STRIKE FIRST AMENDED COMPLAINT

Nor is First Databank's "mere opinion" argument colorable on the facts of this case. First Databank's Class code is "[o]ne of the 'primary fields' in F[irst Databank]'s MedKnowledge database," Order, 2019 WL 3532844, at *1, and there is nothing in First Databank's advertising to suggest that its assignment of a Class code is opinion. To the contrary, First Databank's advertising and promotion focuses on assuring customers that MedKnowledge "encompass[es] FDA-approved prescription drugs, over-the-counter medications and pharmacy benefit medical devices,'" and that it "offer[s] a 'core knowledge base' that is 'persistently researched and verified,'" and that "'is so reliable, governments actually check with us to confirm their own data.'" FAC ¶ 30; *see also id.* ¶ 32 (MedKnowledge is "'compiled' from third party sources including drug manufacturers and governmental agencies, 'using best practices research procedures with extremely thorough validation procedures.'") First Databank further intends its customers (and their customers) to "'rely on the information you provide to understand drug names, descriptions, and pricing, and to make clinical and business decisions.'" *Id.* ¶ 33. Nowhere in these advertisements and promotional statements is there any hint that its classification of products as "F," "O," or "Q" is mere opinion.

## VI.    CONCLUSION

For all of the reasons set forth in this Court's previous Order, and as further argued herein, First Databank's Motion should be denied in its entirety.


Dated: October 24, 2019                    NORTON ROSE FULBRIGHT US LLP

                                           By:  */s/Saul Perloff*
                                                Saul Perloff

                                           Attorney for Plaintiff
                                           ALFASIGMA USA, INC.