UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFASIGMA USA, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>FIRST DATABANK, INC.,<br><br>    Defendant. | Case No. 18-cv-06924-HSG<br><br>**ORDER GRANTING MOTION TO STRIKE AND GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 48 |

Pending before the Court is Defendant First Databank, Inc.'s motion to strike and motion to dismiss. *See* Dkt. No. 48. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS** the motion to strike and **GRANTS** the motion to dismiss.

## I. BACKGROUND

### A. Factual Background

The parties are familiar with the facts of this case, and the Court only briefly summarizes them here as relevant to the pending motion to strike and motion to dismiss. Plaintiff Alfasigma USA, Inc. is a pharmaceutical company that develops, manufactures, sells, and distributes medical foods. *See* Dkt. No. 46 ("FAC") at ¶¶ 11, 17. Plaintiff alleges that, according to federal law, a medical food is defined as "a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." *See id.* at ¶ 22 (emphasis omitted) (quoting 21 U.S.C. § 360ee(b)(3)). Plaintiff's medical foods provide the "distinctive nutritional requirements" of patients with various health conditions, including mild cognitive impairment,

depression, schizophrenia, and diabetic peripheral neuropathy. *See id.* at ¶¶ 11, 18. Plaintiff emphasizes that as medical foods, its products cannot be accurately described as "over-the-counter." *See id.* at ¶¶ 2–4,

Plaintiff filed this action on November 15, 2018, against Defendant, challenging the new coding that Defendant implemented for Plaintiff's products in its pharmaceutical database called "MedKnowledge." *See generally* FAC. Defendant sells subscriptions to its database, which includes numerous fields, including clinical, descriptive, and pricing data about pharmaceutical products, including Plaintiff's medical foods. *See id.* at ¶¶ 39–40, 42. According to Plaintiff, the database is used by prescribers and pharmacists to determine which products to prescribe and dispense. *Id.* at ¶¶ 27–28, 37. It is also used by pharmacists, pharmacy benefit managers ("PBMs"), insurance coverage adjudication systems, and insurance providers to determine whether products are covered and should be reimbursed by public and private insurance plans. *Id.* at ¶¶ 7, 9, 27–28, 38.

Historically, the "class value" field in the MedKnowledge database indicated whether manufacturers identified their products as prescription-only. *See id.* at ¶ 42. Code "F" identified product labels that indicated a prescription was required, and "O" identified when the product label did not contain any dispensing limitations. *See id.* Plaintiff alleges that subscribers "universally understand[] that a product designated 'O' is an [over-the-counter ("OTC")] drug, available over-the-counter and without physician supervision." *Id.* at ¶ 43. Under this coding system, Plaintiff's products were historically designated as "F." *Id.* at ¶ 41. However, between February and April 2016, Defendant reclassified Plaintiff's products as class "O." *See id.* at ¶¶ 51–52. In doing so, Plaintiff asserts that Defendant was "falsely representing that these products are available OTC, when in fact they are available by prescription, and should not be taken by a patient without physician supervision." *Id.* at ¶ 51.

In September 2018, Defendant announced a new plan: the creation of a new class value, "Q." *See id.* at ¶ 70. Under this plan, class value "Q" will apply to "Products that are neither drugs nor devices, such as dietary supplements (including prenatal and other vitamins), medical foods, herbal preparations, and bulk flavorings or colorants." *See id.* at ¶¶ 70, 73. Plaintiff asserts

that this new system is nonetheless still false and misleading. *See id.* at ¶¶ 72–74. Plaintiff further alleges that Defendant misrepresents in written brochures and on its website that it "compile[s]" the relevant information in its database and for its coding determinations from the U.S. Food and Drug Administration ("FDA") and from manufacturers, such as Plaintiff. *See id.* at ¶¶ 3, 32–34, 55, 94–95.

Based on these allegations, Plaintiff brings federal and state law causes of action for (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (2) contributory false advertising in violation of the Lanham Act, *id.*; (3) unfair competition and false description in violation of the Lanham Act, *id.* § 1125(a)(1)(A); (4) false advertising in violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (5) unlawful trade practice in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and (6) common law unfair competition. *See* FAC at ¶¶ 76–138.

### B. Procedural Posture

On August 2, 2019, the Court denied Defendant's motion to strike the state law claims in the original complaint under California's anti-SLAPP statute and granted in part and denied in part Defendant's motion to dismiss the Lanham Act claims under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 41. The Court concluded at the time that Plaintiff had shown a reasonable probability of success on the merits of its state law claims, but had not plausibly alleged that Defendant's coding changes were made for the purpose of influencing subscribers to purchase Defendant's own products or services, as required under the Lanham Act. *See id.*

Plaintiff subsequently amended its complaint. *See* FAC. Defendant now moves to strike the state law claims in Plaintiff's amended complaint under the anti-SLAPP statute, and to dismiss Plaintiff's remaining claims under Rule 12(b)(6). Dkt. No. 48.

