**SAUL PERLOFF** (CBN 157092)
saul.perloff@nortonrosefulbright.com
**KATHARYN GRANT** (*pro hac vice*)
katharyn.grant@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205-3792
Tel.    (210) 224-5575
Fax    (210) 270-7205

**ROBERT ROUDER** (*pro hac vice*)
robert.rouder@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701-4205
Tel.    (512) 474-5201
Fax    (512) 536-4598

**JEFFREY B. MARGULIES** (CBN 126002)
jeff.margulies@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
55 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Tel.    (213) 892-9200
Fax    (213) 892-9494

**Attorneys for Plaintiff**
**ALFASIGMA USA, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ALFASIGMA USA, INC., a Delaware corporation,<br><br>          Plaintiff,<br><br>vs.<br><br>FIRST DATABANK, INC., a Missouri corporation,<br><br>          Defendant. | Case No. 4:18-cv-06924-HSG<br><br>District Judge Haywood S. Gilliam, Jr.<br><br>**PLAINTIFF ALFASIGMA USA, INC.'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:     August 19, 2021, 2021<br>Time:    2:00 p.m.<br>Place:   Courtroom 2, 4th Floor |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................................... 1

II.   STATEMENT OF ISSUES ......................................................................................... 1

III.  STANDARD OF REVIEW ........................................................................................ 2

IV.  ARGUMENT ............................................................................................................. 2

    A.    The SAC's allegations satisfy Rule 9(b) ...................................................... 2

    B.    The SAC pleads standing under Lexmark ..................................................... 5

    C.    The SAC pleads injury proximately caused by First Databank ...................... 7

    D.    First Databank's communications about its database constitute
         commercial speech ....................................................................................... 10

    E.    The SAC states a claim for false advertising ............................................... 12

         1.    First Databank's commercial speech constitutes advertising ................ 13

         2.    The SAC pleads facts showing First Databank's commercial
              speech is false ...................................................................................... 15

         3.    First Databank's false commercial speech is deceptive ......................... 17

         4.    First Databank's false commercial speech is material .......................... 18

    F.    The SAC states a source confusion claim under Section 43(a)(1)(A) ................. 20

    G.    The SAC states a claim for contributory false advertising ................................ 24

V.    CONCLUSION ......................................................................................................... 25

DOCUMENT PREPARED
ON RECYCLED PAPER

3 **Cases** **Page(s)**

4

*Acad. of Drs. of Audiology v. Int'l Hearing Soc'y,*
5    237 F. Supp. 3d 644 (E.D. Mich. 2017)..............................................................7

6 *ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc.,*
   No. 11-cv-05149, 2012 WL 4068632 (N.D. Cal. Sept. 14, 2012) ......................... 24
7

*AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.,*
8    748 Fed. Appx. 115 (9th Cir. 2018)..............................................................7

9 *Air Courier Conf. of Am. v. Am. Postal Workers Union, AFL-CIO,*
   498 U.S. 517 (1991)..............................................................6

10 *Alfasigma USA, Inc. v. First Databank, Inc.,*
    398 F. Supp. 3d 578 (N.D. Cal. 2019) .......................................... 11, 13, 17
11

*Alfasigma USA, Inc. v. First Databank, Inc.,*
12    No. 18-cv-6924, 2021 WL 930453 (N.D. Cal. Mar. 11, 2021).................... 2, 13, 24

13 *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.,*
    434 F.3d 1100 (8th Cir. 2006)..............................................................7
14

*Arch. Mailboxes, LLC v. Epoch Design, LLC,*
15    No. 10-cv-974, 2011 WL 1630809 (S.D. Cal. Apr. 28, 2011) .......................... 5

16 *Ariix LLC v. NutriSearch Corp.,*
    985 F.3d 1107 (9th Cir. 2021)..............................................11, 12, 22
17

*Ashcroft v. Iqbal,*
18    556 U.S. 662 (2009)..............................................................2

19 *Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................2
20

*Benavidez v. City of San Diego,*
21    993 F.3d 1134 (9th Cir. 2021).......................................................... 3, 5

22 *BioCell Tech. LLC v. Arthro-7,*
    No. 12-cv-516, 2012 WL 12892937 (C.D. Cal. Nov. 19, 2012) .......................... 24
23

*Bobbleheads.com, LLC v. Wright Brothers, Inc.,*
24    259 F. Supp. 3d 1087 (S.D. Cal. 2017)..............................................23

25 *Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983)..............................................................11, 12
26

*Boltex Mfg. Co. v. Galperti, Inc.,*
27    No. 17-cv-1439, 2018 WL 1535199 (S.D. Tex. Mar. 29, 2018).......................... 14

28

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
    627 F. Supp. 2d 384 (D.N.J. 2009) ................................................................. 13

*Casper Sleep, Inc. v. Mitcham*,
    204 F. Supp. 3d 632 (S.D.N.Y. 2016) ............................................................. 22

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ......................................................................................... 11

*Cisco Tech., Inc. v. Certification Trendz, Ltd.*,
    177 F. Supp. 3d 732 (D. Conn. 2016) ....................................................... 21, 22

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ................................................................................... 10, 11

*Clorox Co. v. Reckitt Benckiser Grp., PLC*,
    398 F. Supp. 3d 623 (N.D. Cal. 2019) ....................................................... 18, 19

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) ..................................................................... 13, 14

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003) ..................................................................................... 21, 23

*Deston Therapeutics, LLC v. Trigen Labs, Inc.*,
    723 F. Supp. 2d 665 (D. Del. 2010) ............................................................... 15

*Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC*,
    No. 2:17-cv-3007, 2019 WL 6310717 (D. Nev. Nov. 25, 2019) ................. 24, 25

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*,
    No. 20-cv-5486, 2020 WL 8768056 (C.D. Cal. Nov. 9, 2020) .......................... 9

*In re: Dicamba Herbicides Litig.*,
    359 F. Supp. 711 (E.D. Miss. 2019) ................................................................. 9

*Duty Free Am., Inc. v The Estee Lauder Cos., Inc.*,
    797 F.3d 1248 (11th Cir. 2015) ....................................................................... 24

*Exeltis USA Inc. v. First Databank, Inc.*,
    No. 17-cv-4810, 2021 WL 616377 (N.D. Cal. Feb. 17, 2021) ......................... 12

*First Resort, Inc. v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017) ................................................................... 10, 12

*Gen. Universal Sys., Inc. v. Lee*,
    379 F.3d 131 (5th Cir. 2004) (per curiam) ...................................................... 23

*Genus Lifesciences, Inc. v. Lannett Co.*,
    378 F. Supp. 3d 823 (N.D. Cal. 2019) ............................................................. 24

*Gillette Co. v. Norelco Cons. Prods. Co.*,
    946 F. Supp. 115 (D. Mass. 1996) ................................................................... 14

DOCUMENT PREPARED
ON RECYCLED PAPER

*Harbour v. Farquhar,*
    245 F. App'x 582 (9th Cir. 2007) ........................................................................... 23

*Harper House, Inc. v. Thomas Nelson, Inc.,*
    889 F.2d 197 (9th Cir. 1989)................................................................................... 18

*Healthpoint Ltd. v. Allan Pharm.,*
    No. 07-cv-526, 2008 WL 728333 (W.D. Tex. Mar. 18, 2008)................................... 3

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC,*
    No. 14-cv-437, 2014 WL 5812294 (N.D. Cal. Nov. 7, 2014) ........................... 12, 14

*Henley v. Devore,*
    *No.* 09-cv-0481, 2009 WL 10697982 (C.D. Cal. July 8, 2009).......................... 23, 24

*Hertz Corp. v. Avis, Inc.,*
    867 F. Supp. 208 (S.D.N.Y. 1994) ......................................................................... 15

*Hyosung Am., Inc. v. Sumagh Textile Co.,*
    934 F. Supp. 570 (S.D.N.Y. 1996) ......................................................................... 13

*In-N-Out Burgers v. Smashburger IP Holder LLC,*
    No. 17-cv-1474, 2019 WL 1431904 (C.D. Cal. Feb. 6, 2019) ............................... 19

*Inwood Labs, Inc. v. Ives Labs, Inc.*
    456 U.S. 844 (1982).............................................................................................. 24

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.,*
    299 F.3d 1242 (11th Cir. 2002)............................................................................. 18

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.,*
    No. 3:16-cv-1651, 2016 WL 4944370 (N.D. Tex. Sept. 16, 2016) ......................... 7

*Kearns v. Ford Motor Co.,*
    567 F.3d 1120 (9th Cir. 2009)................................................................................. 2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014)........................................................................... 5, 6, 7, 8, 13

*MDM Group Assocs., Inc. v. ResortQuest Int'l, Inc.,*
    No. 06-cv-1518, 2007 WL 2909408 (D. Col. Oct. 1, 2007) ........................... 22, 23

