UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFASIGMA USA, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>FIRST DATABANK, INC.,<br><br>       Defendant. | Case No. 18-cv-06924-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 81 |

Pending before the Court is Defendant First Databank Inc.'s motion to dismiss the second amended complaint. The Court held a hearing on the motion. For the reasons detailed below, the Court **GRANTS** the motion.

## I. BACKGROUND

The parties are familiar with the claims in this case. The Court therefore only briefly summarizes the alleged facts as relevant to this motion.

### A. Allegations

Plaintiff Alfasigma USA, Inc. is a pharmaceutical company that develops, manufactures, sells, and distributes medical foods. *See* Dkt. No. 79 ("SAC") at ¶¶ 12, 17–21. Plaintiff emphasizes that its three products, which must be used under the supervision of a physician, cannot be accurately described as "over-the-counter." *See id.* at ¶¶ 2–4, 12, 18, 22, 42 (citing 21 U.S.C. § 360ee(b)(3)).

First Databank publishes and sells a "pharmaceutical information database" called MedKnowledge, which contains information about "key characteristics" of pharmaceutical products, such as formulation and pricing. *See id.* at ¶¶ 13, 30, 36, 41. According to Plaintiff, MedKnowledge is used by doctors and pharmacists to determine which products to prescribe to

patients. *See id.* at ¶¶ 28, 37. Pharmacy benefit managers ("PBMs") and insurance companies use the database to determine whether products are covered by insurance plans and are eligible for reimbursement. *See id.* at ¶¶ 28, 39, 50. And pharmaceutical wholesalers, distributors, and retail pharmacies also use the database to determine which products to stock and dispense. *See id.* at ¶¶ 28, 38. Various third-parties therefore use the database "to make decisions about which products to prescribe, purchase, dispense, and reimburse." *See id.* at ¶ 28.

At issue in this case is the "class" field in the database. *See id.* at ¶¶ 35, 43. "Historically," the database assigned Plaintiff's products to the "F" class, *id.* at ¶ 3, which was defined as the "[p]roduct labeling indicates prescription or physician supervision required for use," *id.* ¶¶ 43, 44. According to Plaintiff, the "O" class signified "over-the-counter" products, for which "[a] prescription is not required per the product labeling." *See, e.g.*, *id.* at ¶ 43 (emphasis omitted). Plaintiff alleges that under this system, the cost of its products was "often covered by insurance plans that limit coverage to prescription products requiring physician supervision," and was therefore more likely to be reimbursed by PBMs. *See id.* at ¶¶ 46–47, 52.

Starting in 2016, First Databank redefined the "F" class to mean "products that *require a prescription*," without reference to whether physician supervision is needed. *Id.* at ¶ 55 (emphasis added). Because Plaintiff's medical foods can legally be obtained without a prescription but are used with physician supervision, First Databank assigned Plaintiff's medical foods to the "O" code, *id.* at ¶ 3, redefined as "a prescription is not required per the product labeling," *id.* at ¶ 43 (emphasis omitted).[1] However, Plaintiff asserts that even after these changes, "the Healthcare Marketplace universally understood . . . that a product designated 'O' is an OTC drug, available over-the-counter and without physician supervision." *See id.* at ¶ 44. And many payors would reject claims to reimburse for any product classified as "O." *See id.* at ¶ 50. In October 2019, First Databank created a new code—"Q"—which indicates that "[p]roducts that are neither drugs nor devices." *Id.* at ¶¶ 9, 94. First Databank has assigned Plaintiff's medical foods to this "Q"

---

[1] Plaintiff acknowledges that federal law does not prohibit medical foods—including Plaintiff's products—from being dispensed without a prescription. *See, e.g.*, Dkt. No. 95 ("Hrg. Tr.") at 15:5–10. But the FDA allows medical foods to have labels that say they are to be used under physician supervision. *See, e.g.*, SAC at ¶ 89.

2

code ever since. *Id.* at ¶ 9.

Plaintiff acknowledges that First Databank "makes coding decisions that comply with customer preferences." *See id.* at ¶ 51. Plaintiff alleges that First Databank made these specific changes at the request of certain PBMs who no longer wanted to reimburse for medical food prescriptions. *See, e.g.*, *id.* at ¶¶ 23, 50–52. By making these changes, First Databank was making its MedKnowledge database "more attractive to customers," and thus increasing the likelihood that the customers would continue to subscribe to MedKnowledge. *See id.* at ¶¶ 6, 56.