## II. LEGAL STANDARD

### A. Motion to Strike

Under California's anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the

3

United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. P. Code § 425.16.  The statute was enacted to curtail "strategic lawsuits against public participation," that were "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." *Id.* § 425.16(a).  Because "it is in the public interest to encourage continued participation in matters of public significance, and [because] this participation should not be chilled through abuse of the judicial process," the anti-SLAPP statute is to be construed broadly. *Id.*

California courts apply a two-step process for analyzing an anti-SLAPP motion. *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010).  Under the first prong, the moving party must make "a threshold showing . . . that the act or acts of which the plaintiff complains were taken 'in furtherance of the right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute." *Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (Cal. 2002) (quoting Cal. Civ. P. Code § 425.16(b)(1)).  If the moving party meets its threshold showing, then the burden shifts to the non-moving party to prove a probability of prevailing on the claim. *See id.* at 67.[1]

**B.    Motion to Dismiss**

Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

---

[1] Since 1999, the Ninth Circuit has determined that the motion to strike and attorneys' fees provisions of California's anti-SLAPP statute, Cal. Civ. P. Code § 425.16(b)–(c), are available in federal court because there is no "direct collision with the Federal Rules." *See U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972–73 (9th Cir. 1999) (quotation omitted).  Yet a number of judges have questioned this holding. *See, e.g.*, *Makaeff v. Trump Univ.*, LLC, 736 F.3d 1180, 1188–90 (9th Cir. 2013) (Watford, J., concurring); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 275–76 (9th Cir. 2013) (Paez, J., concurring); *cf. Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333–37 (D.C. Cir. 2015) (rejecting application of District of Columbia's anti-SLAPP statute in federal court).  The Court applies the statute in this case as required by binding case law, but shares the concern that this interpretation of the statute "vastly understates the disruption when federal courts apply the California anti-SLAPP statute," particularly as it interacts with Rule 12 and its plausibility standard. *See Makaeff*, 715 F.3d at 274 (Kozinski, J., concurring).

dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Id.* However, a plaintiff must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The Court does not credit allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

## III.   DISCUSSION

In the amended complaint, Plaintiff continues to allege two theories of liability. *First*, Plaintiff contends that Defendant's decision to recode Plaintiff's products as "O" and "Q" in the database is false and misleading ("database allegations"). *Second*, Plaintiff contends that Defendant misrepresents to subscribers that the FDA and manufacturers are the source of the information contained in the database ("source allegations"). The database allegations form the basis of Plaintiff's causes of action for (1) false advertising in violation of the Lanham Act, § 1125(a)(1)(B); (2) contributory false advertising in violation of the Lanham Act, *id.*; (3) false advertising, in violation of the FAL; (4) unlawful trade practices in violation of the UCL; and (5) common law unfair competition. *See* FAC at ¶¶ 77–92, 114–122, 127, 131. And the source allegations form the basis of Plaintiff's overlapping causes of action for (1) false advertising in violation of the Lanham Act, § 1125(a)(1)(B); (2) unfair competition and false description in violation of the Lanham Act, § 1125(a)(1)(A); (3) false advertising, in violation of the FAL; and (4) unlawful trade practices in violation of the UCL. *See id.* at ¶¶ 93–112, 127, 131.

As a matter of law, Defendant's anti-SLAPP motion extends only to Plaintiff's state law causes of action. *See Hilton*, 599 F.3d at 901 ("[T]he anti-SLAPP statute does not apply to federal law causes of action."). And much as they did litigating in the prior motion to strike, the parties do not appear to dispute that Defendant can satisfy the first step of the anti-SLAPP analysis (that Defendant's conduct was taken in furtherance of its free speech rights or in connection with a

5

1   public issue).  The critical question for purposes of the motion to strike, therefore, is whether
2   Plaintiff has established a probability of prevailing on its state law claims.  And with respect to the
3   motion to dismiss, the Court similarly must evaluate whether Plaintiff states a claim for relief that
4   is plausible on its face.  Given the nature of Defendant's arguments, the issues presented in the
5   motion to strike and motion to dismiss converge.  Thus, the Court first addresses the arguments
6   regarding Plaintiff's database allegations and then turns to Plaintiff's source allegations.

### A.   Database Allegations

Defendant challenges the claims that are premised on the database allegations on three bases.  *First*, Defendant argues that the database is not commercial speech.  *See* Dkt. No. 48 at 6–8.  *Second*, Defendant argues that Plaintiff's Lanham Act claims fail—to the extent they are premised on alleged misrepresentations in the MedKnowledge database—because Plaintiff cannot establish that the database is commercial advertising and promotion as required under the statute.  *Id.* at 8–9.  *Third*, Defendant argues that the class value coding changes are not false or misleading.  *Id.* at 10–12.