*Merck Eprova AG v. Brookstone Pharm., LLC,*
    920 F. Supp. 2d 404 (S.D.N.Y. 2013)............................................................. 14, 15

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
    105 F.3d 841 (2d Cir. 1997).................................................................................. 20

*Newcal Indus., Inc. v. IKON Office Sol.,*
    513 F.3d 1038 (9th Cir. 2008)............................................................................... 15

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
Consumer Pharm. Co.,*
    290 F.3d 578 (3d Cir. 2002).................................................................................. 15

DOCUMENT PREPARED
ON RECYCLED PAPER

*In re Outlaw Lab., LLP*,
  463 F. Supp. 3d. 1068 (S.D. Cal. 2020) ............................................................... 24

*PhotoMedex, Inc. v. Irwin*,
  601 F.3d 919 (9th Cir. 2009) ................................................................................ 22

*Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*,
  642 F. Supp. 2d 1112 (C.D. Cal. 2009) .................................................................. 5

*Pom Wonderful LLC v. Purely Juice, Inc.*,
  No. 07-cv-2633, 2008 WL 4222045 (C.D. Cal. Jul. 17, 2008) ............................. 19

*Retail Prop. Trust v. Un. Brotherhood of Carpenters and Joiners of Am.*,
  768 F.3d 938 (9th Cir. 2014) .................................................................................. 2

*Rimini St., Inc. v. Oracle Int'l Corp.*,
  No 14-cv-1699, 2017 WL 4227939 (D. Nev. Sept. 22, 2017) ......................... 3, 12

*Rolex Watch U.S.A., Inc. v. Agarwal*,
  No. 12-cv-6400, 2012 WL 12886444 (C.D. Cal. Dec. 17, 2012) ........................... 2

*Rubenstein v. Neiman Marcus Grp. LLC*,
  687 Fed. Appx. 564 (9th Cir. 2017) ............................................................... 2, 3, 5

*Schroeder v. Volvo Grp. N. Am. LLC*,
  No. 20-05127, 2020 WL 6562242 (C.D. Cal. 2020) ............................................. 23

*Sirius Labs., Inc. v. Rising Pharm., Inc.*,
  No. 03-cv-6965, 2004 WL 51240 (N.D. Ill. Jan. 7, 2004) .................................... 15

*Skydive Ariz., Inc. v. Quattrocchi*,
  673 F.3d 1105 (9th Cir. 2012) .............................................................................. 18

*Societe des Hotels Meridien v. LaSalle Hotel Operating P'shp*,
  380 F.3d 126 (2d Cir. 2004) ................................................................................. 24

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ........................................................... 12, 13, 15, 18

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) .............................................................................. 22

*in re Syngenta AG MIR 162 Corn Litigation*,
  131 F. Supp. 3d 1177 (D. Kansas 2015) ................................................................. 9

*ThermoLife Int'l LLC v. Sparta Nutrition LLC*,
  No. 19-cv-1715, 2020 WL 248164 (D. Ariz. Jan. 16, 2020) ................................. 7

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
  793 F.2d 1034 (9th Cir. 1986) .............................................................................. 17

*U.S. Structural Plywood Integrity Coal. v. PFS Corp.*,
  No. 19-cv-62225, 2021 WL 810279 (S.D. Fla. Mar. 3 2021) ................................. 9

DOCUMENT PREPARED
ON RECYCLED PAPER

*William H. Morris Co. v. Grp. W, Inc.*,
66 F.3d 255 (9th Cir. 1995)...................................................................................... 18

*Williams v. UMG Recordings, Inc.*,
281 F. Supp. 2d 1177 (C.D. Cal. 2003) ................................................................. 23

*Wyndham Vacation Ownership v. Gallagher*,
No. 6:19-cv-00476, 2019 WL 5458815 (M.D. Fl. Sept. 10, 2019) ........................ 9

**Rules and Statutes**

15 U.S.C. § 1125(a)(1) ................................................................................ 6, 20, 21, 23

15 U.S.C. § 1127 ............................................................................................... 6, 7

17 U.S.C. § 501(b) ................................................................................................ 22

FED. R. CIV. P. 9(b) .......................................................................................... 2, 3, 5

FED. R. CIV. P. 12(b)(6) .......................................................................................... 2

DOCUMENT PREPARED
ON RECYCLED PAPER

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff Alfasigma USA, Inc. respectfully offers this Brief in Opposition to defendant First Databank, Inc.'s Motion to Dismiss (Dkt. 81) (May 28, 2021) ("Motion") Alfasigma's Second Amended Complaint (Dkt. 79) (Apr. 28, 2021) ("SAC").

## I.     INTRODUCTION

Relying on long-standing claims that the FDA is the source of its database information, First Databank falsely represented to customers in commercial speech and advertising that its decision to reclassify Alfasigma's medical foods as over-the-counter drugs came from the FDA. This was false; the FDA told First Databank, repeatedly, that medical foods could be dispensed by prescription, and Director Andrea Lotze told First Databank it had "misinterpreted FDA's response regarding the labeling of medical foods and mistakenly classified all medical food products as over-the-counter drugs." In short, the decision was First Databanks', not the FDA's.

First Databank's actions predictably devastated Alfasigma's business and violated the Lanham Act, including Subsection 43(a)(1)(B), prohibiting false advertising, and 43(a)(1)(A), prohibiting unfair competition through false source claims. It also contributed to the false advertising of third parties, who repeated and amplified First Databank's false advertising.

Seeking to avoid the consequences of its Lanham Act violations, First Databank's Motion offers a dozen scattershot arguments, ranging from challenging standing to insisting that promotional brochures published on its website somehow are not "commercial speech." But detailed, well-pled facts support the elements of each of Alfasigma's claims, and the SAC identifies, with particularity, the "who, what, when, where, and how" of First Databank's false representations. There is no basis for dismissal, and First Databank's Motion should be denied.

## II.     STATEMENT OF ISSUES

1.     Whether the Motion should be denied because the SAC alleges a plausible claim for false advertising in violation of § 43(a)(1)(B) of the Lanham Act?

2.     Whether the Motion should be denied because the SAC alleges a plausible claim of false origin, sponsorship, or approval in violation of § 43(a)(1)(A) of the Lanham Act?

3.     Whether the Motion should be denied because the SAC alleges a plausible claim

DOCUMENT PREPARED
ON RECYCLED PAPER

of contributory false advertising in violation of § 43(a) of the Lanham Act?

## III. STANDARD OF REVIEW

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6)," the Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. Un. Brotherhood of Carpenters and Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). "To survive such a motion, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## IV. ARGUMENT

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a right of action for false advertising under Subsection (a)(1)(B), and for unfair competition based on false claims of origin, sponsorship, or approval under Subsection (a)(1)(A). The SAC alleges facts showing that First Databank violated both Subsections by falsely representing in commercial speech and advertising that information in its MedKnowledge database "originates with and/or is approved or sponsored by the FDA and/or the manufacturer," SAC ¶ 99, and by specifically claiming that First Databank changed the coding of Alfasigma's medical foods from "F" to "O" "based on the 'FDA's explicit direction,'" and after "'consultation with FDA's personnel,' that "medical foods cannot be assigned the 'F' Class value,'" *id.* ¶ 100. First Databank's representations are false, caused significant and lasting harm to Alfasigma, and are actionable.

### A. The SAC's allegations satisfy Rule 9(b)

Facts are sufficiently stated under FED. R. CIV. P. 9(b) where a pleading alleges "the 'who, what, when, where, and how' of [the defendant's] alleged misconduct." *Rubenstein v. Neiman Marcus Grp. LLC*, 687 Fed. Appx. 564, 567 (9th Cir. 2017) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)); *see also Alfasigma USA, Inc. v. First Databank, Inc.*, No. 18-cv-6924, 2021 WL 930453, at *10 (N.D. Cal. Mar. 11, 2021) ("*Alfasigma II*").[1]

---

[1] Although "[f]raud is not a necessary element of claims under the Lanham Act." *Rolex Watch U.S.A., Inc. v. Agarwal*, No. 12-cv-6400, 2012 WL 12886444, at *4 (C.D. Cal. Dec. 17, 2012), this Court found that, as pled in the Am. Compl., Alfasigma's "claims sound in fraud," and therefore "the Rule 9(b) pleading standard applies." *Alfasigma II,* 2021 WL 930453, at *10.