Plaintiff also alleges that the majority of *other* MedKnowledge customers—who did not request changes to the coding of medical foods—were actually misled by these changes, and began improperly treating Plaintiff's medical foods "as OTC drugs," despite the fact that they required doctor supervision. *See id.* at ¶¶ 7–8, 57, 77–78. These customers, Plaintiff suggests, relied on First Databank's advertising that its database was accurate and reliable. *See id.* at ¶¶ 5, 30–35, 57–61, 100. Specifically, First Databank circulated "Editorial Highlights" as part of the weekly publications to its existing customers regarding changes to MedKnowledge. *Id.* at ¶¶ 59–61. In December 2015, the Editorial Highlights explained that First Databank was changing the designation for medical foods from "F" to "O":

> While certain medical food labels bear an "Rx" or prescription dispending limitations, FDA regulations limit such designations to drugs and expressly prohibit their application to medical foods.
> . . .
> Consequently, since [First Databank's] "F" Class value identifies products that require a prescription, it cannot be correctly applied to medical foods.
>
> Accordingly, [First Databank] will be applying an "O" Class value to all newly added medical food products and will commence a review of existing medical food products on the database to ensure that they are in alignment with these FDA standards. FDB will preannounce any products that undergo a resulting change in their Class value during the next several months.

*Id.* at ¶ 60.

According to Plaintiff, First Databank reiterated that it was "chang[ing] the coding of medical foods from 'F' to 'O' at the direction of the FDA, as required by FDA regulations, and to

3

be 'in alignment with' FDA's 'standards.'" *See id.* at ¶ 61. Plaintiff alleges that these notifications misled MedKnowledge customers to believe that the *FDA* required the coding change, and that the *FDA* had indicated that Plaintiff's medical foods were over-the-counter drugs. *See, e.g.*, *id.* at ¶¶ 62–74, 76–78, 90, 100, 112. Plaintiff also cites instances of payors announcing that medical foods were not "Rx only," and therefore would be considered "over-the-counter" instead. *See id.* at ¶¶ 80–82, 113. As a result of the coding change, Plaintiff asserts that fewer payors reimbursed for them. *Id.* at ¶¶ 81–82, 84. This, in turn, led to fewer doctors prescribing Plaintiff's medical foods and fewer wholesalers and pharmacies stocking them. *See id.* at 86–87. Plaintiff then lost sales as fewer patients purchased its products. *See id.* at ¶ 85.

### B. Procedural History

Plaintiff filed this action in November 2018. *See* Dkt. No. 1. Plaintiff initially brought false advertising claims under the Lanham Act; California's False Advertising Law; California's Unfair Competition Law; and common law unfair competition. *See id.* at ¶¶ 59–106. The Court denied Defendant's motion to strike the state law claims in the original complaint under California's anti-SLAPP statute and granted in part and denied in part Defendant's motion to dismiss the Lanham Act claims under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 41. Plaintiff then filed its first amended complaint. *See* Dkt. No. 46 ("FAC"). In the FAC, Plaintiff alleged two theories of liability. *First*, Plaintiff alleged that Defendant's decision to recode Plaintiff's products as "O" and "Q" in the database was false and misleading ("database allegations"). *Second*, Plaintiff argued that Defendant misrepresented to subscribers that the FDA and manufacturers were the source of the information contained in the database ("source allegations").

Defendant again moved to strike the state law claims under the anti-SLAPP statute and to dismiss Plaintiff's remaining claims under Rule 12(b)(6). Dkt. No. 48. The Court granted the motion to strike Plaintiff's state law claims that were premised on the database allegations and granted the motion to dismiss as to the remaining causes of action. *See* Dkt. No. 68. The Court reasoned that "the database is noncommercial speech," and that the database codes are not "'commercial advertising or promotion' as required under 15 U.S.C. § 1125(a)(1)(B)." *Id.* at 12,

4

15. Based on these findings, the Court concluded that leave to amend Plaintiff's database allegations would be futile, and thus did not grant leave to amend those claims. *Id.* at 18–19. The Court only granted leave to amend the source allegations. *Id.* Plaintiff contends that the SAC now only includes source allegations, and brings causes of action under the Lanham Act for (1) false advertising and false description of source; and (2) contributory false advertising. *See* SAC at ¶¶ 98–121. First Databank now moves to dismiss the SAC in its entirety. Dkt. No. 81.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Id.* However, a plaintiff must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The Court does not credit allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

## III. DISCUSSION

### A. Statutory Standing

As a threshold matter, First Databank contends that Plaintiff lacks statutory standing to bring its Lanham Act claims. *See* Dkt. No. 81 at 5–9. First Databank argues that (1) Plaintiff's interests fall outside the zone of interests in § 1125(a); and (2) Plaintiff has not established proximate cause.