### i.   Law of the Case

As an initial matter, Plaintiff argues that the law of the case precludes the Court from considering Defendant's arguments regarding whether the database is commercial speech.  *See* Dkt. No. 53 at 9–10.  The Court is not persuaded.

"The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (quoting *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016)).  However, the Ninth Circuit has clarified that "[t]he law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case."  *Id.*  Rather, it applies where an issue has been decided by a higher court or where the court has entered a final decree or judgment.  *Id.* at 1042–43.  Neither circumstance is present here.  The Court is therefore free to assess Plaintiff's amended complaint in its entirety on the merits "without having to find that its prior decision was 'clearly erroneous.'"  *Id.* at 1043.

//

### ii. Commercial Speech

As this Court has previously explained, Plaintiff can only succeed on its "database claims" under the Lanham Act, and on its state law claims for violations of the FAL, UCL, and unfair competition, if Defendant's database is commercial speech.[2]  In its prior order, the Court initially denied Defendant's motion to strike, finding that Plaintiff's allegations gave rise to a reasonable probability that Defendant engaged in commercial speech.  *See* Dkt. No. 42 at 7–10.  In the intervening time, however, Plaintiff has amended its complaint to include additional allegations.  More importantly, the Ninth Circuit has since provided further guidance regarding the contours of commercial speech.  *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115–117 (9th Cir. 2021).  The Court therefore finds it appropriate to reconsider its prior holding.

As this Court has previously explained, the law is not "clear" about "what type of speech qualifies as commercial speech."  *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004); *cf. Kasky*, 27 Cal. 4th at 956–60, 969 (applying Supreme Court precedent and declining to articulate a separate test for distinguishing commercial and noncommercial speech under the California Constitution).  Although the Supreme Court has held that the "core notion of commercial speech" encompasses "speech which does no more than propose a commercial transaction," *see Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (quotation omitted), courts have been reluctant to articulate a bright-line rule to identify commercial speech that falls outside this "core" zone.  *Cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (acknowledging "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category"); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557,

---

[2] "The Lanham Act prohibits any person from misrepresenting her or another person's goods or services in 'commercial advertising or promotion.'"  *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114–115 (9th Cir. 2021) (citing 15 U.S.C. § 1125(a)(1)(B)).  Commercial advertising or promotion, in turn, is defined as: "(1) *commercial speech*, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public."  *Id.* (emphasis added) (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).  Courts have also clarified that "California's consumer protection laws, like the unfair competition law, govern only commercial speech."  *Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140 (Cal. Ct. App. 2004); *see also Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 953–56, 962 (Cal. 2002), *as modified* (May 22, 2002).

579 (1980) (Stevens, J., concurring) (cautioning that commercial speech should "not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed"). Rather, the "commercial speech analysis is fact-driven," and courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *Ariix*, 985 F.3d at 1115 (quotations omitted). "Where the facts present a close question," the Supreme Court has identified three non-exhaustive factors for courts to consider as part of the commercial speech analysis: (1) whether the speech is an advertisement; (2) whether the speech refers to a particular product; and (3) whether the speaker has an economic motivation for publication. *See id.* (citing *Bolger*, 463 U.S. at 66–68); *see also Kasky*, 27 Cal. 4th at 969 (applying the same three-factor test under *Bolger*).

Although Plaintiff alleges that Defendant tailors its database to its subscribers' needs, *see* FAC at ¶¶ 6–9, 78–79, there is no dispute that Defendant's database provides information about third-party pharmaceutical products (including Plaintiff's products), not its own products, *see id.* at ¶¶ 39–40, 42. Other third parties then use this information to determine which products to prescribe and dispense, and to decide whether to reimburse for these pharmaceutical products. *See id.* at ¶¶ 7, 9, 27–28, 37–38. "The United States Supreme Court has never decided whether false statements about a [third party's] product or service . . . would properly be categorized as commercial speech." *See Kasky*, 27 Cal. 4th at 962. The Court must, therefore, assess the *Bolger* factors to determine whether the database may be considered commercial speech.

Because Plaintiff (wrongly) contended that the law of the case precludes the Court from considering whether the database is commercial speech, it did not address the three *Bolger* factors or Defendant's arguments directly. The Court thus considers Plaintiff's arguments in opposition to the prior motion to strike and motion to dismiss, *see* Dkt. No. 26, and the allegations in the amended complaint.