DOCUMENT PREPARED
ON RECYCLED PAPER

Rule 9(b) "'does not require absolute particularity or a recital of the evidence.'" *Benavidez v. City of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021). Its "heightened standard serves the dual purpose of (1) giving defendants notice of the alleged misconduct so that they may defend themselves and (2) deterring plaintiffs from using complaints as a pretext for the discovery of unknown wrongs while protecting defendants and the courts from the costs associated with these complaints." *Id.* Where facts lie in defendant's sole possession, "a 'pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.'" *Rubenstein*, 687 Fed. Appx. 568 (citation omitted).[2]

While First Databank argues the SAC does not satisfy Rule 9(b)'s standard, Motion at 13, 19, it fails to explain what is missing or insufficiently alleged so that First Databank is unable to answer or otherwise defend itself. In fact, the SAC describes at length First Databank's efforts over the years to ensure its customers would buy—and keep buying—subscriptions to MedKnowledge because it is "'so reliable, governments actually check with us to confirm their own data.'" SAC ¶ 30 (quoting First Databank advertising). First Database further advertises its database as: "'Rigorously compiled using best practices research procedures with extremely thorough validation processes,' and 'Continuously and reliably updated every day, ***thanks to our strong relationships with manufacturer and wholesaler communities, as well as with federal and state government entities***.'" *Id.* ¶ 31; *see also* ¶ 32 (quoting brochure that First Databank sources information from manufacturers). In sum, First Databank spent decades assuring customers the data in MedKnowledge is accurate *because* it comes from FDA and manufacturers.

The SAC goes on to allege that First Databank's decision to change the coding of medical foods from "F," and to begin falsely describing them as "O" or over-the-counter, represented a

---

[2]"Alfasigma does not have access to or knowledge of all of First Databank's advertising and promotional efforts. Pharmaceutical marketing 'often occurs 'under the radar' in targeted communications with drug wholesalers, retailers and others,' and thus Alfasigma is 'not privy to these communications'" between First Databank and its customers." SAC ¶ 59 n.2 (quoting *Healthpoint Ltd. v. Allan Pharm.*, No. 07-cv-526, 2008 WL 728333, at *5 (W.D. Tex. Mar. 18, 2008). In these circumstances, "Rule 9(b) only "requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can reasonably be expected to have access." *Rubenstein*, 687 Fed. Appx. at 567-68 (quotations and citations omitted); *see also Rimini St., Inc. v. Oracle Int'l Corp.*, No. 14-cv-1699, 2017 WL 4227939, at *3 (D. Nev. Sept. 22, 2017).

Document Prepared
on Recycled Paper

major shift. SAC ¶ 65 ("the decision to re-code medical foods was the first time First Database decided to disregard manufacturer labeling with regard to class code"). Accordingly, "[t]o reassure customers that its MedKnowledge database remained accurate despite this significant change in the coding of medical foods, and as a continuation of its long-standing advertising of MedKnowledge," "First Databank repeatedly and falsely stated in commercial communications with its customers that it changed the coding of the Alfasigma Products from 'F' to 'O' at FDA's direction, in consultation with the FDA, and to 'align' with FDA's standards." *Id.* ¶ 58.

The SAC thus describes the "what" with particularity. *See* SAC ¶ 7 (summarizing First Databank's advertising); *see also id.* ¶¶ 30-32, 58-61. The SAC also specifically identifies the "who," "when," and "where" elements: In addition to its brochures and website advertising, e.g., SAC ¶¶ 30-32, First Databank made these claims in the "'Editorial Highlights' section of its 'Customer Connection' publications, which First Databank disseminates each week to First Databank's customers to support its sale of the MedKnowledge database." *Id.* ¶ 59. First Databank sends its Customer Connections "via email directly to all of First Databank's customers, including, for example, CVS, Rite-Aid, Kroger, Walgreens, Anthem, Aetna, certain Blue Cross/Blue Shield entities, Humana, Cigna, UnitedHealthCare, and Express Scripts . . . ." *Id.*

Thus, "[i]n its December 7, 2015 Editorial Highlights," sent to *all* of its customers, "First Databank falsely asserted that 'FDA regulations limit' the use of 'Rx' or prescription dispensing limitations' 'to drugs and expressly prohibit their application to medical foods.'" *Id.* ¶ 60. It falsely claimed it would change medical foods from "F" to "O" to "align[] with these FDA standards." *Id.* "First Databank repeated and emphasized its December 7, 2015 announcement, including, for example, in its February 1, 2016, March 7, 2016, April 4, 2016, May 31, 2016, and November 7, 2016 Editorial Highlights." *Id.* ¶ 61. "In each instance, First Databank again falsely told customers it changed the coding of medical foods from 'F' to 'O' at the direction of FDA, as required by FDA regulations, and to be "in alignment with" FDA's 'standards.'" *Id.* The specific language First Databank used is not only directly quoted, but set forth in context. *Id.*

The SAC also explains, again at length, how and why First Databank's representations were false: The false information that Alfasigma products are "O" or over-the-counter "did not

Document Prepared
on Recycled Paper

come from Alfasigma," which "correctly and consistently stated that these are prescription products, and further labeled the products as dispensed through a prescription." SAC. ¶ 65. "Nor did this information come from the FDA. It was not based on the 'FDA's explicit direction,' or in 'consultation with the FDA,' or under 'controlling regulations' or to be 'in alignment with' FDA's 'standards.'" *Id.* ¶ 66.[3] Instead, the FDA specifically advised First Databank "'that ***because medical foods are required by statute to be consumed or administered enterally under the supervision of a physician***, FDA would not object to the use of language to communicate this requirement" in a medical food label." SAC ¶ 68 (quoting Mar. 17, 2016 email from FDA). And when it continued to misrepresent medical foods as over-the-counter products, Director Andrea Lotze herself advised First Databank it had "'***mistakenly classified all medical food products as over-the-counter drugs***.'" *Id.* ¶¶ 70-74 (emphasis added) (Jun. 29, 2017 letter).

Courts have found Rule 9(b) satisfied on far less detailed pleadings. *Benavidez*, 993 F.3d at 1148-49 (allegations sufficient under Rule 9(b) because "[t]he SAC contained particular allegations in stating the who, what, when, and where of the judicial deception"); *Rubenstein*, 687 Fed. Appx. at 567 (allegations satisfied pleading requirements); *Arch. Mailboxes, LLC v. Epoch Design, LLC*, No. 10-cv-974, 2011 WL 1630809, at *5 (S.D. Cal. Apr. 28, 2011); *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112, 1123-24 (C.D. Cal. 2009).

The SAC is sufficiently pled, with particularity, under Rule 9(b).

**B.    The SAC pleads standing under *Lexmark***

Citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), First Databank erroneously argues that "Alfasigma's theory of injury" is "far afield from the interests protected by the Lanham Act that Alfasigma lacks statutory standing." Motion at 5-6. First Databank fundamentally misunderstands *Lexmark,* the Lanham Act, and the SAC.

In *Lexmark,* the Supreme Court rejected a narrow "prudential standing" standard that limited the class of plaintiffs who could bring Lanham Act false advertising suits, and instead

---

[3] No "controlling regulations" allow medical foods to be used without physician supervision. E.g., SAC ¶¶ 62-64 (quoting FDA's definitions of OTC drugs, which may be used without medical supervision, and medical foods, which *must* be used with physician supervision).

held that a false advertising claim is available to a plaintiff who does *not* compete with defendant, but who, like Alfasigma, nevertheless alleges a competitive injury. The *Lexmark* counterclaim defendant, Lexmark, manufactured and sold toner cartridges used for laser printers it also marketed. Counterclaimant Static Control manufactured components that third parties used to refurbish Lexmark toner cartridges for resale. 572 U.S. at 120-21. When sued by Lexmark, Static Control counterclaimed for false advertising. *Id.* at 122. The counterclaim was dismissed on the grounds of "prudential standing," *id.* at 123-24, but the Supreme Court rejected this paradigm.

Section 43(a) "authorizes suit by 'any person who believes that he or she is likely to be damaged' by a defendant's false advertising." 572 U.S. at 129 (quoting 15 U.S.C. § 1125(a)(1)). Rather than appending a "prudential standing" gloss on this statutory framework, *Lexmark* held a plaintiff instead must fall within the "zone of interests" protected by the Lanham Act. *Id.* at 129-30. "Identifying the interests protected by the Lanham Act, however, requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's purposes": "'The intent of this chapter is . . . to protect persons engaged in [interstate] commerce *against unfair competition*.'" *Id.* at 131 (emphasis added) (quoting 15 U.S.C. § 1127).[4]

"Although 'unfair competition' was a 'plastic concept at common law, it was understood to be concerned with injuries to business reputation and present and future sales." *Id.* (citations omitted). Thus: "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131-32. The Court thus distinguished a proper Lanham Act false advertising plaintiff from "[a] consumer who is hoodwinked into purchasing a disappointing product," who, though arguably injured, "cannot invoke the protection of the Lanham Act . . . ." *Id.* at 132.

Under this framework, the Court held that "Static Control comes within the class of plaintiffs whom Congress authorized to sue under § 1125(a)," because:

Static Control's alleged injuries—lost sales and damage to its business

---

[4]In *Air Courier Conf. of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517 (1991), relied on by First Databank, postal workers lacked standing to sue under the APA to enforce Private Express Statutes because there was no support in the statutory language or legislative history to support the argument they were intended to protect jobs within the Postal Service. *Id.* at 524-25.

reputation—are injuries to precisely the sorts of commercial interests the Act protects. Static Control is suing not as a deceived consumer, but as a "perso[n] engaged in" "commerce within the control of Congress" whose position in the marketplace has been damaged by Lexmark's false advertising. § 1127. There is no doubt that it is within the zone of interests protected by the statute.