#### i. Zone of Interests

Courts apply the zone of interests test to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127

(2014). To determine whether a plaintiff satisfies this test, courts consider whether the plaintiff's "interests fall within the zone of interests protected by the law invoked." *Id.* at 129 (quotation omitted). As relevant here, the Lanham Act states that its purpose is "to protect persons engaged in [interstate] commerce against unfair competition." 15 U.S.C. § 1127. The Supreme Court has therefore held that to fall within the zone of interests of the Lanham Act, "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32 (quotations omitted). In *Lexmark*, the Court explained that it was sufficient for the plaintiff to allege that it "lost sales and [incurred] damage to its business reputation" as a result of the defendant's false advertising. *See id.* at 137.

        First Databank contends that despite Plaintiff's allegations that it lost sales due to the recoding of its medical foods, Plaintiff still does not fall within the zone of interests. Dkt. No. 81 at 6. First Databank argues that Plaintiff must assert a competitive injury, which it does not do. *See id.* First Databank points out that the Lanham Act is intended to protect against "unfair *competition*." 15 U.S.C. § 1127 (emphasis added). But here, Plaintiff does not compete in First Databank's market for pharmaceutical databases. *See id.* Nor does Plaintiff allege that it is worse off as compared to other medical food manufacturers and distributors. *See id.* Rather, the coding changes applied to *all* medical foods. *See, e.g.*, SAC at ¶¶ 52–53 (noting First Databank's announcement that "it would change the MedKnowledge database and reclassify all medical foods . . . from 'F' to 'O'").

        In support of its argument, First Databank relies on a single case, *Air Courier Conference of America v. American Postal Workers Union, AFL-CIO*, 498 U.S. 517 (1991). *See* Dkt. No. 81 at 6. In *Air Courier*, the Supreme Court considered whether postal workers fell within the zone of interests of a group of statutes known as the "Private Express Statutes" or "PES," which codified the Postal Service's monopoly over letter carrying. A provision of the PES allows the Postal Service to "suspend [the PES monopoly] upon any mail route where the public interest requires the suspension." 498 U.S. at 519. The Postal Service suspended the PES monopoly for "extremely urgent letters," which "allow[ed] overnight delivery of letters by private courier services." *Id.* Private couriers used this exception to engage in a practice called "international

6

remailing," which allowed them to bypass the Postal Service for letters "destined for foreign addresses." *Id.* at 519–20. The Postal Service eventually issued a final rule explicitly allowing this practice. *Id.* at 520. The postal worker unions sought to challenge this rule, claiming that their employment interests were protected by the PES. *See id.* at 520–24. However, the Supreme Court found that the postal workers were not within the zone of interest because neither the language of PES nor the legislative history of the statutes supported the idea that Congress intended to protect postal workers' jobs. *See id.* at 524–31. Rather, the Court found that the PES and the postal monopoly were intended "to ensure that postal services will be provided to the citizenry at large, and not to secure employment for postal workers." *See id.* at 528. In a footnote, the Supreme Court also stated that the PES were "competition statutes that regulate the conduct of competitors," while the plaintiff postal workers "are not competitors" in the market governed by those statutes. *Id.* at 528, n.5. The Court further explained that "[e]mployees have generally been denied standing to enforce competition laws because they lack competitive and direct injury." *See id.*

The Supreme Court in *Air Courier*, however, did not consider the scope of the zone of interests—or the need for competitive injury—under the Lanham Act specifically. And even if *Air Courier* suggests that a competitive injury may be required, the case predates *Lexmark*. In *Lexmark* itself, the plaintiff and defendant were not direct competitors. In fact, the Court in *Lexmark* explicitly rejected the argument that a "direct-competitor test" should apply. *See* 572 U.S. at 136. The Court explained that "prohibiting all suits by noncompetitors would read too much into the [Lanham] Act's reference to 'unfair competition' in § 1127." *Id.* The Court therefore concluded that it would be "a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors." *Id.* (emphasis in original).

The facts of *Lexmark* provide important context for that holding. Lexmark manufactured, sold, and advertised laser printers and toner cartridges for those printers. *See id.* at 120–121. Lexmark's printers only worked with its own style of toner cartridges, although third parties called "remanufacturers" would acquire used Lexmark cartridges, refurbish them, and sell them. *See id.*

These remanufacturers therefore sold the cartridges "in competition with new and refurbished cartridges sold by Lexmark." *Id.* at 121. But these remanufacturers were not at issue in the case. Rather, the case involved Static Control, which manufactured microchips that the remanufacturers used to refurbish Lexmark toner cartridges. *Id.* at 121. Static Control counterclaimed that Lexmark (1) misled consumers into believing they had to return their Lexmark cartridges to Lexmark; and (2) misrepresented to remanufacturers that it was illegal to sell refurbished Lexmark cartridges. *Id.* at 122–23.