As to the first factor, Plaintiff has previously acknowledged that Defendant's database "is not a traditional advertisement." *See* Dkt. No. 26 at 16; *see also Exeltis USA Inc. v. First Databank, Inc.*, No. 17-CV-04810-HSG, 2021 WL 616377, at *4 (N.D. Cal. Feb. 17, 2021). In its most recent opposition brief, Plaintiff notes that Defendant "'markets' its MedKnowledge

8

1   database 'on its website.'" *See* Dkt. No. 53 at 14–15. This is inapposite. Although
2   representations on Defendant's website about its database may be considered advertisements, this
3   does not make the database itself an advertisement. *Cf. Ariix*, 985 F.3d at 1116 (noting that a
4   guidebook which rated nutritional supplements was not a traditional advertisement).

5        As to the second *Bolger* factor, the database clearly references thousands of specific
6   pharmaceutical products. *See* FAC at ¶¶ 27–30. But the Ninth Circuit has explained that this
7   factor may "not shed much light" on whether speech is commercial. *See Ariix*, 985 F.3d at 1116
8   (comparing a newsletter containing investment advice, which may be considered commercial
9   speech, with product reviews, which generally are not considered commercial speech). The
10  commercial speech analysis therefore turns on the third factor: whether Defendant had an
11  economic motivation for the speech. Here, Plaintiff alleges that the database is commercial speech
12  because (1) "pharmaceutical product manufacturers and distributers have . . . come to rely on [the]
13  database as a crucial promotional channel for their products"; (2) the database is directed toward
14  third parties "to influence their decisions whether to prescribe, purchase, dispense and/or pay for"
15  Plaintiff's products; and (3) Defendant collaborates with its subscribers in making changes to the
16  database. *See* FAC at ¶¶ 35, 78–79.

17        Plaintiff persuasively alleges that Defendant's database is used widely by third parties.
18  *See, e.g.*, *id.* at ¶¶ 30–31. Plaintiff has alleged that Defendant's subscribers rely on the database to
19  make prescribing, dispensing, purchasing, and reimbursement determinations. *See id.* at ¶¶ 27,
20  36–38, 78. And because of this, manufacturers like Plaintiff rely on Defendant's database to
21  promote their products to these third parties. *Id.* at ¶¶ 27–28, 35–38, 77. In short, Plaintiff has
22  alleged that Defendant's database is critical to the billion-dollar pharmaceutical industry. *See,*
23  *e.g.*, *id.* at ¶¶ 25–28. These allegations, however, only underscore that third parties—not
24  Defendant—use the information contained in the database as part of their own commercial
25  transactions. Plaintiff does not allege that Defendant is actually making any prescribing,
26  dispensing, purchasing, or reimbursement determinations. Nor does Plaintiff allege that
27  Defendant decides what is or is not covered under a specific insurance plan. Rather, Plaintiff's
28  allegations simply indicate that Defendant's database generally, and the class value more

specifically, is used by third parties to drive their own decisions.  As Plaintiff itself explains, databases such as Defendant's simply "consolidate, package, and disseminate this information." *Id.* at ¶ 27.

Plaintiff also suggests that Defendant's editorial decisions in maintaining and updating the database are driven by subscribers' feedback, and that Defendant "generates revenue by selling subscriptions to MedKnowledge." *See* FAC at ¶¶ 39, 46–47, 49–51, 54, 79–80.  For example, Plaintiff cites to "commercial advertising" in which Defendant "emphasizes that PBM customers can 'leverage' [Defendant's] products and services to reduce costs, thus 'magnifying profits.'" *Id.* at ¶ 46.  The advertisement states that the database "provide[s] your decision makers with all the information they need and in precisely the way they need it." *Id.*  Plaintiff further alleges that Defendant "promotes and advertises itself as working 'collaboratively' with customers as 'partners' to help them achieve 'success.'" *Id.* at ¶ 47.  Plaintiff also explains that Defendant decided to change the class value of Plaintiff's products at least "[i]n part to satisfy the preferences of certain customers . . . ." *Id.* at ¶¶ 51, 54, 80.  Plaintiff suggests that Defendant is thus implicated in subscribers' commercial transactions.  But again, this only underscores that Defendant has an incentive to provide the information that its subscribers require.  There is no question that Defendant has an incentive to sell its database and for its subscribers to use it.  But as the Supreme Court has noted:

> If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales.  Such a basis for regulation clearly would be incompatible with the First Amendment.

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973); *accord Ariix*, 985 F.3d at 1117 ("A simple profit motive to sell copies of a publication or to obtain an incidental economic benefit, without more, does not make something commercial speech.  Otherwise, virtually any newspaper, magazine, or book for sale could be considered a commercial publication.").