*Id.* at 137; *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, No. 3:16-cv-1651, 2016 WL 4944370, at *7 (N.D. Tex. Sept. 16, 2016) (loss of sales a "direct injury from false advertising").[5]

Alfasigma similarly alleges *competitive* injuries—and not those of a "consumer"—including the loss of sales of its medical foods and damage to is business reputation, that are "precisely the sorts of commercial interests the Act protects." As the SAC alleges:

> First Databank's false advertising and source confusion cost Alfasigma sales of its medical foods when doctors no longer prescribed, pharmacists no longer dispensed, and insurers no longer reimbursed its products. This caused profound injury to Alfasigma, which lost tens of millions of dollars in profits each year following First Databank's false statements, and caused a steep decline in its enterprise value.

SAC ¶ 8; *id.* ¶¶ 78, 105 (misrepresentations "negatively impacted Alfasigma's sales"). Alfasigma has sufficiently pled that its claims fall within the Lanham Act's zone of interest. *AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*, 748 Fed. Appx. 115, 118 n.2 (9th Cir. 2018) (false advertising plaintiff had standing because it alleged "harm to its business reputation").

## C.     The SAC pleads injury proximately caused by First Databank

The Lanham Act also "incorporate[s] a requirement of proximate causation." *Lexmark*, 574 U.S. at 132. While "[t]he proximate-cause inquiry is not easy to define," *id.* at 133, it "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* As the Court continued, however, an "intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute. That is consistent with our

---

[5] The authority relied on by First Databank is easily distinguishable. *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103-4 (8th Cir. 2006), which issued pre-*Lexmark*, held that the plaintiff lacked standing because the requested relief would not redress its injury. In *Acad. of Drs. of Audiology v. Int'l Hearing Soc'y*, 237 F. Supp. 3d 644, 663 (E.D. Mich. 2017), the plaintiff—an association of audiologists—did "not even allege that defendant IHS itself is 'advertising,'" and further "had not actually alleged that its members will suffer a competitive injury . . . .'" And in *ThermoLife Int'l LLC v. Sparta Nutrition LLC*, No. 19-cv-1715, 2020 WL 248164, at *7 (D. Ariz. Jan. 16, 2020), the court dismissed an action because it was "unable to decipher what the Complaint's vague, conclusory allegations mean, let alone identify any particular harm suffered by Plaintiff because of Defendant's purported false advertising."

DOCUMENT PREPARED
ON RECYCLED PAPER

recognition that under common-law principles, a plaintiff can be directly injured by a misrepresentation even where a third party, and not the plaintiff, relied on it." *Id.* (quotations and citations omitted). Thus, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "***occurs when deception of consumers causes them to withhold trade from the plaintiff***." *Id.* (emphasis added); *see also id.* at 134 ("a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses").

While *Lexmark* did "not present the classic Lanham Act false-advertising claim in which one competitor directly injures another by making false statements about his own goods or the competitor's goods and thus inducing customers to switch," *id.* at 137 (quotations and citations omitted), diversion of sales "is not the only type of injury cognizable under § 1125(a)." *Id.* at 138.

> When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements. . . . Traditional proximate-causation principles support those results: As we have observed, a defendant who 'seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product may be said to have proximately caused the plaintiff's harm.

*Id.* (quotations and citations omitted). And "when a party claims reputational injury from disparagement, competition is not required for proximate cause; and that is true even if the defendant's aim was to harm its immediate competitors, and the plaintiff merely suffered collateral damage." *Id.*

First Databank erroneously accuses Alfasigma of presenting "a labyrinthine causal chain connecting First Databank's statements to the injury." Motion at 7. There is a clear, direct causal relationship between First Databank's representations to the market that *the FDA* designated Alfasigma's medical food products as "OTC," and Alfasigma's loss of sales of those medical foods. Insurers stopped covering Alfasigma's products, consumers stopped purchasing them, and doctors stopped prescribing the products, which represents a direct loss of sales. SAC ¶¶ 84-86 ("As the FDA warned, this mistaken belief caused insurers to deny coverage for the Alfasigma Products to their customers, resulting in higher out-of-pocket costs to consumers.") Thus, based on First Databank's misrepresentations, "wholesalers and pharmacies reduced inventories of the

DOCUMENT PREPARED
ON RECYCLED PAPER

1    Alfasigma Products on the mistaken belief that that the FDA had determined that the products are

2    not prescription products and need not be stocked by pharmacies for dispensing." *Id.* ¶ 87.

3        Courts have found proximate causation with a less direct relationship between misconduct

4    and lost sales. In *in re Syngenta AG MIR 162 Corn Litigation*, 131 F. Supp. 3d 1177 (D. Kansas

5    2015), a large Lanham Act false advertising class action, Syngenta had advertised its genetically-

6    modified (GM) strain of corn as likely to be imminently allowed for exportation to China. The

7    plaintiffs, farmers who were *not* using defendant's GM seeds, alleged their crops were

8    contaminated by defendant's GM strain through cross-pollination which, in turn, caused the crops

9    to be banned by China, thereby collapsing the corn market. The defendant argued against a

10   finding of proximate causation "because an extra step is required—not only must plaintiffs show

11   that Syngenta's conduct in commercializing Viptera without proper safeguards proximately

12   caused plaintiffs' market-based injuries, but they must also proximately link that chain at the

13   beginning to the allegedly misleading statements (advertising) by Syngenta." *Id.* at 1222. The

14   court rejected this argument: "Plaintiffs have at least alleged a plausible claim that Syngenta's

15   false and misleading statements caused sales of Viptera and Duracade, which in turn caused

16   contamination." *Id.* And "because proximate cause ordinarily presents a question of fact, the

17   Court cannot conclude as a matter of law at this stage that plaintiffs' injuries were not fairly

18   traceable to or proximately caused by Syngenta's conduct that is alleged to violate the Lanham

19   Act." *Id.*; *see also U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, No. 19-cv-62225, 2021

20   WL 810279, at *9 (S.D. Fla. Mar. 3 2021) (U.S. plywood companies sufficiently alleged

21   proximate cause for false advertising against plywood inspectors who falsely certified that

22   Brazilian plywood met industry standards); *Diamond Resorts U.S. Collection Dev., LLC v.

23   Pandora Mktg., LLC*, No. 20-cv-5486, 2020 WL 8768056, at *5-6 (C.D. Cal. Nov. 9, 2020); *In

24   re: Dicamba Herbicides Litig.*, 359 F. Supp. 711, 722 (E.D. Miss. 2019) (following *In re

25   Syngenta*); *Wyndham Vacation Ownership v. Gallagher*, No. 6:19-cv-00476, 2019 WL 5458815,

26   at *7 (M.D. Fl. Sept. 10, 2019) (rejecting "attempt to identify as many intervening steps as

27   possible" between the advertising and the injury).

28       Here, proximate causation is far more direct. But for First Databank's false assurances that

information in MedKnowledge comes from manufacturers and the FDA, and its repeated representations that the FDA required the reclassification of medical foods as over-the-counter, PBMs and insurers would not have begun treating Alfasigma's products as non-covered "over-the-counter/non-prescription medicines." E.g., SAC ¶ 82 (insurer's ad explaining that medical foods would no longer be covered because: "The FDA determined they can be used safely and effectively without a doctor's supervision.")

**D.      First Databank's communications about its database constitute commercial speech**

Alfasigma's Lanham Act claims are NOT based on First Databank's false statements in MedKnowledge, but rather address First Databank's false commercial speech *about* that database:

> Through commercial communications with customers, including in (but not limited to) ***written brochures, web-sites, and its weekly "Customer Connection" publications,*** Defendant falsely represents to customers . . . that the source of the information it provides in its services and products, including MedKnowledge, is the FDA and/or the manufacturers of pharmaceutical products, including Alfasigma. In so doing, First Databank states and implies that it is affiliated, connected, or associated with the FDA and/or the manufacturer of the products listed and described and that information it publishes about those products originates with and/or is approved or sponsored by the FDA and/or the manufacturer.

SAC ¶ 99 (emphasis added). First Databank's red-herring arguments which ignore the actual bases of the SAC, *see* Motion at 8-11, thus may be disregarded.

First Databank also argues "that many of the statements in the SAC are noncommercial speech entitled to full First Amendment protection." Motion at 12. It specifically includes in this supposed exempt category its "Customer Connection," which it asserts is "unmistakably non-commercial speech." *Id.* First Databank further argues that even "statements on the First Databank website"—that is, advertising brochures and overtly promotional webpages—do "not propose any transaction, which is the core of commercial speech." *Id.* at 13.