The Supreme Court noted that the Lanham Act was intended to protect against "unfair competition," but explained that this "was a plastic concept at common law," and "was understood to be concerned with injuries to business reputation and present and future sales." *Id.* at 131 (quotations omitted). The Court therefore held that Static Control had standing to bring a cause of action under the Lanham Act simply based on allegations of lost sales and damage to its business reputation. *See id.* at 137–38. Unlike deceived consumers, the Court reasoned that Static Control was "engaged in commerce within the control of Congress" and its "position in the marketplace ha[d] been damaged by Lexmark's false advertising." *Id.* at 137. The Court did not ask, however, whether Static Control was in competition with Lexmark, or whether Static Control was harmed more than or as compared to other microchip manufacturers. As noted above, the remanufacturers—not Static Control—were in direct competition with Lexmark. And Lexmark's alleged misrepresentations about its cartridges and the illegality of refurbishing them, would affect Static Control and other microchip manufacturers equally.

The Court therefore follows the Supreme Court's guidance that to fall within the zone of interests under the Lanham Act, a plaintiff must simply "allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32. Here, Plaintiff has alleged it ultimately lost sales due to First Databank's conduct because (1) payors treated the Alfasigma medical foods as over-the-counter drugs that were no longer reimbursable; and (2) some patients stopped purchasing Alfasigma's medical foods rather than pay the full cost of the products. *See* SAC at ¶¶ 8, 78, 80–82, 84, 86–87, 90. The Court finds these allegations sufficient to satisfy the zone of interests test.

//

### ii. Proximate Cause

Satisfying the zone of interests test, however, is necessary but not sufficient. Statutory standing also requires a plaintiff to establish proximate cause. *See Lexmark*, 572 U.S. at 133–34, & n.6. Proximate cause asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 133. "Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* "If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed." *Id.* at 134, n.6.

In *Lexmark* the Supreme Court considered when an injury may be "too remote" to establish proximate cause for Lanham Act claims. The Court recognized that in the context of false advertising, all commercial injuries are necessarily "derivative of those suffered by consumers who are deceived by the advertising." *Id.* In other words, the plaintiff is injured in false advertising cases because consumers—not the plaintiff—are misled by the defendant's false advertising into buying fewer (or none) of the plaintiff's product(s). But the Court reasoned that "the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute" because "a plaintiff can [still] be directly injured by a misrepresentation even where a third party, and not the plaintiff, . . . relied on it." *Id.* (quotations omitted) (alterations in original). Therefore, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 134.

The Court described "the classic Lanham Act false-advertising claim," "in which one competito[r] directly injur[es] another by making false statements about his own goods [or the competitor's goods] and thus inducing customers to switch." *Id.* at 137–38 (quotations omitted) (alterations in original). The Supreme Court recognized that generally courts should not "stretch proximate causation beyond th[is] first step" of the causal chain because the injury may result from "any number of [other] reasons" beyond the defendant's conduct. *See id.* at 139–40 (quotations omitted). The facts in *Lexmark*—like this case—did not fit this paradigmatic example.

9

The Supreme Court nevertheless made an exception based on the "relatively unique circumstances" in *Lexmark*. *Id.* at 140. The Court held that direct competition is not required to establish proximate cause provided the plaintiff can still allege a direct injury "without the need for any speculative . . . proceedings or intricate, uncertain inquiries." *See id.* at 138–40. Static Control's Lanham Act claims therefore satisfied the proximate cause requirement based on allegations that (1) Static Control had "suffered reputational injury" because Lexmark had called its business illegal; and (2) the close relationship between the remanufacturers' business and Static Control's business led to a near "1:1" loss of sales. *See id.* at 138–40.

Here, First Databank contends that the causal chain leading from its alleged false advertising to Plaintiff's claimed injury of lost sales is simply too attenuated. *See* Dkt. No. 81 at 6–9. To determine whether Plaintiff has alleged a direct injury sufficient to satisfy the proximate cause requirement, the Court must first pinpoint First Databank's alleged false advertising and Plaintiff's alleged injury.