The Court recently concluded that the MedKnowledge database was noncommercial in

10

another case, *Exeltis v. First Databank*, 17-CV-04810-HSG, 2021 WL 616377, at 3–7. Although in *Exeltis* the Court was analyzing the defendant's motion for summary judgment rather than a motion to dismiss, its discussion of recent Ninth Circuit authority is still applicable here:

> The Ninth Circuit's recent opinion in *Ariix, LLC v. NutriSearch Corp.* offers an instructive comparison. [985 F.3d at 1111–122]. In *Ariix*, a nutritional supplement company brought a false advertising claim against the publisher of a nutritional supplement guide, which the defendants stated was "an evidence-based book" without any "particular bias." *See id.* at [1111–112]. The plaintiff argued that the guide was in fact "rigged" and that the defendants had an undisclosed financial arrangement with one of the plaintiff's competitors, Usana, to rate Usana's supplements as the best. *Id.* at [1112–113]. In analyzing whether the guide constituted commercial speech, the Ninth Circuit noted that "[o]n its face, the Guide purportedly describes the science of nutritional supplements and provides ratings for various nutritional supplement products," and thus "does not appear to propose a commercial transaction." *Id.* at [1115]. The court then considered the *Bolger* factors, specifically whether the defendant "acted primarily out of economic motivation" in publishing the guide. *See id.* at [1116–117]. The court explained that "economic motivation is not limited simply to the expectation of a direct commercial transaction with consumers," but also can "involve[] indirect benefits." *Id.* at [1117].
>
> In finding that the guide was commercial speech, the Ninth Circuit emphasized that its decision was "a narrow one that is tied specifically to the troubling allegations in this case." *Id.* at [1118]. The Ninth Circuit highlighted that according to the allegations in the complaint, the defendant's CEO was paid inflated speaking fees in exchange for better reviews of Usana's products; the defendant adjusted its rating criteria to favor Usana and thwart competitors from receiving the guide's top rating; and the entire guide was in fact created to increase Usana's sales. *Id.* at [1112–113, 1118–119]. Based on these facts, the court concluded that the plaintiff had plausibly alleged that the defendants "published the Guide mainly with the economic goal of furthering their own self-interests beyond simply benefiting from sales of the publication" or "to inform consumers about nutritional supplements." *Id.* at [1117]. The Ninth Circuit contrasted the "informational" aspects of the guide, including "the benefits and science of nutritional supplements," with the "allegedly rigged ratings of nutritional supplements," and concluded that the guide was "more like a sophisticated marketing sham rather than a product review guide." *Id.* at [1119–120].

*Exeltis*, 2021 WL 616377, at *5–6.

Here, Plaintiff does not allege that there is any "hidden financial arrangement" in which Defendant benefits from the information in the database "beyond simply benefiting from sales of

the publication" itself. *Ariix*, 985 F.3d at 1117. Instead, Plaintiff alleges that "the primary cost for many PBMs, insurance companies, and others in the claim processing industry is for the reimbursement of covered pharmaceutical products." FAC at ¶ 48. Therefore, "[r]educing the number of covered products reduces the costs for PBMs and others" and "thus magnif[ies] [their] profits." *Id.* Plaintiff further alleges that at least some subscribers "wished to avoid reimbursing prescriptions for medical foods" and "expressed a preference for recoding medical foods" in Defendant's database. *Id.* at ¶ 50. According to Plaintiff, Defendant consequently decided to change the class value of Plaintiff's products based, at least in part, on some subscribers' desire to "maximize profits." *See* FAC at ¶¶ 49, 51. But as noted above, Plaintiff does not allege that Defendant determines which products are covered under any specific insurance plan. And unlike in *Ariix*, Plaintiff does not allege that Defendant is compensated more (or at all) based on whether a PBM or insurer decides to pay or deny a claim for a specific product or based on whether third parties increase their profits by using the database. In short, Plaintiff has not identified what direct or indirect benefit Defendant may receive for changing the manner in which it codes Plaintiff's products, aside from selling licenses to its database.

As this Court noted in *Exeltis*, "there is no ready limiting principle under Plaintiff's proposal: any speech could be commercial if eventually relied on by third-party actors who conduct business." *Exeltis*, 2021 WL 616377, at *7 (citation omitted). The Court finds that even as alleged the database is noncommercial speech. Plaintiffs' Lanham Act, FAL, and UCL claims thus fail on this basis.[3]

### iii. Commercial Advertising and Promotion

Even if the database were considered commercial speech, Plaintiff's database-based Lanham Act claims also independently fail because the FAC does not adequately allege that Defendant made representations for the purpose of "commercial advertising and promotion."[4] As noted above, "[t]he Lanham Act prohibits any person from misrepresenting her or another

---

[3] Because the Court finds that the database does not constitute commercial speech, it need not decide whether Plaintiff has adequately alleged that the coding changes are false or misleading.
[4] Here, the Court only addresses Plaintiff's Lanham Act claims to the extent they are premised on the database allegations and *not* the source allegations.