The Ninth Circuit's "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort, Inc. v. Herrera,* 860 F.3d 1263, 1272 (9th Cir. 2017) (quotations and citations omitted). But while the "core notion of commercial speech" is "speech which does no more than propose a commercial transaction," *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410,

- 10 -

DOCUMENT PREPARED
ON RECYCLED PAPER

422 (1993), "commercial speech" encompasses more than this "core notion." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Courts thus "try to give effect to 'a common-sense distinction between commercial speech and other varieties of speech.'" *Ariix LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (citations omitted).

Thus, in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), the Supreme Court held that informational pamphlets about contraceptives, which included discussions about "important public issues such as venereal disease and family planning," constituted "commercial speech." *Id.* at 68. While the pamphlets could not "be characterized merely as proposals to engage in commercial transactions," a close examination revealed the pamphlets referred to a specific product, were used as advertising, and the company sending them had "an economic motivation for mailing the pamphlets." Together, these provided "strong support" to conclude "that the informational pamphlets are properly characterized as commercial speech." *Id.* at 66-67.

First Databank's brochures and website promotions reflect "a classic advertising campaign." *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F. Supp. 3d 578, 590 (N.D. Cal. 2019) (*Alfasigma I*) (quotations omitted). They tout First Databank's own product, and propose a commercial transaction. Dkt. 81-2 at 8 (Ex. 1 att'd to Sitwala Decl.) ("For more information, call SALES at 800.633.3453 or visit fdbhealth.com"); SAC ¶¶ 30-34 ("First Databank's promotion and advertising influence customers to purchase its services and products.")

In insisting that its "Customer Connection" is non-commercial speech, First Databank fails to address the *Bolger* factors, and disputes the SAC's facts about the communication. Motion at 12 (arguing its ads "provide information about third-party products in which First Databank has no financial interest"). But as alleged in the SAC, First Databank disseminates it weekly to customers "to support its sales of the MedKnowledge database":

> First Databank provides this publication to its customers both to assist them in understanding the MedKnowledge product, ***and also to reassure customers that information in the MedKnowledge database remains reliable, current, and complete, thus influencing them to continue purchasing MedKnowledge.***

SAC ¶ 59 (emphasis added).

As pled, First Databank has a primary economic motivation for communicating with its

DOCUMENT PREPARED
ON RECYCLED PAPER

customers about its database: to "influenc[e] them to continu[e] purchasing MedKnowledge." *Id.*
Its Customer Connection also "refer[s] to a specific product"— specifically to First Databank's
*own* product. SAC ¶ 61. Notably, in concluding that the contents of the MedKnowledge itself was
not commercial speech, this Court highlighted that "Defendant's database provides information
about third-party pharmaceutical products (including Plaintiff's prenatal vitamins), ***not its own
products***." *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-cv-4810, 2021 WL 616377, at *4
(N.D. Cal. Feb. 17, 2021) (emphasis added). Here, the Customer Connection **is about First
Databank's own product** and constitutes commercial speech. *See Ariix,* 985 F.3d at 1119
(publicists' speech about product is commercial speech).

Though the *Bolger* analysis is context specific, *Ariix*, 985 F.3d at 1117 n.7, it is
unsurprising that an ongoing communication from a merchant to a customer *about the merchant's
product* will often constitute "commercial speech." *See Heartland Payment Sys., Inc. v. Mercury
Payment Sys., LLC*, No. 14-cv-437, 2014 WL 5812294, at *7 (N.D. Cal. Nov. 7, 2014).
*Heartland,* cited by First Databank, held that the defendant's " monthly statements could induce
merchants to continue using Mercury's services, and hence could be considered commercial
speech designed to propose a continued business relationship." *Id.* "Likewise," an "Operating
Guide posted on Mercury's website" provided "information to a potential merchant who may be
considering using Mercury's services," and thus "could be seen to propose a commercial
transaction," *Id.*; *accord Rimini*, 2017 WL 4227939, at *6 (email marketing "constitute
commercial speech"). First Databank's communications with customers *about* its own database
are "commercial speech," and as false commercial speech, are not entitled to First Amendment
protection. *First Resort,* 860 F.3d at 1271 ("the Constitution affords no protection to false or
misleading commercial speech.")

**E.    The SAC states a claim for false advertising**

The elements of a claim for false advertising include:

(1)    the ads of the opposing party were false or misleading;
(2)    the ads deceived, or had the tendency to deceive, consumers;
(3)    the deception had a material effect on purchasing decisions;
(4)    the misrepresented product affects interstate commerce; and
(5)    the claimant has been, or is likely to be, injured by the false advertising.

DOCUMENT PREPARED
ON RECYCLED PAPER

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). First Databank contests the first three elements, and disputes whether its speech is advertising. Motion at 12-18.

### 1. First Databank's commercial speech constitutes advertising

Advertising "is not limited to newspaper, television or radio announcements; any notice *addressed to the public* serves the same purpose." *Hyosung Am., Inc. v. Sumagh Textile Co*., 934 F. Supp. 570, 580 (S.D.N.Y. 1996) (quotation and citation omitted), *aff'd in part, rev'd in part on other grounds*, 137 F.3d 75 (2d Cir. 1998). "Courts have applied the Lanham Act to just about every imaginable print and media form, including press releases, print ads, posters, and websites." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 462 (D.N.J. 2009).

In *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999), the court adopted a multi-factor test for evaluating whether commercial speech constituted advertising: it must be made "for the purpose of influencing consumers to buy defendant's goods or services," and "[w]hile the representations need not be made in a 'classic advertising campaign,'" and instead may be made in "more informal types of 'promotion,' the representations must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Id.* at 735 (citations and numbering omitted).[6]

Here, the SAC sufficiently alleges facts showing that First Databank's speech *about* its MedKnowledge product constitutes advertising, including its brochures and website, SAC ¶¶ 30-35, and its Customer Connection. *Id.* ¶¶ 59-61 & 91-92; *see also id.* ¶ 103 (First Databank's misrepresentation that the FDA determined that medical foods are OTC "is economically motivated commercial speech, directed towards customers to influence their decisions whether to purchase, or to continue to purchase, Defendant's own products and services.")

Contradicting the well-pled allegations in the SAC, First Databank contends that its advertising was not "made 'for the purpose' of influencing purchases" because "the purchases have already happened." Motion at 22. But as the SAC pleads, First Databank's advertising is

---

[6] *Coastal Abstract* also presented an additional element, that the parties must be direct competitors. 173 F.3d at 735. As this Court observed, this "element likely has been abrogated by" *Lexmark*. *Alfasigma I*, 398 F. Supp. 3d at 590 n.4 (citing cases); *see also Alfasigma II*, 2021 WL 930453, at *7 n.5.

DOCUMENT PREPARED
ON RECYCLED PAPER

intended "to influence customers to purchase **or renew** subscriptions to First Databank's services and products, including MedKnowledge." SAC ¶ 5 (emphasis added); *see also id.* at ¶¶ 6, 56.

*Coastal Abstracts* illustrates that false advertising to existing customers is not beyond the bounds of the Lanham Act. There, Shearson Lehman, a mortgage company, launched a refinance program for its borrowers. It hired the plaintiff, Coastal Abstract, to perform various tasks for the refinance loans. Coastal Abstract then hired First American to handle some of its obligations, and First American began working directly with Shearson. And during one of the discussions between First American and Shearson, First American reported—falsely—"that Coastal's failure to disburse the loan amounts, including the payments for title insurance premiums, created the delay in issuing the title policies." 173 F.3d at 729-30. This "statement that Coastal was not 'paying the bills,'" *id.* at 730, was actionable as false advertising:

> The statement that Coastal was not paying its bills (perhaps with the narrower implication that it was not paying in timely fashion), is quite a different matter. That statement is clearly one of fact, able to be proven true or false. Neither Hollenbeck nor First American contend otherwise. The statement is therefore actionable under the Lanham Act and the California law of defamation.

*Id.* at 732. And though the statement was made to only a single, existing customer about a group of loans already in process, the Ninth Circuit affirmed that the communication satisfied the definition of "advertising." *Id.* at 735 (concluding that "the representation that Coastal was not paying its bills on time [was] sufficiently disseminated to the relevant purchasing public to constitute promotion within that industry") (quotations and ellipses omitted).