During the hearing, Plaintiff emphasized that the key false advertising at issue in this case is the "Editorial Highlights" that First Databank sent to its subscribers specifically about the coding changes for medical foods. *See* Hrg. Tr. at 13:23–15:4, 17:9–18:5; *see also* SAC at ¶¶ 59–61. A sample of the 2015 Editorial Highlights is cited in Section I.A above. These notifications explained, for example, that "[m]edical foods are not prohibited by federal law from being dispensed without a prescription," and therefore "the use of the symbol 'Rx only' in the labeling of a medical food would misbrand a medical food." *See* SAC at ¶ 61. Plaintiff acknowledges that this is accurate as a matter of law. *See* Hrg. Tr. at 15:5–10. However, Plaintiff urges that it was misleading for First Databank to then state that "in view of the FDA's explicit direction, medical foods cannot be assigned the 'F' Class value intended to identify products for which a prescription is *required* by federal law." *See id.* (emphasis in original). Plaintiff argues that the *FDA* did not direct First Databank to change its coding. *See* Hrg. Tr. at  15:15:10–17:8; *see also* SAC at ¶¶ 65–74.

As an initial matter, the Court finds Plaintiff's reading of the Editorial Highlights strained. The notifications appear to identify the information from the FDA that First Databank

10

considered—namely, that medical foods do not *require* a prescription.  It appears equally clear from the face of the Highlights that First Databank is changing the coding of medical foods to be consistent with this limitation in light of how First Databank defines its class values "O," "F," and later "Q."  *See* SAC at ¶¶ 60–61.  Even as pled, therefore, First Databank does not appear to have misled its subscribers about the source of the information in its database or the reason for its coding changes.  In any event, the Court need not reach this question.  For purposes of proximate cause, the Court accepts Plaintiff's interpretation, but finds that there is still a disconnect between these "Editorial Highlights" and Plaintiff's alleged injury.

Plaintiff argues that there is a "clear, direct causal relationship" between First Databank's misrepresentations and its lost sales because "[i]nsurers stopped covering Alfasigma's products, consumers stopped purchasing them, and doctors stopped prescribing the products, which represents a direct loss of sales."  *See* Dkt. No. 84 at 8.  Plaintiff concludes that these third parties would not have done so—and Plaintiff would not have lost sales—"[b]ut for First Databank's false assurances that information in MedKnowledge comes from manufacturers and the FDA."  *See id.* at 9–10.  Plaintiff notes, for example, that historically "some private insurance companies traditionally provided coverage for medical foods under their pharmacy or medical plans."  *See* SAC at ¶¶ 23, 47.  And doing so "assisted patients to purchase the Alfasigma Products prescribed by their physicians," which "are often more expensive than traditional foods."  *Id.*

But Plaintiff does not allege that these decisions about prescription coverage or reimbursements were made based on the Editorial Highlights.  Nor could they.  The notifications did not contain any specific information about Plaintiff's products or any other medical foods.  They simply provided information about changes happening in the MedKnowledge database.  As Plaintiff alleges, these Editorial Highlights were intended "to assist [First Databank customers] in understanding the MedKnowledge product, and also to reassure customers that information in the MedKnowledge database remains reliable, current, and complete, thus influencing them to continue purchasing MedKnowledge."  *See id.* at ¶ 59; *see also id.* at ¶ 104.

Prescription coverage and reimbursement decisions were made based on the coding in the database itself.  The SAC makes this clear:

> First Databank falsely described Alfasigma's medical foods as class "O," that is, OTC drugs, *in its flagship product, the MedKnowledge™ ("MedKnowledge") database*, thus misleading and confusing First Databank's customers—including prescribing physicians, dispensing pharmacists, and insurers—into incorrectly believing that these medical foods are in fact OTC drugs.

*Id.* at ¶ 3 (emphasis added); *see also id.* at ¶¶ 27–28, 100.  Plaintiff contends that First Databank's customers accepted these coding changes in the database "as accurate and truthful" because the advertisements "falsely claimed that the source of the information in MedKnowledge, including the false information that the Alfasigma Products are OTC drugs, was the FDA and Alfasigma itself."  *Id.* at ¶ 4 (emphasis omitted); *see also id.* at ¶ 5 ("First Databank states and implies that its information comes from FDA and manufacturers like Alfasigma in order to convince customers that MedKnowledge is authoritative and reliable . . . ."); *id.* at ¶¶ 31–34, 58–59, 99.  Plaintiff's injury therefore appears to derive from the coding changes in the database itself, and not First Databank's advertising.  *See, e.g.*, *id.* at ¶¶ 62–74, 76–78, 90, 100, 112.  *See id.* at ¶¶ 80–82, 113.