12

person's goods or services in 'commercial advertising or promotion.'" *See Ariix*, 985 F.3d at 1114–115 (citing 15 U.S.C. § 1125(a)(1)(B)). Commercial advertising or promotion, in turn, is defined as: "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Id.* at 1115 (citing *Coastal Abstract*, 173 F.3d 735) (emphasis omitted).[5]

Here, Defendant argues that Plaintiff has not plausibly alleged that the database was created for the purpose of influencing consumers to buy *defendant's* goods or services. *See* Dkt. No. 48 at 8. In response, Plaintiff contends that it has provided sufficient allegations that the coding changes were motivated by Defendant's own economic motivation to continue selling subscriptions to its database. *See* Dkt. No. 53 at 16–18. As discussed above, Plaintiff alleges that Defendant "promotes and advertises itself as providing a collaborative approach in tailoring its products and services to allow its customers to be more profitable and commercially successful." FAC at ¶¶ 6–9, 78–79. Plaintiff asserts that Defendant thus changed the class value of Plaintiff's products at some of its subscribers' urging. *See id.* at ¶¶ 48–54.

But Plaintiff's theory is internally inconsistent. On the one hand, Plaintiff contends that some subscribers—including certain PBMs—would benefit financially if Defendant changed the coding of Plaintiff's medical foods from "F" to "O." *See, e.g.*, *id.* at ¶¶ 6–9. And according to Plaintiff, Defendant capitulated to encourage these entities to continue using Defendant's database. *See id.* at ¶¶ 8, 79. On the other hand, Plaintiff asserts that Defendant's *other* subscribers were confused about this coding change. They "did not know that [Plaintiff's] recoding was a commercial decision intended to enhance the profits of PBM and insurance company customers, rather than based on information from the FDA or [Plaintiff]." *Id.* at ¶ 9; *see also id.* at ¶ 55. Defendant's reclassification of Plaintiff's products thus purportedly "created confusion within the Healthcare Marketplace." *Id.* at ¶ 62. Some insurers, for example, thought

---

[5] Although the Ninth Circuit has not yet weighed in, *see Ariix*, 985 F.3d at 1120, other courts have found that the Supreme Court's opinion in *Lexmark* appears to have abrogated the "in competition" prong. *See Genus*, 378 F. Supp. 3d at 844 (collecting cases).

that Plaintiff's products were "no longer subject to prescription insurance coverage and reimbursement" and mistakenly denied coverage for them. *See id.* at ¶¶ 64–68. The FDA's medical director even "expressed concern" that "patients . . . are losing or have lost insurance coverage for their products marketed as medical foods" because "their insurance providers belie[ve] that the products are over-the-counter (OTC) drugs . . . ." *Id.* at ¶ 59.

Plaintiff posits on these bases that Defendant inaccurately changed its coding and class value field to promote its own services (*i.e.*, the MedKnowledge database). But Plaintiff has not alleged sufficient facts to explain why this is plausible. As Plaintiff acknowledges, "[i]t is important for [Defendant's] customers that the compendia services and products they purchase be accurate." *See id.* at ¶ 34. At best, Plaintiff alleges that only "certain PBM customers" would be encouraged to continue subscribing to its database. But accepting Plaintiff's allegations as true, as the Court must at this stage, Defendant simultaneously confused many of its subscribers and provided them with false information that was later challenged by the FDA itself. The Court is hard-pressed to understand how this would promote Defendant's own products or services.

Even putting aside this implausibility, Plaintiff's theory proves too much. Any publication would be deemed an advertisement if the defendant had an interest in encouraging others to purchase it. Plaintiff does not cite any authority that has accepted such a broad interpretation of "commercial advertising or promotion" under the Lanham Act. In *Ariix*, the Ninth Circuit left open the possibility that a defendant could have a creative financial arrangement such that it could be said to advertise its own products, even where it only endorses *others'* products. *See Ariix*, 985 F.3d at 1122, & n.10, 1125.

As this Court explained in *Exeltis*:

> Again, the Ninth Circuit's recent opinion in *Ariix* is instructive. There, the majority ultimately remanded the case for the district court to determine in the first instance whether the nutritional supplement guide was intended to influence consumers to buy the defendants' goods. *See Ariix*, [985 F.3d at 1122]. . . . [I]n a footnote, the majority advised the district court that "it may be useful to determine whether the defendants and Usana [a nutritional supplement manufacturer] had an agency relationship." *See id.* at [1120], n.10. If "the defendants were acting as agents of Usana and therefore had a vested interest in the goods that Usana sold," the

14

> majority reasoned that "might be enough to satisfy this element." *Id.* Here, there is no suggestion that the database is intended to influence consumers to buy any of Defendant's own goods or services. The database does not list any of Defendant's own products or additional services. Rather, the database itself is Defendant's product.
>
> The dissent in *Ariix* recognized that "there may be other endorsers who have such a direct financial stake in specific sales of a product—such as a cut of each sale—that it may likewise be fair to say that they are thereby *advertising* their *own* product. [*Id.* at 1125]. But Plaintiff has not advanced such an argument.