*Gillette Co. v. Norelco Cons. Prods. Co.*, 946 F. Supp. 115 (D. Mass. 1996), cited by First Databank, involved a user manual for a "wet shaver"—a product which, unlike a database subscription, is unlikely to be purchased repeatedly. *Boltex Mfg. Co. v. Galperti, Inc.*, No. 17-cv-1439, 2018 WL 1535199 (S.D. Tex. Mar. 29, 2018), distinguished *Gillette,* and rejected the argument that "post-sale communications to consumers who have already purchased a product" could not be actionable as false advertising. *Id.* at *6 (holding that shipping documents "confirm the assumption that consumers make when purchasing the flanges, namely that the flanges are of the quality and specifications that they purport to be"); *see also Heartland Payment Sys.,* 2014 WL 5812294, at *6; *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 416 &

DOCUMENT PREPARED
ON RECYCLED PAPER

1  18 (S.D.N.Y. 2013) (pharmaceutical package inserts were advertising); *Deston Therapeutics, LLC*

2  *v. Trigen Labs, Inc.*, 723 F. Supp. 2d 665, 674 (D. Del. 2010) (same); *Sirius Labs., Inc. v. Rising*

3  *Pharm., Inc.*, No. 03-cv-6965, 2004 WL 51240, at *4 (N.D. Ill. Jan. 7, 2004) (same).

4  Finally, First Databank falsely states that "the SAC does not allege the audience for First

5  Databank's" false advertising. Motion at 22. But the SAC specifically alleges that "First Database

6  disseminates" its Customer Connection publications "each week to First Databank's customers,"

7  and that this dissemination is conducted "via email directly to all of First Databank's customers,

8  including, for example, CVS, Rite-Aid, Kroger, Walgreens, Anthem, Aetna, certain Blue

9  Cross/Blue Shield entities, Humana, Cigna, UnitedHealthCare, and Express Scripts, to name only

10  a few." SAC ¶ 59. First Databank further admits that its brochures are "publicly available on the

11  internet," Motion at 22, and "First Databank provides its brochures to customers and potential

12  customers as part of its marketing efforts for MedKnowledge, and to influence customers and

13  potential customers to purchase or to continue purchasing First Databank's products." SAC ¶ 30.

14  As pled, First Databank's communications about its database are advertising. *Newcal*

15  *Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1054 (9th Cir. 2008) ("Whether the relevant

16  statements were 'disseminated sufficiently to the relevant purchasing public' may turn out to be

17  true or false, but the allegation suffices for purposes of stating a claim.") (citation omitted).

18      **2.**      **The SAC pleads facts showing First Databank's commercial speech is false**

19  First Databank's advertising is actionable if it is (1) literally false or (2) literally true, but

20  likely to mislead or confuse consumers. *Southland Sod*, 108 F.3d at 1139. A "literally false"

21  message may be "conveyed by necessary implication when, considering the advertisement in its

22  entirety, the audience would recognize the claim as readily as if it had been explicitly stated."

23  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d

24  578, 586-87 (3d Cir. 2002) (citation and quotation omitted). "The Court may rely on its own

25  common sense and logic in interpreting the message of the advertisement." *Hertz Corp. v. Avis,*

26  *Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994).

27  As alleged in the SAC, it is crucial to First Databank's customers that MedKnowledge is

28  "accurate and consistent with product labeling and FDA law and regulations." SAC ¶ 28. This is

DOCUMENT PREPARED
ON RECYCLED PAPER

why First Databank has spent years advertising the database as "[r]igorously compiled using best practices research procedures with extremely thorough validation processes," and "persistently researched and verified," *id.* ¶ 30, and why it touts MedKnowledge as "so reliable, governments actually check with us to confirm their own data." *Id.*; *see also id.* at ¶ 31. It is also why it tells manufacturers that "Your customers and our customers rely on the information you provide to understand drug names, descriptions, and pricing, and to make clinical and business decisions." *Id.* ¶ 32. It is based on these representations of accuracy, reliability, and a "strong relationship" with the FDA and manufacturers that First Databank's customers rely on its products in making pharmaceutical purchasing, dispensing, and prescribing decisions. *Id.* ¶¶ 35-40.

And it was in this context—in which First Databank had spent years convincing its customers that the information it provides is sourced from the FDA itself and from manufacturers—that First Databank falsely told those same customers that Alfasigma's products are now "over-the-counter," and that this re-classification was made by the FDA itself. *See* SAC ¶ 58 ("First Databank repeatedly and falsely stated in commercial communications with its customers that it changed the coding of the Alfasigma Products from 'F' to 'O' at FDA's direction, in consultation with the FDA, and to 'align' with FDA's standards."); *id.* ¶¶ 59-61 (quoting First Databank's Customer Connection advertising).[7]

The reclassification of medical foods as OTC did not come from Alfasigma, SAC ¶ 65, and it did not come from the FDA. "It was not based on the 'FDA's explicit direction,' or in 'consultation with the FDA,' or under 'controlling regulations' or to be 'in alignment with' FDA's 'standards.'" *Id.* ¶ 66. In fact, First Databank asked FDA if labeling a medical food as "Dispensed by prescription" "would run counter to the Agency's express statement" that "there is no prescription required for medical foods and that identifying them as prescription products runs the risk of misbranding them." Dkt. 81-3 (Feb. 16, 2016 email from First Databank to FDA). And FDA answered ***no***: "because medical foods are required by statute to be consumed or

---

[7]In September 2018, First Databank essentially admitted its claim that Alfasigma's products are OTC drugs was false when it declared they would be classified as "Q," akin to flavorings and colorants. SAC ¶¶ 9-10, 91-93. This new characterization also is false. *Id.* ¶¶ 94-97.

DOCUMENT PREPARED
ON RECYCLED PAPER

administered enterally under the supervision of a physician, FDA would not object to the use of language to communicate this requirement . . . ." *Id.* (Feb. 17, 2016 email from FDA to First Databank), *see also* SAC ¶ 68. But that did nothing to stop Frist Databank, which continued to tell customers that "in view of the FDA's explicit direction, medical foods cannot be assigned the 'F' Class value . . . ." SAC ¶ 61; *see also id.* ¶ 69.[8]

FDA Director Lotze then wrote First Databank, specifically warning it about its "misinterpretation of FDA's position and policies on medical foods." SAC ¶ 70 (Jun. 29, 2017 Letter) ("We believe First Databank has misinterpreted FDA's response regarding the labeling of medical foods and mistakenly classified all medical food products as over-the-counter drugs.") Dr. Lotze reiterated FDA's position that it "does not object to manufacturers also ***indicating in the labeling of such products that prescriptions may be written for the product*** . . . ." SAC ¶ 73 (emphasis added). She explained *why* FDA did not approve of First Databank's reclassification of medical foods: These are products that are important to patient health, and "[i]f medical foods are not accessible to these individuals and consumed as medically indicated, they can suffer severe, and even life-threatening, health consequences." *Id.* ¶ 72; *see also id.* ¶ 74 (warning that patients "are losing or have lost insurance coverage for their products marketed as medical foods" because "insurance providers belie[ve] that the products are over-the-counter (OTC) drugs").

Alfasigma has more than sufficiently pled that First Databank's advertising is *false.*

### 3. First Databank's false commercial speech is deceptive

When a statement is literally false, the court *presumes* deception. *U-Haul Int'l, Inc. v.*

---

[8] First Databank also claims it never stated that Alfasigma's "products were 'OTC drugs.'" Motion at 15. But the falsity at issue here is First Databank's representation that the information in MedKnowledge comes from the FDA, and that it was the FDA that made the decision that medical foods must be coded "O." That "O" means "over-the-counter" is well-pled in the SAC: "as a result of First Databank's commercial efforts over the span of decades, the Healthcare Marketplace universally understood at all times relevant to this case, including from February 2016 through October 2019, that a product designated 'O' is an OTC drug." SAC ¶ 54. First Databank *knew* "that its 'O' code is regarded by customers 'as an over-the-counter indicator.'" *Id.* ¶ 89. Thus, this Court already rejected First Databank's argument that it can define its way out of a falsehood. *Alfasigma I*, 398 F. Supp. 3d at 588 ("the understanding and expectations of its subscribers based on an earlier, stable definition may override a subtle definitional change, particularly when Alfasigma has pled that consumers are confused").

DOCUMENT PREPARED
ON RECYCLED PAPER

*Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986); *see also Harper House, Inc. v. Thomas*

*Nelson, Inc.,* 889 F.2d 197, 209 (9th Cir. 1989). It was based on the presumption of deception that

*William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255 (9th Cir. 1995), cited by First Databank,

reversed a defense judgment following a bench trial. Trial evidence showed that only 3% of the

recipients of a literally true but misleading ad had been deceived by it, which the Ninth Circuit

agreed was not a "significant" portion. However, the court also observed that an *intent* by the

defendant to deceive warrants a presumption of deception. Because the trial court had not

addressed the defendant's intent, the court remanded for findings. *Id.* at 258-59. Here, Alfasigma

pleads that First Databank's ads are literally false. SAC ¶ 100. Deception thus may be presumed.