The Court's prior order dismissing the FAC precluded Plaintiff from reasserting its database allegations.  *See* Dkt. No. 68; *cf. Genus Lifesciences Inc. v. Lannett Co., Inc.*, No. 18-CV-07603-WHO, 2019 WL 4168958, at *14–15 (N.D. Cal. Sept. 3, 2019) (rejecting challenge to alleged false or misleading product coding in First Databank's database based on representations that database was "reliable" and "accurate").  Plaintiff acknowledges this, but asserts that its claims "are NOT based on First Databank's false statements in MedKnowledge, but rather address First Databank's false commercial speech *about* that database."  *See* Dkt. No. 84 at 10 (emphasis in original).  During the hearing, Plaintiff explained that the coding in the database was simply "part of the causal chain."  *See* Hrg. Tr. at 5:18–6:16.  Plaintiff suggests that it nevertheless has still established "but for" causation that is directly related to the actionable false advertising."  *See id.* at 6:2–9.  In short, because Plaintiff could no longer allege that it lost sales due to the coding changes in the database itself, it has extended the causal chain back further to statements that First Databank has made about the database and its coding changes for medical foods.

Even if the Court accepts this arguable circumvention of its finding that the database is not

12

commercial speech—and therefore not actionable under the Lanham Act—Plaintiff's "source allegations" are based on an even longer chain of inferences:

- First Databank falsely implied that the information in its database generally, and about the class value specifically, is reliable and comes from the FDA and manufacturers, SAC ¶¶ 5, 31–33;
- These statements improperly influenced First Databank's customers to purchase or renew their database subscriptions, *id.* at ¶¶ 5–6, 34;
- Third parties in the "Healthcare Marketplace," including insurance companies, PBMs, doctors, pharmacies, and pharmaceutical wholesalers subscribe to and rely on the information in the database to decide which products to prescribe, dispense, cover, reimburse, and purchase, *id.* at ¶¶ 7, 28, 39;
- Payors often used the class field as a "default requirement . . . for reimbursement of a claim," *id.* at ¶ 89;
- Over time and through their use of the database, these third parties "universally understood" the class O "as meaning that a product is available over-the-counter," *id.* at ¶¶ 43–44;
- Some insurance companies and third-party payors mistakenly interpreted the recoding of Plaintiff's medical foods as "O" (and later as "Q") to mean that Plaintiff's products were no longer subject to prescription insurance coverage and were therefore not eligible for reimbursement, *id.* at ¶¶ 8, 39, 57, 77–78, 84, 90, 94;
- Physicians stopped prescribing Plaintiff's medical foods "under the mistaken belief that [] prescriptions are no longer required and/or because the E-prescribing systems they use no longer list the products," *id.* at ¶¶ 36–37, 86;
- Wholesalers and retail pharmacies reduced their inventories and did not restock Plaintiff's products "on the mistaken belief that that the FDA had determined that the products are not prescription products and need not be stocked by pharmacies for dispensing," *id.* at ¶¶ 38, 87; and
- This ultimately led to some patients not purchasing Plaintiff's products,

diminishing Plaintiff's profits, *id.* at ¶ 85.

Despite this circuitous causal chain, Plaintiff asserts that it has still established proximate cause. *See* Dkt. No. 84 at 7–10. But the Court agrees with First Databank that the "relatively unique circumstances" in *Lexmark* that permitted consideration of proximate cause beyond the first step in the causal chain do not apply here. *See* 572 U.S. at 140. Plaintiff has neither established reputational injury or loss of sales resulting directly from the purported false advertising.

In *Lexmark*, the Supreme Court provided the following hypothetical to illustrate reputational injury:

> Consider two rival carmakers who purchase airbags for their cars from different third-party manufacturers. If the first carmaker, hoping to divert sales from the second, falsely proclaims that the airbags used by the second carmaker are defective, both the second carmaker and its airbag supplier may suffer reputational injury, and their sales may decline as a result.

*Id.* The Supreme Court explained that in the hypothetical, the second carmaker and its airbag supplier are both "directly and independently harmed by the attack on its merchandise." *Id.* at 139. But on their face the Editorial Highlights do not disparage or otherwise "attack" Plaintiff's products. They do not mention Plaintiff's products at all. *See* SAC at ¶¶ 60–61. Plaintiff makes no effort to explain how these notifications nevertheless disparage Plaintiff's reputation. And to the extent the Editorial Highlights mention "medical foods" generally, the Editorial Highlights do not criticize these pharmaceutical products. The Editorial Highlights simply explain how they will be categorized moving forward in the MedKnowledge database. Although Plaintiff explains how it may ultimately lose sales downstream from this coding change, there is nothing inherently disparaging about labeling a product as "F" or "O," or even labeling a product as one that does not require a prescription.