*Exeltis*, 2021 WL 616377, at *7–8. Here, Plaintiff does not proffer any facts to suggest that Defendant has an "agency relationship" with the manufacturers or any other sort of "financial stake in specific sales of a product," such that Defendant has "a vested interest in the goods that [any manufacturer] sold." *See Ariix*, 985 at 1120, & n.10. And the *Ariix* Court did not suggest that a profit motive to sell one's publication could be sufficient on its own. *See id.* at 1127 (rejecting as insufficient evidence that defendant "wrote obsequious reviews in the hope that Usana would be pleased and buy more Guides or give [the CEO] speaking engagements").

Plaintiff's Lanham Act claims thus fail on the independent ground that Plaintiff has not plausibly alleged that the database is "commercial advertising or promotion" as required under 15 U.S.C. § 1125(a)(1)(B).

### iv. Contributory False Advertising

Plaintiff also alleges that Defendant's misrepresentations induced its subscribers to falsely advertise that Plaintiff's products are "OTC drugs." *See* FAC at ¶¶ 106–107. Plaintiff thus asserts a cause of action for contributory false advertising under the Lanham Act. *See id.* at ¶¶ 105–112. "It is unclear in this Circuit if contributory false advertising can apply to non-commercial speech in any context because the Lanham Act, as a whole, applies only to commercial speech." *Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 847 (N.D. Cal. 2019), *reconsideration denied*, No. 18-CV-07603-WHO, 2019 WL 4168958 (N.D. Cal. Sept. 3, 2019). As discussed in Section III.A.ii above, Plaintiff has not pleaded a false advertising claim because it has not alleged that the database is commercial speech. For the same reason, Plaintiff's contributory false advertising claim also fails. In addition, the Court finds persuasive the district court's analysis in *Genus Lifesciences Inc. v. Lannett Co., Inc.*, and adopts it here. *See* 378 F. Supp. 3d at 847–49.

15

1    Even considering the merits of Plaintiff's contributory false advertising claim, Plaintiff has not
2    alleged that Defendant knowingly or intentionally induced, or materially participated in, its
3    subscribers' alleged false advertising. *See id.* To the contrary, Plaintiff has alleged how PBMs
4    and insurers have their own incentives to code Plaintiff's products as "O" and to refuse coverage
5    for Plaintiff's products. *See* FAC at ¶¶ 8–9, 48–51.

### B.  Source Allegations

7    Defendant also challenges Plaintiff's source allegations, arguing that Plaintiff has failed to
8    identify the allegedly false or misleading statements with sufficient particularity. *See* Dkt. No. 48
9    at 14–15. As a threshold matter, the parties disagree on whether a heightened pleading standard
10   applies to Plaintiff's false advertising, unfair competition, and false description claims under the
11   Lanham Act, and to Plaintiff's FAL and UCL claims. *Compare id.* at 13–14, *with* Dkt. No. 53 at
12   13–14.

#### i.  Heightened Pleading Standard

14   Defendant contends that Plaintiff accuses Defendant of engaging in fraud, and therefore
15   must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See* Dkt. No.
16   48 at 14 (citing Fed. R. Civ. P. 9(b)). Under Rule 9(b), "[i]n alleging fraud or mistake, a party
17   must state with particularity the circumstances constituting fraud or mistake." *See* Fed. R. Civ. P.
18   9(b). The applicability of Rule 9(b) turns on the nature of the allegations. "Rule 9(b) applies to
19   'averments of fraud' in all civil cases in federal district court . . . ." *See Vess v. Ciba-Geigy Corp.*
20   *USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). Even where fraud is not a necessary element of a
21   claim, if the plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that
22   course of conduct as the basis of a claim . . ., the claim is said to be 'grounded in fraud' or to
23   'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity
24   requirement of Rule 9(b)." *Id.* Plaintiff responds that its Lanham Act claims in particular are not
25   grounded in fraud because although common law fraud requires intent, false advertising under the
26   Lanham Act does not. *See* Dkt. No. 53 at 14.
27   //
28   //

16

But Plaintiff fails to contend with the actual nature of its allegations.[6] Here, the complaint does not explicitly allege fraud. *See generally* FAC. It also generally avoids averments that Defendant "knowingly" or "intentionally" made the alleged misrepresentations. However, Plaintiff alleges that Defendant coordinated with certain of its subscribers to publish false statements about Plaintiff's medical foods to encourage those entities to continue subscribing to the database. *See, e.g.*, FAC at ¶¶ 8–9, 48–51. Plaintiff further alleges that this decision was "directly contrary to FDA's and [Plaintiff's] stated position that [Plaintiff's products] may be dispensed by prescription, must be used under physician supervision, and are not OTC drugs." *Id.* at ¶ 95. Plaintiff concludes that Defendant falsely represents that "it is affiliated, connected, or associated with the FDA and/or the manufacturer of the products listed and described and that information it publishes about those products originates with and/or is approved or sponsored by the FDA and/or the manufacturer." *See id.* at ¶ 114; *see also id.* at ¶¶ 3, 5, 96, 115, 127, 131.