The SAC also amply pleads deception. Because it deceived its customers, First

Databank's false advertising "caused insurers to deny coverage for the Alfasigma Products to

their customers, resulting in higher out-of-pocket costs to consumers." *Id.* ¶ 84. Its false

advertising "confused and will continue to confuse physicians about the status and availability of

the Alfasigma Products," *id.* ¶ 86, and "wholesalers and pharmacies reduced inventories of the

Alfasigma products on the mistaken belief that the FDA had determined that the products are not

prescription products . . . ." *Id.* ¶ 87. Thus, "Defendant's false and misleading description of the

source of its published information as the manufacturer and/or the FDA has caused and will likely

continue to cause confusion and deception in the marketplace, to Plaintiff's injury." *Id.* ¶ 105.

**4.  First Databank's false commercial speech is material**

A statement is material if "it is likely to influence the purchasing decision." *Southland*

*Sod*, 108 F.3d at 1139. At trial, "[m]ateriality is typically proven through consumer surveys,"

though that is not "the only way to prove materiality." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d

1105, 1110-11 (9th Cir. 2012) (quotations omitted) (materiality supported by declaration). "A

plaintiff can also establish materiality by showing that 'the defendants misrepresented an inherent

quality or characteristic of the product.'" *Clorox Co. v. Reckitt Benckiser Grp., PLC*, 398 F. Supp.

3d 623, 644 (N.D. Cal. 2019) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts,*

*Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (other citations omitted)

In *Clorox*, the ads at issue "attack Clorox products' efficacy, safety, and durability,"

which "implicate inherent qualities and characteristics of cleaning products, and would likely influence the purchasing decision of a consumer." *Id. In-N-Out Burgers v. Smashburger IP Holder LLC*, No. 17-cv-1474, 2019 WL 1431904, at *7 (C.D. Cal. Feb. 6, 2019); and *Pom Wonderful LLC v. Purely Juice, Inc.*, No. 07-cv-2633, 2008 WL 4222045, at *11 (C.D. Cal. Jul. 17, 2008), cited by First Databank, held that misrepresentations about the size of a hamburger patty and the content of a juice mix were inherent qualities or characteristics, and thus material.

Here, the accuracy and reliability of the information provided in First Databank's MedKnowledge product—and specifically whether that data is aligned with information provided by manufacturers and the FDA itself—is central to, and likely to influence, customer decisions, and is an inherent quality or characteristic of the product. SAC ¶ 27 ("Each of these segments—prescribing, dispensing, and reimbursing—requires accurate and consistent information about the commercial availability and key characteristics of the products prescribed, dispensed, and reimbursed."); *id.* ¶ 28 ("Because the Healthcare Marketplace makes critical decisions based on the information contained in these drug databases, that information ***must be accurate and consistent with product labeling and FDA law and regulations***."); *id.* ¶ 34 ("It is important for First Databank's customers that the compendia services and products they purchase be accurate. For pharmaceutical products, accuracy requires that the information provided be consistent with the FDA's position, as well as manufacturer labeling.") And this is precisely why First Databank has spent so much effort over the years to convince its customers that First Databank is not only the largest compendium, *id.* ¶ 29, but the most accurate and reliable. *Id.* ¶ 30 (advertising MedKnowledge as "encompassing FDA-approved prescription drugs, over-the-counter medications and pharmacy benefit medical devices," and as offering a "core knowledge base" that is "persistently researched and verified.") And it claims to be so accurate and reliable *because* of "***our strong relationships with manufacturer and wholesaler communities, as well as with federal and state government entities***." *Id.* ¶ 31. Thus, "First Databank's claims that the information it provides is sourced from the FDA and manufacturers is a key selling point in its advertising and promotion of its products and services." *Id.* ¶ 32.

First Databank's remarkable assertion that, "when advertising a service that provides

DOCUMENT PREPARED
ON RECYCLED PAPER

information, ***the information's provenance is not material***," Motion at 18 (emphasis added), is not only obviously wrong and antithetical to its own advertising, but contradicted by the sole case cited. In *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997), the Second Circuit affirmed a finding that an ad stating that "SportsTrax provides 'updated game information direct from each arena' which 'originates from the press table in each arena,'" though inaccurate, was "not material in the present factual context." *Id.* at 855. As the court explained, this information "would not influence consumers at the present time, whose interest in obtaining updated game scores on pagers is served only by SportsTrax. Whether the data is taken from broadcasts instead of being observed first-hand is, therefore, simply irrelevant." *Id.* But as the Court continued, "if the NBA were in the future to market a rival pager with a direct datafeed from the arenas— perhaps with quicker updates than SportsTrax and official statistics—then Motorola's statements regarding source might well be materially misleading." *Id.*

First Databank is not offering scores on pagers; it is providing critical information to the medical community about pharmaceuticals. And First Databank is not alone—it has competition. SAC ¶¶ 29, 75. The information it provides *has to be accurate*, or patients suffer. And here, First Databank was *not* accurate; it falsely claimed FDA classified medical foods as OTC drugs, when FDA did no such thing. First Databank's false advertising is *material*. *Id.* ¶ 104.

The SAC states a claim for false advertising under Section 43(a)(1)(B).

**F.     The SAC states a source confusion claim under Section 43(a)(1)(A)**

Section 43(a)(1)(A) of the Lanham Act creates liability against: "Any person who, on or in connection with any goods or services," uses in commerce "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which" "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the ***origin, sponsorship, or approval*** of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A) (emphasis added). First Databank "violated Section 43(a)(1)(A) because" it "in fact is not affiliated, connected, or associated with the FDA and/or the manufacturer of the products listed and described, and the information it publishes about those products does not originate with, and

is not approved or sponsored by the FDA and/or the manufacturer." SAC ¶ 103.

Citing *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23 (2003), First

Databank incorrectly argues that its false claims that the information in its database—and in

particular its decision to characterize medical foods as over-the-counter products—came from the

FDA is not actionable. Motion at 19-21. In *Dastar*, the Court observed that "§ 43(a), 15 U.S.C. §

1125(a) is one of the few provisions [in the Lanham Act] that goes beyond trademark protection."

539 U.S. at 29. Dastar, the defendant, had taken a video series based on President Eisenhower's

book "Crusade in Europe," copied it, "and produced its very own series of videotapes," offered at

a discount from similar videotapes offered by Fox—which had never renewed the now-long-

expired copyright for the series. *Id.* at 315. Unable to sue Dastar under copyright law, Fox sued

under § 43(a), claiming Dastar's **failure** to give creative credit amounted to false designation of

origin. *Id.* The Court disagreed; in this context, "origin" referred to the source of the physical

good, that is, the videotapes. *Id.* at 37. This was due in large part to the inconsistency of allowing

what was in effect a claim for copyright infringement *after* the copyright expired. *Id.* at 33-35.

The *Dastar* Court also considered a Catch-22 that defeats First Databank's argument. A

"practical difficulty" of requiring attribution for intellectual property is that a party copying a

work without approval "could face Lanham Act liability for *crediting* the creator if that should be

regarded as implying the creator's 'sponsorship or approval' of the copy, 15 U.S.C.

§ 1125(a)(1)(A)." *Dastar,* 539 U.S. at 36. Thus, "if Dastar had simply copied the television series

as Crusade in Europe and sold it as Crusade in Europe, without changing the title or packaging

(including the original credits to Fox), it is hard to have confidence in respondents' assurance that

they would not be here on a Lanham Act cause of action." *Id.* (quotations omitted).

And that distinct scenario, which the Court relied upon as a viable cause of action, is the

circumstance First Databank has presented. The issue here is not First Databank's appropriation

of another's intellectual property without attribution, but its false claim that its products are

sourced from, approved, or sponsored by FDA and manufacturers like Alfasigma. E.g.,

SAC ¶ 102. This claim is actionable. *E.g., Cisco Tech., Inc. v. Certification Trendz, Ltd.,* 177 F.

Supp. 3d 732, 738 (D. Conn. 2016) (partial copying of test preparation books allegedly sold by

competitor as "ACTUAL" and "REAL" version of the original was the "type of commercial activity that could fall well within the umbrella of conduct prohibited by Sec. 43(a) of the Lanham Act.")

First Databank's contention that the Lanham Act can never reach a defendant's false claims about the source of intellectual property, Motion at 20, is also contrary to Ninth Circuit precedent. *See PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 932-33 (9th Cir. 2009). A false advertising case, the court reversed a grant of summary judgment in favor of the defendant on a claim that it falsely credited its co-owner as the "inventor" of a medical device:

> Defendants' commercial depiction of Irwin as "inventor" of the XTRAC is actionable to the extent it misled consumers into believing that Irwin was the sole inventor or made more than his actual share of inventive contributions. Calling Irwin the "inventor of the XTRAC" might have been misleading. Evidence supplied by PhotoMedex shows that Irwin was only named as an inventor in patents for XTRAC's cooling apparatus and that other individuals designed the bulk of the XTRAC system. Thus, we vacate summary judgment for the claims relating to Defendants' representations that Irwin was the inventor of the XTRAC and remand those claims for further proceedings.