Plaintiff also fails to allege any other injury resulting directly from these purportedly false advertisements. In *Lexmark*, the Supreme Court cautioned against finding a direct injury based on mere speculation connecting the false advertising to the injury. *See* 572 U.S. at 138–40. The

14

Court was nevertheless persuaded that Static Control had adequately alleged a direct relationship between Lexmark's statements about the illegality of refurbishing its toner cartridges and the loss of business to Static Control. *See id.* Static Control had alleged that its microchips "(1) were necessary for, and (2) had no other use than, refurbishing Lexmark toner cartridges." *Id.* at 139, & n.7. Consequently, if the remanufacturers sold fewer refurbished cartridges due to the alleged misstatements, "then it would follow more or less automatically" that Static Control would sell that many fewer microchips. *Id.* at 140. The Court reasoned that Lexmark may have intended to curtail the remanufacturers' toner cartridge business, but reducing that business "necessarily injured Static Control as well." *Id.* The Court found that this "very close to a 1:1 relationship" between the remanufacturers' sales and the number of Static Control's microchip sales meant that the Court could identify Static Control's injury "without the need for any speculative . . . proceedings or intricate, uncertain inquiries." *Id.* (quotations omitted) (alterations in original). The critical question for proximate cause is thus whether the plaintiff's injury is "surely attributable" to the defendant's conduct or if it "might instead have resulted from any number of [other] reasons." *Id.* (quotations omitted).

Plaintiff has not alleged the kind of direct relationship between the MedKnowledge database—or advertising about the database—and Plaintiff's sales that could rule out "any number of reasons" why Plaintiff may have lost sales. *Id.* at 139–40 (quotations omitted). As the causal chain above indicates, there are several intervening steps—and third-party decisions—that may have caused Plaintiff's alleged injury.

First Databank does not make decisions about what products to prescribe, which products are reimbursable, or how much consumers will have to pay for pharmaceutical products. Rather, doctors, insurance companies, and PBMs make those decisions. *See* SAC at ¶¶ 23, 26, 39, 47. Plaintiff also acknowledges that insurance companies and PBMs have their own financial incentives to reduce the number of products that are covered by insurance and eligible for reimbursement. *See id.* at ¶ 50. Plaintiff states that "[r]educing the number of covered products reduces the costs for PBMs, insurance companies, and others, thus magnifying profits and providing them an economic benefit." *Id.* Insurance companies and PBMs therefore may have

15

decided to stop covering Plaintiff's medical foods without regard to the purported source representations about the database. In fact, Plaintiff contends that First Databank ultimately changed the coding in its database *because of* certain customers' preferences. *See id.* at ¶¶ 51–52, 56 (noting that "the largest PBM in the nation . . . wished to avoid reimbursing prescriptions for medical foods").

Moreover, the SAC recognizes that the MedKnowledge database is not the only means through which actors in the "Healthcare Marketplace" learn about Plaintiff's products. For example, "Alfasigma markets its medical foods directly to physicians, educating them on the benefits and appropriate uses of its products." *See id.* at ¶ 24. And "[o]ver the years, Alfasigma has spent millions of dollars calling on tens of thousands of physicians through its sales force, providing millions of product samples, publishing articles and advertisements in medical journals, and funding clinical studies to assist in educating physicians likely to prescribe medical foods for their patients." *Id.* Plaintiff's allegations require the Court to speculate about how much of its alleged injury flows from First Databank's advertising and how much flows from these third parties' own independent decisions. This is "a far cry from the situation in *Lexmark*, where the Court held that the harm flowed so 'automatically' that there were no concerns about attributing damages" to Lexmark's statements. *See City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1040 (9th Cir. 2021) (quoting *Lexmark*, 572 U.S. at 140). Determining the actual relationship between First Databank's statements about its database and Plaintiff's loss of sales would require precisely the "speculative . . . proceedings or intricate, uncertain inquiries" that the Supreme Court cautioned against in *Lexmark*. 572 U.S. at 140 (quotations omitted).

In its opposition, Plaintiff emphasizes that the Supreme Court in *Lexmark* explained that economic injury sufficient to establish proximate cause "***occurs when deception of consumers causes them to withhold trade from the plaintiff***." Dkt. No. 84 at 8 (citing *Lexmark*, 572 U.S. at 134) (emphasis in original). But even as alleged, the patients who purchase (or do not purchase) Plaintiff's medical foods are not the ones who are deceived or misled by First Databank's advertising. Patients do not subscribe to MedKnowledge, and as such, they would never even see the Editorial Highlights at issue in this case. *See* SAC at ¶ 59 (noting that Editorial Highlights

16

were "disseminate[d] each week to First Databank's customers to support its sale of the MedKnowledge database"). Rather, Plaintiff alleges that insurance companies and PBMs were misled, and but for these Editorial Highlights they "would not have begun treating Alfasigma's products as non-covered 'over-the-counter/non-prescription medicines.'" *See* Dkt. No. 84 at 9–10. But PBMs and insurers do not purchase Plaintiff's products. And Plaintiff's alleged injury is from its loss of sales, not simply that its products were treated as non-covered and non-reimbursable pharmaceutical products. Plaintiff's argument ignores key steps in the causal chain, and as a result, fails to explain how the allegations in the SAC are sufficient to establish proximate cause.