Plaintiff does not allege or even suggest in its opposition brief any potentially non-fraudulent cause of these misrepresentations. And elsewhere in the complaint, Plaintiff alleges that "Defendant's acts are willful, wanton and calculated to deceive and are undertaken in bad faith." *Id.* at ¶ 121; *see also id.* at ¶¶ 100, 111, 138. Plaintiff also alleges that Defendant requires companies who desire their pharmaceutical products to be included in the database to sign waivers. *See id.* at ¶ 75. Plaintiff asserts that Defendant does so "because it knows that its advertising of prescription products as 'O' or OTC drugs, or 'Q' as non-drug, non-Rx, and/or OTC products is false and misleading." *See id.* at ¶ 75. The Court therefore finds that these claims sound in fraud and that the Rule 9(b) pleading standard applies.

### ii. Alleged Misrepresentations

Under Rule 9(b), Plaintiff must state the "who, what, when, where, and how" of the alleged conduct, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997), and "set forth an

---

[6] The Court acknowledges that the Ninth Circuit has not decided whether Rule 9(b) applies to Lanham Act claims. However, the majority of district courts in the Circuit appear to apply Rule 9(b). *See, e.g.*, *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019); *Ely Holdings Ltd. v. O'Keeffe's, Inc.*, No. 18-CV-06721-JCS, 2019 WL 3779197, at *4 (N.D. Cal. Aug. 12, 2019). And the Court finds the reasoning of these cases persuasive.

explanation as to why [a] statement or omission complained of was false or misleading," *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Ronconi v. Larkin*, 253 F.3d 423, 429 & n.6 (9th Cir. 2001).

The Court finds that the complaint is devoid of specifics about when and where the alleged "source" misstatements were made. Plaintiff alleges generically that Defendant:

- "[S]tates and implies that its information comes from FDA and manufacturers like [Plaintiff]" "[i]n commercial speech to customers," FAC at ¶ 5;

- "[M]arkets MedKnowledge as 'encompassing FDA-approved prescription drugs, over-the-counter medications and pharmacy benefit medical devices,"; *id.* at ¶ 30;

- "[C]laims the content of its database is 'compiled' from third party sources including drug manufacturers and governmental agencies," *id.* at ¶ 32;

- "[I]n a brochure entitled 'Manufacturer Relations,' [Defendant] touts: 'You tell us. We tell the world," *id.* at ¶ 34;

- "[F]alsely advised customers it made these changes be 'in alignment with [] FDA standards," *id.* at ¶ 52;

- "[I]n written brochures and on its web-site, Defendant falsely represents . . . that the source of the information it provides in its services and products, including MedKnowledge, is the FDA and/or the manufacturers of pharmaceutical products, including Alfasigma." *Id.* at ¶ 94; and

- "In communications with its customers . . . Defendant represents that it obtains the information it publishes from the FDA and the manufacturer of the product." *Id.* at ¶ 114.

This is insufficient under Rule 9(b). Plaintiff's remaining claims thus fail on this basis.

### IV.   CONCLUSION

Accordingly, the Court **GRANTS** the motion to strike Plaintiff's state law claims that are premised on the database allegations. *See* FAC at ¶¶ 127, 131. The Court further **GRANTS** the motion to dismiss as to the remaining causes of action. The Court finds that, given the nature of the dispute and the Court's legal findings regarding Plaintiff's database allegations, amendment would be futile, and the Court accordingly will not grant leave to amend those claims. *See id.* at

18

¶¶ 77–92, 114–122. However, to the extent Plaintiff believes it may cure the deficiencies identified with its source allegations, *see id.* at ¶¶ 93–112, 127, 131, Plaintiff may file an amended complaint by March 26, 2021. The Court further **SETS** a telephonic case management conference on April 6, 2021, at 2:00 p.m. All parties, counsel, and members of the public and press may use the following dial-in information below to access the conference line:

    **Dial In:** 888-808-6929

    **Access Code:** 6064255

The parties shall also file a joint case management statement by March 30, 2021, and must be prepared to discuss at the case management conference how to move this case forward efficiently.

    **IT IS SO ORDERED.**

Dated: 3/11/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

19