(citations omitted). And just as a false claim of a *lack* of an affiliation is actionable, *Ariix*, 985 F.3d at 1122, so too is a false claim of an affiliation. *Casper Sleep, Inc. v. Mitcham,* 204 F. Supp. 3d 632 (S.D.N.Y. 2016) (mattress reviewer's false claim to have the same financial interest in plaintiff's companies as other mattress companies actionable under Lanham Act).[9]

---

[9] Citing *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008), First Databank argues that "Statements about the provenance of data in a database are not statements about the nature, characteristics, qualities, or geographic origin of the database," and thus purportedly are not actionable as false advertising. Motion at 23. But this was not the Ninth Circuit's holding. Rather, the case involved a plaintiff attempting to enforce copyrights held by third parties. But: "Copyright is wholly a 'creature of statute, and the only rights that exist under copyright law are those granted by statute.'" *Id.* at 1143-44 (citation omitted). And under "[c]opyright law, only copyright owners and exclusive licensees of copyright may enforce a copyright or a license." *Id.* at 1144 (citing 17 U.S.C. § 501(b))."Therefore, third party strangers and nonexclusive licensees cannot bring suit to enforce a copyright, even if an infringer is operating without a license to the detriment of a nonexclusive licensee who has paid full value for his license." *Id.* The court therefore declined to construe "the Lanham Act to cover misrepresentations about copyright licensing status," because to do so would allow non-copyright holders to "litigate the underlying copyright infringement when they have no standing to do." *Id.* But the instant case raises no such concerns; Alfasigma is not seeking to avoid the limitations of copyright law, but rather to hold First Databank liable for its false representations in commercial speech that its information comes from or is sponsored or approved by the FDA.

DOCUMENT PREPARED
ON RECYCLED PAPER

*MDM Group Assocs., Inc. v. ResortQuest Int'l, Inc.*, No. 06-cv-1518, 2007 WL 2909408 (D. Col. Oct. 1, 2007), is instructive. There, the court applied *Dastar* to preclude a Lanham Act claim that the defendant "published materials describing the damage waiver policy that were substantially similar to MDM's brochure without crediting MDM," explaining: "This is exactly the kind of allegation that the copyright laws were meant to address." *Id.* at *6 (citing *Dastar*, 539 U.S. at 33). [10] But the plaintiff *also* alleged that defendant's "advertising material falsely suggested that MDM knew about and approved the use of" the brochure at issue. *Id.* at *7 (noting allegations that this "falsely suggest[s] a sponsorship, connection, or association with MDM, thereby injuring MDM and the public.") This claim was actionable:

> Section 43(a)(1)(A) of the Lanham Act prohibits the use of false or misleading representations of fact that is likely to cause confusion as to the sponsorship or approval of one's goods or services. 15 U.S.C. § 1125(a)(1)(A). This would encompass MDM's apparent allegation that the brochures' statement that MDM designed the plan was misleading in that it suggested MDM's sponsorship or approval of the plan.

*Id.* The claim therefore was "not governed by *Dastar*," and was not subject to dismissal. *Id.*; *see also Schroeder v. Volvo Grp. N. Am. LLC*, No. 20-05127, 2020 WL 6562242, at *7 (C.D. Cal. 2020) (allegation that "Defendant has created a false impression that Sumida has endorsed Defendant and is 'passing off' a relationship with Sumida" does not sound in copyright, and is actionable under the Lanham Act) (construing *Dastar*); *Bobbleheads.com, LLC v. Wright Brothers, Inc.*, 259 F. Supp. 3d 1087, 1098 (S.D. Cal. 2017) (distinguishing *Dastar* and allowing claim where "Plaintiff alleges that Defendants misrepresented that their goods were somehow endorsed by the Trump organization as an 'official' product of the campaign."); *Henley v.*

---

[10] First Databank cites similar cases in which, like *Dastar*, a plaintiff sought to enforce a copyright theory under the Lanham Act. In *Harbour v. Farquhar*, 245 F. App'x 582, 582-83 (9th Cir. 2007), the plaintiff attempted to claim a § 43(a) violation because it was not given composition credit for musical works used in defendant's television programs—a claim indistinguishable from that in *Dastar*. *Accord Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004) (per curiam) ("In sum and substance, GUS's claim is simply a claim that HAL has infringed its copyright," but "*Dastar* makes clear that such claims are not actionable under § 43(a)."); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1183 (C.D. Cal. 2003) (rejecting plaintiff's claim he "should be given credit for 'the authoring of the 'narration Script'. . ., editing film sequences and re-scoring the music" in a film).

DOCUMENT PREPARED
ON RECYCLED PAPER

*Devore*, No. 09-cv-0481, 2009 WL 10697982, at *7 (C.D. Cal. July 8, 2009) (distinguishing *Dastar*, and explaining: "Henley and Campbell allege a false association or endorsement claim, in which they contend that they received credit, at least implicitly, where they should not have.")

The SAC states a claim for unfair competition under Section 43(a)(1)(A).

## G. The SAC states a claim for contributory false advertising

In *Inwood Labs, Inc. v. Ives Labs, Inc.* 456 U.S. 844, 853-54 (1982), the Supreme Court recognized a claim for contributory trademark infringement under the Lanham Act. Based on *Inwood*, both the Second and Eleventh Circuits later held the Lanham Act also allows a claim for contributory false advertising. *Societe des Hotels Meridien v. LaSalle Hotel Operating P'shp,* 380 F.3d 126, 133 (2d Cir. 2004); *Duty Free Am., Inc. v The Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1274-77 (11th Cir. 2015). District Courts within this Circuit also have recognized a claim for contributory false advertising. *In re Outlaw Lab., LLP*, 463 F. Supp. 3d. 1068, 1083 (S.D. Cal. 2020); *Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC*, No. 17-cv-3007, 2019 WL 6310717, at *6 (D. Nev. Nov. 25, 2019); *Genus Lifesciences, Inc. v. Lannett Co.*, 378 F. Supp. 3d 823 (N.D. Cal. 2019); *BioCell Tech. LLC v. Arthro-7*, No. 12-cv-0516, 2012 WL 12892937, at *12 (C.D. Cal. Nov. 19, 2012); *ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc*., No. 11-cv-05149, 2012 WL 4068632, at *3 (N.D. Cal. Sept. 14, 2012).

A defendant is liable for a third party's false advertising if it "contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it," or alternatively if it "(1) intentionally induced the primary Lanham Act violation; or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." *Genus*, 378 F. Supp. 3d at 848-49 (quotations and citations omitted). Thus, a pleading must allege "that Defendant knowingly or intentionally induced, or materially participated in, its subscribers' alleged false advertising." *Alfasigma II*, 2021 WL 930453, at *9.

The SAC sufficiently alleges contributory false advertising. One of the reasons First Databank recoded medical foods as "O" was to benefit its PBM customers, including Express Scripts. SAC ¶¶ 51-52, 56. At the same time, First Databank had to reassure *all* its customers that its database was still reliable, and so it claimed this coding change came "at FDA's direction." *Id.*

DOCUMENT PREPARED
ON RECYCLED PAPER

¶ 8. In turn, First Databank's own customers, including Express Scripts, then engaged in virtually identical false advertising, telling their own customers that the FDA had determined that medical foods are now OTC products. SAC ¶ 79 (Express Scripts' ad stating that "Federal regulations require medical 'food' be identified as not requiring a prescription"). In so doing, Express Scripts specifically identified First Databank as authority for this representation: "First DataBank (FDB) . . . now classifies all medical foods as over-the-counter (OTC) items." *Id.* Other First Databank customers followed suit. *Id.* ¶¶ 80-82; *id.* at 114-116 (summarizing third party false advertising).

Count II of the SAC, ¶¶ 111-121, further describes First Databank's central role in inducing and materially participating in these third party false advertisements. By convincing its own customers that the *FDA* classified medical foods as "OTC" products, *id.* ¶ 111, First Databank induced or contributed to its customers' subsequent false advertising. *Id.* ¶¶ 112; 117-119. These third parties were repeating and amplifying First Databank's false advertising, and would not have published their own false advertising but for First Databank's misconduct. On these well-pled facts, a jury could find First Databank liable for its false advertising. E.g., *Diamond Resorts*, 2019 WL 6310717, at *6 (defendant's knowledge of and participation in third party false advertising sufficient to support a claim for contributory false advertising).

The SAC states a claim for contributory false advertising.

## V.     CONCLUSION

Plaintiff Alfasigma USA, Inc. respectfully requests that the Court deny in its entirety Defendant's Motion to Dismiss the Second Amended Complaint.

Dated: June 28, 2021

NORTON ROSE FULBRIGHT US LLP
SAUL PERLOFF
JEFFREY B. MARGULIES
KATHARYN GRANT
ROBERT ROUDER


By:     */s/ Saul Perloff*
     **Saul Perloff**

Attorneys for Plaintiff
ALFASIGMA USA, INC.

DOCUMENT PREPARED
ON RECYCLED PAPER