Both in its opposition brief and during the hearing, Plaintiff also cited an out-of-district case, *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1185 (D. Kan. 2015), in support of its argument that the causal chain is not too attenuated. There, Syngenta developed genetically modified corn seeds that were supposed to be more resistant to certain pests. *See id.* at 1186. Over time, however, even farmers in the United States who did not purchase Syngenta's seeds saw their corn crops gradually become contaminated with the genetically modified traits. *See id.* These non-Syngenta farmers alleged that they were harmed as a result of Syngenta's misrepresentations about steps the company would take to avoid contamination of the entire corn supply. *Id.* at 1187, 1222. The farmers alleged that Syngenta knew of the contamination risks and nevertheless advertised and commercialized its products "without taking sufficient steps to avoid the foreseen consequences . . . ." *Id.* at 1189. These genetic traits therefore proliferated in all domestic corn. Although this genetically modified corn was approved for sale in the United States, China had not approved such corn. *Id.* at 1122. For approximately a year, China rejected all corn with Syngenta's genetically modified traits, including from non-Syngenta farmers. *Id.*

Beyond the fact that *Syngenta* is not binding authority, that decision's analysis of proximate cause was cursory. *See id.* at 1192–93, 1221–22. Although the district court cited *Lexmark*, it did not discuss the Supreme Court's concerns about extending proximate cause beyond the first step of the causal chain, or even describe what the causal chain actually was. It simply concluded that the plaintiffs had alleged "a plausible claim that Syngenta's false and misleading statements caused sales of [its genetically modified corn], which in turn caused

17

contamination." *Id.* at 11222. The court in in *Syngenta* thus does not appear to have considered the entire causal chain. The contamination itself did not lead to the non-Syngenta farmers' injuries. Rather, the farmers suffered financially due to China's import ban on the contaminated corn, but the court did not discuss that intervening conduct directly. However, the court emphasized that "the foreseeability of harm is especially pertinent to the proximate cause analysis," and that the harm in that case was foreseeable and in fact "actually foreseen by Syngenta." *Id.* at 1193. At the time Syngenta was commercializing its seeds in the United States, China had not approved them for import, and "Syngenta's actions actually increased the risk of contamination and commingling of the corn." *See id.* at 1186, 1190–91, 1208–09. To the extent the Court can discern what allegations the court in *Syngenta* considered as part of its proximate cause analysis, the Court does not find that analysis persuasive under *Lexmark* given the facts here.

Having considered Plaintiff's allegations, the Court finds that there is a "discontinuity" between the alleged false advertising and Plaintiff's asserted injury, and bridging this gap to determine the true cause of Plaintiff's injury would require "speculative . . . proceedings or intricate, uncertain inquiries." *Lexmark*, 572 U.S. at 140 (quotations omitted). The Court finds that Plaintiff has not plausibly pled proximate cause, and therefore lacks statutory standing to bring its Lanham Act claims.

**IV. CONCLUSION**

Accordingly, the Court **GRANTS** the motion to dismiss. Given the nature of the deficiencies and the number of opportunities Plaintiff has had to amend its complaint, the Court finds that amendment would be futile, and therefore grants the motion without leave to amend. Leave to amend is only warranted "if the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint." *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (quotation omitted); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege

18

those facts." (quotations omitted)).  Plaintiff does not suggest that it could assert new or additional allegations to fix its source allegations.  And given its prior allegations about the nature of the "Healthcare Marketplace," how entities use the MedKnowledge database, and the basis for Plaintiff's lost sales, the Court finds that Plaintiff would have to contradict its prior allegations to plausibly plead proximate cause for its source allegations.  From the outset, Plaintiff has challenged First Databank's decision to change the coding in its database for medical foods.  But Plaintiff's attempt to recast its theory by shifting the focus to the supposed source allegations has fared no better.

The clerk is directed to enter judgment in favor of Defendant and close the case.

**IT IS SO ORDERED.**

Dated:  3/28/2022

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge